1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name __Dang_____ __Tai_____ __Q._____
       (Last)       (First)      (Initial)

3  Prisoner Number __P-83131__

4  Institutional Address __California State Prison- Solano__

5  __P.O. Box, 4000, Vacaville, Ca. 95696__

FILED

JUN 2 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6  **UNITED STATES DISTRICT COURT**
7  **NORTHERN DISTRICT OF CALIFORNIA**

8  __Tai Q. Dang_____
   (Enter the full name of plaintiff in this action.) Petitioner

9  vs.

10  __D.K. Sisto, Warden,_____

11             Respondent.

12

13

14  (Enter the full name of respondent(s) or jailor in this action)

15

**C 07 3268**

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT SI
OF HABEAS CORPUS**

**ORIGINAL(PR)**

16  Read Comments Carefully Before Filling In

17  When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

1 | Who to Name as Respondent

2      You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11     1. What sentence are you challenging in this petition?

12         (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14           <u>Santa Clara Superior Court</u>     <u>County of Santa Clara</u>

15              Court                 Location

16         (b)    Case number, if known <u>C9927769</u>

17         (c)    Date and terms of sentence <u>6/9/00- 52 Yrs. to Life</u>

18         (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)      Yes <u>X</u>   No _____

20              Where?

21              Name of Institution: <u>California State Prison- Solano</u>

22              Address: <u>2100 Peabody Rd. (P.O. Box,4000) Vacaville, Ca.</u>
                                                                95696

23     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | <u>Murder, Cal. Penal Section 187 and possession of a firearm by a</u>

27 | <u>Convicted felon, Cal. Penal Code Section 12021 subd. (a)(1)</u>

28

1     3. Did you have any of the following?

2          Arraignment:                                      Yes __X__      No _____

3          Preliminary Hearing:                              Yes __X__      No _____

4          Motion to Suppress:                               Yes _____      No __X__

5     4. How did you plead?

6          Guilty _____    Not Guilty __X__    Nolo Contendere _____

7          Any other plea (specify) __No__   _____ _____ _____ _____ _____

8     5. If you went to trial, what kind of trial did you have?

9          Jury __X__     Judge alone _____    Judge alone on a transcript _____

10    6. Did you testify at your trial?                      Yes _____      No __X__

11    7. Did you have an attorney at the following proceedings:

12         (a)   Arraignment                                 Yes __X__      No _____

13         (b)   Preliminary hearing                         Yes __X__      No _____

14         (c)   Time of plea                                Yes __X__      No _____

15         (d)   Trial                                       Yes __X__      No _____

16         (e)   Sentencing                                  Yes __X__      No _____

17         (f)   Appeal                                      Yes __X__      No _____

18         (g)   Other post-conviction proceeding            Yes _____      No __X__

19    8. Did you appeal your conviction?                     Yes __X__      No _____

20         (a)   If you did, to what court(s) did you appeal?

21               Court of Appeal                             Yes __X__      No _____

22               Year: _2000-2002_    Result:_Affirmed (See Exhibit J)_ _____

23               Supreme Court of California          Yes __X__    No _____

24               Year: _2002-2003 *_   Result:_Review denied (See Exhibit K.)_

25               Any other court                             Yes _____      No __X__

26               Year: _____      Result:_____ _____ _____ _____ _____

27

28    * See Declaration of Petitioner and the Declaration of Attorney Arther Dudley, attached hereto as Exhibit L.

(b)   If you appealed, were the grounds the same as those that you are raising in this

      PET. FOR WRIT OF HAB. CORPUS        - 3 -

1   petition?                                                    Yes $\underline{X}$   No____

2        (c)   Was there an opinion?                             Yes $\underline{X}$   No____

3        (d)   Did you seek permission to file a late appeal under Rule 31(a)?

4                                                                Yes ____   No $\underline{X}$

5              If you did, give the name of the court and the result:

6              _____Not applicable_____

7              _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?              Yes ____   No $\underline{X}$

10  [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11  challenged the same conviction you are challenging now and if that petition was denied or dismissed

12  with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13  for an order authorizing the district court to consider this petition. You may not file a second or

14  subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15  U.S.C. §§ 2244(b).]

16       (a)   If you sought relief in any proceeding other than an appeal, answer the following

17             questions for each proceeding. Attach extra paper if you need more space.

18             I.    Name of Court: _____

19                   Type of Proceeding: _____

20                   Grounds raised (Be brief but specific):

21                   a._____

22                   b._____

23                   c._____

24                   d._____

25                   Result: _____ Date of Result:_____

26             II.   Name of Court: _____

27                   Type of Proceeding: _____

28                   Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1                a._____

2                b._____

3                c._____

4                d._____

5                Result: _____ _____ _____Date of Result:_____

6       III.   Name of Court: _____ _____ _____ _____

7               Type of Proceeding: _____ _____

8               Grounds raised (Be brief but specific):

9               a._____

10              b._____

11              c._____

12              d._____

13              Result: _____ _____ _____Date of Result:_____

14      IV.   Name of Court: _____ _____

15              Type of Proceeding: _____

16              Grounds raised (Be brief but specific):

17              a._____

18              b._____

19              c._____

20              d._____

21              Result: _____ _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                  Yes _____   No_X_

24             Name and location of court: _____ ____ _____

25   **B. GROUNDS FOR RELIEF**

26      State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1    need more space. Answer the same questions for each claim.

2    [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5    Claim One: Improper use of bad character evidence to impeach portions
             of petitioner's out-of-court statements to the police
6    violated due process of law under the 14th amendment of the U.S.
     Constitution
7    Supporting Facts: Please refer to the following Pages-Pages 6(1)-6(14)

8

9

10

11    Claim Two: Improper attacks and attempted attacks on the credibility
      of a witness violated due process of law under the 14th amendment of the
12    U.S. Constitution

13    Supporting Facts: Please refer to the following pages-Pages6(15)-6(28)

14

15

16

17    Claim Three: Improper instructions to the jury that uncharged crimes only needed to
      be proved by a preponderance of the evidence violated the right to a jury trial under the
18    6th amendment of the U.S. Constitution and violated due process of law under the 14th
      amendment of the U.S. Constitution
19    Supporting Facts:            Please refer to the following pages-Pages 6(28)-6(34)

20

21

22

23    If any of these grounds was not previously presented to any other court, state briefly which

24    grounds were not presented and why:

25                              Not applicable

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

## STATEMENT OF THE FACTS

Defendant was convicted by a jury of first degree murder (Pen. Code, §§ 187, 189) and possession of a firearm by a convicted felon (Pen. Code, § 12021, subd. (a)(1)). As to the murder conviction, the jury also found to be true a special sentencing enhancement under subdivision (d) of section 12022.53 of the Penal Code for intentionally and personally discharging a firearm causing great bodily injury or death. As a result of these convictions, defendant ultimately was sentenced to state prison for a total term of 52 years to life.

The underlying facts pertinent to this case are as follows:

Some time around 7:00 P.M., on November 21, 1998, Khanh Nguyen, Ky Nguyen (no family relationship to Khanh Nguyen), Phap Le and two or three other individuals came together in two separate cars to the Hoan My Restaurant owned in part by Loc Vo which was located near the corner of Senter and Monterey in the City of San Jose. They went there to celebrate the birthday of Khanh Nguyen who was turning 29 years old that day. They all sat at the same table (table 11) at the restaurant. (RT 148-153, 181, 284-285, 293-294, 325, 417; Exhibit 59.)

About an hour later, defendant and a young lady by the name of Tina Ha came to the Hoan My Restaurant together and sat at table 14 near the cash register. This was Tina's first date with defendant. (RT 153, 157-158, 286, 293, 295-297, 610-612, 614-616.) Defendant ordered beer and started to consume a beer at his table. Tina Ha only ordered orange juice. (RT 619-620.)

At one point defendant got up from table 14, left Tina Ha behind and started walking around the restaurant and talking to various people at other tables in the restaurant. When defendant got to table 11 where Khanh Nguyen and the other individuals were seated, defendant initially sat down and got into an argument with Khanh Nguyen. Defendant and Khanh Nguyen both stood

6(1)

up and continued their argument in front table 11. There was name calling and cursing going on between defendant and Khanh Nguyen. The words "mother fucker" could be heard, and defendant and Khanh Nguyen both were pointing at each other. Defendant appeared angry, while Khanh Nguyen appeared to be calm. The total argument lasted for five to ten minutes. This argument concluded when defendant left the restaurant by himself leaving Tina seated alone at table 14. (RT 162-166, 216, 296-297, 620-621.)    After defendant left the restaurant, Tina Ha, who felt as though she was not being treated on her date the way she wanted to be treated, called a friend who agreed to come and pick her up at the restaurant. (RT 621-622.) Also, after defendant left the restaurant Phap Le, who was seated at table 11, along with the other individuals, including Khanh Nguyen and Ky Nguyen paid the complete bill for the party at table 11 in the sum of about $300.00, after which he left the restaurant. When Phap Le left the restaurant, Ky Nguyen walked out of the restaurant with Phap Le, walked Phap Le to his car and then returned back inside the restaurant. (RT 166-168, 324-325.)

After Ky Nguyen returned to the restaurant, he went to the bathroom in the restaurant for about one or two minutes. (RT 167-168, 186-187.) By then defendant had come back to the restaurant. Defendant now was wearing a jacket which he had not been wearing earlier. Tina Ha was still seated alone at table 14. Defendant walked over to table 11 where Khanh Nguyen was seated. Defendant, while standing up, pointed a pistol at the front of Khanh Nguyen's face and fired the pistol at Khanh Nguyen when the muzzle of the pistol was only one to two feet away from the front of Khanh Nguyen's face. The bullet entered to the left of Khanh Nguyen's nose. Khanh Nguyen, who was still seated at the table, fell forward and then onto the floor and died. (RT 158-159, 167-173, 185-186, 325, 623-628, 1121-1130.)

At the time of the shooting there were about 10 to 20 people in the restaurant, including customers and employees. When Ky Nguyen saw the

shooting he froze momentarily in a place that was about seven to eight feet away from the location of the shooting. After the shooting defendant walked out of the restaurant and got away. Also, all of the customers in the restaurant, including Tina Ha and Ky Nguyen, left the restaurant and took off. (RT 171, 173-174, 183, 218-221, 328-329, 332-333, 625.) The first police officer arrived at the restaurant at 9:26 P.M., in response to a 911 call placed by Loc Vo. (RT 182-183, 341-342, 426.)

After Tina Ha left the restaurant, she was picked up in the parking lot of the restaurant by the friend or friends she earlier had called. This occurred before the police arrived at the restaurant. They then went to San Francisco to dance. They had a good time at San Francisco, after which Tina Ha came back to San Jose. (RT 634, 714, 744-745.)

On the next day, November 22, 1998, defendant placed a telephone call to Tina Ha. Defendant said he wanted to talk to her. Tina Ha agreed. When defendant came and picked up Tina Ha, they drove to Sacramento to the apartment of Linda Tran on Skypark Way in Sacramento. (RT 635-636, 863, 867.) On the way to Sacramento, Tina Ha asked defendant about the shooting. Defendant related that the victim had said a lot of bad things about defendant's mother and that he (defendant) had gotten angry. When Tina Ha tried to ask more about the shooting, defendant would avoid the subject and just change the subject of the conversation. (RT 636.)

Defendant stayed in Sacramento at the apartment of Linda Tran. Linda Tran's boyfriend, Tuan Ngo, was a good friend of defendant. Linda Tran knew defendant lived in San Jose and had met defendant in San Jose in 1993. Linda Tran had three children by Tuan Ngo all of whom lived with Linda Tran. At that time Tuan Ngo was still Linda Tran's boyfriend, and he would spend the weekends at Linda Tran's apartment in Sacramento. During the week, Tuan Ngo worked in San Francisco. (RT 637-638, 863-872.)

In the months that followed, defendant continued to stay at Linda

Tran's apartment in Sacramento. During that time, Tina Ha still lived and worked in San Jose, but would regularly go to Sacramento to be with defendant with whom she was strongly in love. Tina Ha, while in San Jose, also would frequently talk with defendant on the telephone. (RT 638-641, 870-837.) During this time, when Tina Ha would bring up the subject of the San Jose shooting, defendant would say nothing more than the fact that he got angry over what the victim had said about defendant's mother, after which defendant would change the subject. (RT 636-637.)

Linda Tran started to become uncomfortable about the fact that defendant was regularly staying at her apartment in Sacramento. Once when Linda Tran asked her boyfriend about what was going on, her boyfriend indicated that defendant had no place to stay. Defendant also explained that he had shot someone in the head in San Jose and that he had had a dispute with that person over "control" of the cafes. (RT 871-872, 874-876.)

Eventually, on April 22, 1999, defendant was arrested in Sacramento at a location away from Linda Tran's apartment. This occurred after defendant indicated that he was going out to visit friends. (RT 639, 641, 882-883.)

Detectives from the San Jose City Police Department then quickly went to Sacramento County where defendant was in custody. They commenced a three and one-half hour interrogation of defendant at the Sacramento Police Department starting at approximately 12:40 A.M., on April 23, 1999. (RT 985-989, 1036; Augmented CT 11.) Throughout this interrogation defendant not only denied any involvement in the shooting at the Hoan My Restaurant, defendant repeatedly stated that he was not Tai Quoc Dang, that he had never been to the Hoan My Restaurant, that he had never been to San Jose, that he had never been to Santa Clara County and that he continuously had lived in Sacramento for the preceding two and one-half years. Defendant said that he his name was Viet Le with a date of birth of November 2, 1971, and with an address of 2321 Connie Drive in Sacramento. (RT 995-1000, 1007-1009,

1011-1013, 1016-1017, 1021, 1029-1030, 1046-1048.) The detectives even showed defendant a picture of himself under the name of Tai Quoc Dang, and defendant denied that was a photograph of himself. (RT 1000-1002, 1030; Exhibit 22.) During the early stages of the interrogation, defendant indicated that his girlfriend was a Cindy Pham from Los Angeles and that he barely knew her; however, near the end of the interrogation, defendant said his girlfriend's name was Cindy Nguyen. (RT 1017, 1024.)

At one point in the interrogation when the detectives were discussing with defendant the tatoos defendant had on his body, defendant initially indicated that he had gotten the tatoos at a store on Boulevard Street in Sacramento. Then, defendant at one point changed that story and said that his tatoos were homemade. Later, during the interrogation, defendant began to say that he had gotten the tatoos in downtown San Jose, but he caught himself when he began to say the words San Jose. At that point one of the detectives began to laugh at defendant and repeatedly told defendant that he had said San Jose. (RT 1022-1023.)

Later, on April 23, 1998, after the detectives completed their interrogation of defendant, a series of telephone calls were made by defendant from the Sacramento County Jail to Tina Ha who was at that time at Linda Tran's apartment in Sacramento. These telephone conversations were tape recorded. (RT 641-643; Exhibit 61.) During the course of these telephone conversations, defendant indicated "I lost" and told Tina Ha that she was Cindy Nguyen, that she barely met him and that she lived in L.A. (RT 646-647, 651.) Defendant also indicated not to mention his name or use the words San Jose. (RT 662-664.) Defendant also said that the police had a picture that they claimed was a photograph of himself. (RT 670.) At one point, Tina Ha said in one of the telephone calls "the thing about the murd –." Defendant said, "Ah." (RT 672.)

At another point in one of the telephone conversations, defendant

indicated to Tina Ha that the police had told him that people had pointed him out. Tina Ha replied that they were all drunk. Defendant said, "Don't say anything, we'll work it out later." (RT 677.) Defendant said that he had told police that he was not there. (RT 678.) Later, in one of the telephone calls, Tina Ha brought up the word "restaurant" when she indicated that the people in the restaurant were drunk; defendant responded by saying, "Don't say anything." (RT 679.)

## DISCUSSION

CLAIM: 1.    Improper Use of Bad Character Evidence to Impeach Portions
of Defendant's Out-of-Court Statement to the Police:

In this case the prosecution in its case in chief presented to the jury almost the entire statement defendant gave to the detectives from the San Jose City Police Department shortly after defendant's arrest in Sacramento. In that statement, defendant, among other things, denied that he was Tai Quoc Dang, denied that he had ever been in the Hoan My Restaurant at any time, denied that he ever had been to San Jose and denied that he had ever been to Santa Clara County.

In attempting to show a consciousness of guilt on the part of defendant, the prosecution proceeded to impeach the credibility of the denials in question in a number of ways. For example, this impeachment consisted of the following: (1) a document reflecting a police contact with defendant dated July 12, 1991, in which defendant's address was designated as 1350 Foxdale Loop, San Jose, California (Exhibit 28, RT 525); (2) a document reflecting a police contact with defendant dated October 28, 1994, in which defendant's address was designated as 1302 Sippola Way, San Jose, California (Exhibit 29; RT 526); (3) a document reflecting a police contact with defendant dated October 6, 1997, in which defendant's address was designated as 3675 Waterbury Court, No. 3, San Jose, California (Exhibit 30; RT 526); (4) a document reflecting a police contact with defendant dated January 21, 1998, in which defendant's address was designated as 3675 Waterbury Court, No.

3, San Jose, California (Exhibit 31; RT 526); (5) a document reflecting a police contact with defendant dated July 26, 1998, in which defendant's address was designated as 3154 Heritage Spring Court, San Jose, California (Exhibit 32; RT 527); (6) a document reflecting a police contact with defendant dated October 12, 1998, in which defendant's address was designated as 3154 Heritage Spring Court, San Jose, California (Exhibit 33; RT 527); (7) testimony from an individual who was a probation officer who interviewed defendant for a presentence report in December 1994, during which defendant indicated that his address was 1302 Sippola Way, San Jose, California, and further stated that he had lived full time in Santa Clara County for the previous six years (RT 1037-1043); (8) evidence that on October 21, 1998, just a month before the shooting incident in this case, the police were called to the Hoan My Restaurant to investigate an attack defendant and others committed on a customer (RT 303-304); and (9) testimony from one of the detectives, who interrogated defendant in Sacramento right after defendant's arrest, who explained that during that interrogation defendant was confronted with the fact of the prior police contacts in San Jose, and also was confronted with the fact of the police investigation at the Hoan My Restaurant on October 21, 1998, during which defendant was detained at the restaurant, and defendant still continued to deny that he ever had been in San Jose (RT 998-999, 1019-1020).

It is defendant's position, contrary to the trial court's rulings (RT 75-80, 560-564), and contrary to the opinion of the Court of Appeal, that the impeachment evidence just summarized hereinabove was in fact inadmissible

Any superficial reading of what was euphemistically referred to as "police contact" documents (Exhibits 28, 29, 30, 31, 32 and 33; RT 525-527), even though they were redacted in some form, clearly indicated that they were police arrest records. Each of the forms contained defendant's inked fingerprints and contained a certification that they were correct copies of

documents on file with the Sheriff of Santa Clara County. It would not take a rocket scientist to conclude that these records were arrest records pertaining to defendant on six different occasions beginning as early as July 21, 1991 (Exhibit 28), up to and including October 12, 1998 (Exhibit 33). In fact, in the tape recording of defendant's interrogation, which tapes were admitted into evidence at defendant's trial (Exhibits 54A, 54B, 54C and 54D; RT 991-992), the documents in question were unabashedly referred to as "booking sheet[s]," which is what they really were. (Ex. 53; Augmented CT 84.)

Next, the testimony of the probation officer that he had done a presentence report where he interviewed defendant reeked of evidence of prior criminal conduct. Moreover, the testimony of the investigation of the incident at the Hoan My Restaurant on October 21, 1998, involving an attack committed by defendant and others on a customer, is obviously evidence of other significant criminal conduct on the part of defendant.[1]

---

1. In footnote 1, on page 3 of the opinion of the Court of Appeal, it is stated that defendant had refused to stipulate that he was the person in the arrest records and also had agreed to the redaction of those records and the use of the euphemism "police contacts." This is an over-simplification of what actually appears in the record on appeal, and this over-simplification was pointed out to the Court of Appeal in defendant's petition for rehearing. As the pertinent portion of the record reflects, the refusal to stipulate merely dealt with the issue of whether defendant was the person that "deposited" the fingerprints on some, but not all, of the booking records. (RT 561.) In fact, based upon what was said on the record, it appears that defendant was willing to acknowledge that he was the person who had been arrested on these prior occasions, but the underlying problem dealt with whether some of the actual fingerprint cards were those that were generated at the time of some of his previous arrests. (RT 561.) Additionally, it is important to note that the prosecutor also was a part of the stipulation refusal process. Early on in the case, defendant was willing to stipulate that he had been in the Hohn My Restaurant a month earlier on October 21, 1998, when the alleged, earlier assault had taken place. However, the prosecutor was unwilling to accept that stipulation. (RT 77-79.)

Furthermore, as defendant pointed out in his petition for rehearing filed in the Court of Appeal, it also was an incorrect reading of the record to suggest that defense counsel had openly agreed to the redactions of the arrest records

Clearly, the above evidence of prior arrests and prior criminal conduct on the part of defendant painted defendant in a bad light to the jury. Also, the only reason really advanced by the prosecution for the admissibility of this evidence was to show that defendant was not being truthful to the detectives who interrogated him in Sacramento County when defendant said that he had never been to San Jose, and thus, it tended to indicate a consciousness of guilt on the part of defendant in connection with the charged murder in this case.

When evidence of prior bad conduct becomes involved in a current case, a number of critical policy considerations exist. As explained in People v. Sheets (1967) 251 Cal.App.2d 759, 764-765, "[i]f both justice and predictability of decision are to be served, rigidity of tests of admission and exclusion, in our opinion, is not the answer. We believe that whenever the quarrel is between relevancy and the policy of the law to protect the accused against bias and prejudice likely to be engendered from the admission of relevant evidence, a balancing process must take place - - a weighing of the probative value of evidence offered against the harm it is likely to cause." (Accord People v. Schader (1969) 71 Cal.2d 761, 774.)

Furthermore, as explained in People v. Schader, supra, 71 Cal.2d 761, 774-775, "[p]robative value and prejudice obviously are not commodities subject to quantitative measurement. Nonetheless, we may identify some of the guidelines which courts follow in performing the balancing process described generally above. The chief elements of probative value are

_____

and to the use of the euphemism "police contacts." At one point during the trial, defense counsel explained that he agreed to the redactions, not as a concession that the underlying documents were admissible, but as a basis to reduce the amount of prejudice to be caused by those records by what defense counsel believed was the trial court's erroneous ruling to admit all of the documents concerning the arrest records. (RT 562-563.) These type of defensive acts in order to take the "sting" out of otherwise prejudicial evidence, which defense counsel believes is otherwise inadmissible, is no basis whatsoever to detract from the ability to raise the underlying substantive issue on appeal. (See People v. Turner (1990) 50 Cal.3d 668, 704, fn. 18.)

relevancy, materiality and <u>necessity</u>. [¶] Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) 'tends logically, naturally and by reasonably inference' to prove the issue upon which it is offered; (b) is offered upon an issue which will ultimately prove to be material to the People's case; and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue." (Footnotes omitted.) (Emphasis added.)

Stated in another manner, regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice. Therefore, the law places other restrictions on its admissibility. If evidence is merely cumulative with respect to other evidence which the prosecution may use to prove the same issue, it is excluded under a rule of necessity. (<u>People v. Thompson</u> (1980) 27 Cal.3d 303, 318.)

What is particularly troublesome in this case is the prosecution was permitted to present all of the impeachment evidence in question without any showing that it was necessary to include anything about defendant's prior arrests and crimes. Additionally, the prosecution was permitted to present all of the impeachment evidence in question without any showing that the existence of defendant's earlier addresses could not have been proven by some other type of evidence that did not include the facts of defendant's prior arrests and crimes.

Common sense dictates that there are many ways to prove one's current and previous addresses without the necessity of demonstrating one's prior arrests and crimes. For example, a person's current and previous addresses can be proved by records from the Department of Motor Vehicles with regard to driver's licenses and vehicle registrations, records from a telephone company, rental agreements with landlords, observations of neighbors, tax forms such as employee withholding information, bank records with regard to checking and savings accounts, and post office records.

Under the rule of necessity discussed hereinabove, before admitting evidence encompassing past arrests and crimes, the prosecution in this matter should have been required to show that less prejudicial ways of proving defendant's current and past addresses did not really exist. That did not occur in this case. To allow the prosecution in this matter to present the address information in issue which encompassed evidence of defendant's prior arrests and crimes was clearly erroneous.

All of the arguments just discussed hereinabove are equally applicable to the evidence of defendant's involvement in the attack that occurred in the Hoan My Restaurant on October 21, 1998, where, for impeachment purposes, the only relevance of the evidence was to show that defendant really had been in San Jose contrary to the statements he gave to the detectives after his arrest in Sacramento.

Moreover, due to the fact that the inadmissible evidence in question involved evidence of so many incidents of other bad acts (i.e., six prior arrests, an interview with the probation officer and an uncharged attack at the restaurant a month before the charged murder), the admission of this evidence for whatever purpose violated principles of federal due process of law as articulated in the case of McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378, 1380-1385.

Parenthetically, on page 5 of the opinion filed by the Court of Appeal in this case, the Court of Appeal reaches the erroneous conclusion that the rule of necessity discussed hereinabove is simply a component of the balancing process that a trial court undertakes when ruling on an objection under section 352 of the Evidence Code. This conclusion is contrary to the established law in this state.

Pursuant to the express language of section 352 of the Evidence Code, the balancing process that actually takes place is between "probative value" and "undue prejudice." As section 352 of the Evidence Code states in

pertinent part, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Emphasis added.) Thus, before one ever gets to the required balancing process, the evidence in the first instance must have "probative value."

Next, "probative value" is not an issue of discretion. As explained in People v. Thompson, supra, 27 Cal.3d 303, 318, footnote 20, "[p]robative value goes to the weight of the evidence of other offenses. The evidence is probative if it is material, relevant, and necessary. '[H]ow much "probative value" proffered evidence has depends upon the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality), and the necessity of proving the issue by means of this particular piece of evidence (degree of necessity).'" (Emphasis in original.) (See also People v. Delgado (1973) 32 Cal.App.3d 242, 249.) Accordingly, contrary to the suggestions of the Court of Appeal, for evidence to be "probative" one of the components that needs to be shown, before the balancing process ever begins, is the necessity of proving the issue by means of this particular piece of evidence (degree of necessity).

Furthermore, pursuant to subdivision (a) of section 403 of the Evidence Code, the burden of proving any preliminary fact falls upon the proponent of the evidence, in this case the prosecution. Subdivision (a) of section 403 of the Evidence Code specifically states the proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact when ". . . the relevance of the proffered evidence depends on the existence of the preliminary fact." Since the prosecution in this case did not do this with regard to the requirement of necessity, as argued hereinabove, the impeachment evidence of defendant's prior arrests and crimes needed to be

excluded by the trial court.

The only remaining issue is whether the improper admission of the above-described evidence was prejudicial. In this regard, defendant will admit that at trial both Ky Nguyen and Tina Ha identified defendant as the individual who shot Khanh Nguyen. (RT 168-169, 175, 225, 624-625, 627.) Additionally, Linda Tran testified that on one occasion while defendant was staying at her apartment, defendant admitted to her that he had shot someone in the head in San Jose with whom he was having a dispute over control of the cafes. (RT 874-875.) Also, some of defendant's fingerprints were found on a glass on the table where defendant and Tina Ha had been seated in the Hoan My restaurant and on the inside of the front door of the Hoan My restaurant at a location that was above and to the left of the handle to that door. (RT 522-523, 527-528, 532, 537-538, 931, 935-936; Exhibits 23, 25, 34, 38 and 42.)

On the other hand, the prejudicial impact of the inadmissible evidence in issue was tremendous. It showed that defendant had six prior arrests from July 12, 1991, to October 12, 1998; that defendant was interviewed by a probation officer in connection with a presentence report after the conviction for a crime; and that defendant was investigated in connection with an attack on a customer at the Hoan My restaurant just a month prior to the murder charge in this case. It is clear that evidence of other crimes or acts of violence alleged to have been committed by a defendant, when such crimes are unrelated to the charged offense, can have a highly inflammatory and prejudicial effect on a jury. (See In re Jones (1996) 13 Cal.4th 552, 580-582.)

Additionally, in closing argument to the jury, the prosecutor was more than willing to emphasize the prejudicial nature of the inadmissible evidence in question. The prosecutor referred to the prior "police contacts" (RT 1191) and talked about the attack at the Hoan My restaurant the month before the murder charge in this case. (RT 1181, 1193.) In fact, the prosecutor gave a very descriptive explanation of the earlier attack at the Hoan My restaurant, for

which there was no foundational basis in the evidence presented to the jury, which went as follows: "We heard that a month earlier the defendant - - the defendant had been involved in a violent attack on another customer in the restaurant one month earlier. You heard that the defendant and his two buddies dragged or took some guy into the bathroom, and there in the bathroom they struck this man over the head with a beer bottle, and the man was bleeding and so forth. You heard police were called. You heard that Tai Dang was temporarily detained and identified as one of the suspects at the scene." (RT 1181.)

Defendant in this case was charged with murder. Instead of facing that charge, irrelevant and gratuitous evidence of defendant's prior record and police investigations were paraded before the jury without any relevant purpose other than to prejudice the minds of the jurors against defendant. Evidence showing that defendant had been, and lived, in San Jose, contrary to his statement to the detectives, could have been presented to the jury by nonprejudicial evidence that did not reflect a record of prior arrests and police contacts in Santa Clara County, including an attack in the Hoan My restaurant just a month before the murder charge in this case.

The net effect of the inadmissible evidence in question was to paint a picture for the jury that defendant was an unrepentant criminal. Under such circumstances, under any standard of harmless error, the admission of the inadmissible evidence in question was prejudicial. This is particularly true when the federal harmless error standard in Chapman v. California (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705] (i.e., is there a reasonable possibility that the evidence complained of might have contributed to the conviction; stated conversely, can it be shown beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained) is applied with regard to the federal due process violation in connection with the use of the inadmissible evidence in question.

6(14)

CLAIM: 2.    Improper Attacks and Attempted Attacks on the Credibility of Witness Loc Vo:

Loc Vo was one of the owners of the Hoan My restaurant, and he was present in the area of the cash register at the restaurant at the time of the shooting incident involved in this case. (RT 284, 286, 331-332.) Loc Vo knew defendant and the victim Khanh Nguyen to be regular customers at the restaurant. (RT 287-288, 290-291.)

At trial, Loc Vo testified that defendant was in the restaurant on the evening of the shooting, left the restaurant at around 8:00 p.m., and came back to the restaurant about 15 to 20 minutes before the shooting. (RT 286, 575-576.) Loc Vo also testified that although he heard the shot fired and saw the victim fall to the ground, he (Loc Vo) crouched down and did not see who did the shooting. (RT 334-335, 339, 341, 345.)

Also, evidence was produced at trial to show that when Loc Vo was interviewed by a detective just several hours after the shooting, Loc Vo said he did not look in the direction of the shot, hit the ground, hid upon hearing the shot, did not look at the shooter and did not know the shooter. (RT 447-448, 463-464, 466-467.) However, at one point in this interview, Loc Vo indicated that he had seen the shooter, but he did not then know the shooter's name; furthermore, Loc Vo explained that he once knew the shooter's name, but could not remember it. (RT 465-468.)

Over defense counsel's objections, the prosecution was permitted to attack, and attempt to attack, the credibility of Loc Vo by the following ways: (1) Loc Vo was aware of the police investigation that occurred on October 21, 1998, a month before the shooting in this case, where defendant and others attacked a customer of the Hoan My restaurant (RT 304-305); (2) Loc Vo was aware that members of gangs patronized his restaurant (RT 457, 584-590); (3) Loc Vo was asked by the prosecution, but denied, that he paid protection money, in particular to defendant, which purported fact was never otherwise proven by the prosecution (RT 299-300, 304-306, 312-315, 593); (4) Loc Vo

was asked by the prosecution, but denied, that anybody was trying to take control of his restaurant, which purported fact also was never otherwise proven by the prosecution (RT 316-317); and (5) the detective who interviewed Loc Vo shortly after the shooting was of the opinion that Loc Vo knew the name of the shooter and was not giving all of the information he knew (RT 451, 453-457; 466-467, 514-515).

First, the detective, who testified that he believed that Loc Vo knew the shooter's name and was not giving all of the information he (Loc Vo) knew, was expressing nothing more than an opinion that he believed that Loc Vo was not being completely truthful in the area of the shooter's identity. The obvious purpose of this testimony was to suggest to the jury that Loc Vo was not believable when he said that he did not know the identity of the shooter. In fact, in closing argument to the jury, that is type of inference the prosecutor wanted the jury to draw. (RT 1176-1183.) However, it is well settled that opinion testimony on the veracity, or lack of veracity, of a particular statement by another is inadmissible on that issue. (People v. Melton (1988) 44 Cal.3d 713, 744; People v. Smith (1989) 214 Cal.App.3d 904, 915; see also People v. Sergill (1982) 138 Cal.App.3d 34, 38-40.)

To the extent that the prosecutor at trial tried to justify the admissibility of the detective's belief that Loc Vo knew the shooter's name and was not giving all the information he (Loc Vo) knew, on the grounds that it showed and explained the detective's conduct in the investigation (RT 451), that too is an improper basis to support the admissibility of the evidence in question. In a trial on the issue of guilt or innocense, testimony pertaining to information learned by an officer, in order to explain that officer's conduct, is irrelevant. (See People v. Aguilar (1971) 16 Cal.App.3d 1001, 1006.)

Next, several times during the prosecutor's examination of Loc Vo, both in direct examination and redirect examination, the prosecutor asked Loc Vo whether he was paying protection money to anyone, whether he otherwise

was allowing individuals to eat and drink for free at the restaurant as a form of payment of protection money, whether in particular he specifically paid protection money to defendant, and whether he had told anyone he was paying protection money in one form or another. On each occasion Loc Vo's answers were in the negative. (RT 299-300, 305, 593.) Defense counsel vehemently objected to the line of questioning in issue on the basis that the prosecutor could not prove any of the facts intimidated by the questions; in fact, defense counsel even moved for a mistrial on these grounds. (RT 299, 305-307, 312, 315-317, 593-594.)

The prosecutor represented to the court that the prosecution would be able to prove all of the suggested facts by competent witnesses including a witness by the name of Hong Troung. (RT 308-311.) Defense counsel's objections to the line of questioning in issue, and the motion for mistrial, were denied primarily upon the grounds that the prosecutor had represented that the suggested facts could be proved by competent evidence. (RT 299, 314-315, 594.) However, the prosecutor never called any witnesses, or presented any competent evidence, to prove the damaging facts suggested by the questions to Loc Vo which were denied by that witness.

Similarly, defense counsel's objections to the prosecutor's line of questioning concerning whether anybody was trying to take control of Loc Vo's restaurant, which was met with denials by the witness Loc Vo, were overruled by the trial court. (RT 316-317.) Again, the prosecutor never called any witnesses, or presented any competent evidence, to prove the damaging facts suggested by this line of questioning to Loc Vo which were denied by that witness.

Clearly, the lines of questioning in issue were improper since they suggested facts harmful to defendant which the prosecution made no effort to prove once there were denials by Loc Vo. (People v. Perez (1962) 58 Cal.2d 229, 240-241; People v. Blackington (1985) 167 Cal.App.3d 1216, 1220-1223;

People v. Lo Cigno (1961) 193 Cal.App.2d 360, 387-388.)

With regard to the gang evidence concerning the fact that Loc Vo was aware that members of gangs patronized his restaurant, that evidence got before the jury in a very convoluted and circular route that was procedurally improper.

Preliminarily, during in limine motions prior to the commencement of trial, there was a ruling by the trial court that there was to be no mention of gangs and no mention of defendant's affiliation with any gang. (RT 74-75.) Thereafter, when Loc Vo was questioned on direct examination by the prosecutor, in accordance with the trial court's in limine rulings, there was no mention of gangs at all (RT 283-355), except at one innocuous spot when Loc Vo was explaining that on the night of the shooting, about an hour before the shooting occurred, the police were called in connection with a situation at the restaurant that Loc Vo described as follows: "I wouldn't call it loud – loud disturbance. All I would say – because I knew there were two group of people, two gang, two group of people, so that's the reason why the police was called." (RT 320.) Parenthetically, on cross-examination of Loc Vo, it was clarified that defendant was not in the restaurant at the time of this earlier situation. (RT 419.)

Then, after the direct examination of Loc Vo was completed, defense counsel's cross-examination of Loc Vo was interrupted near its completion in order to allow for some witnesses to be taken out of order. During the first portion of Loc Vo's cross-examination there was no mention of gang or gangs. (RT 355-361, 417-437.)

One of the witnesses who was taken out of order was the detective who interviewed Loc Vo shortly after the shooting. The reason why this witness was being taken out of order at the time was due to the fact that the detective in question was going to be out of the country due to a serious family obligation. (RT 438-439.)

It was during the direct examination of the detective in question, who was the same one who also had testified that in his (the detective's) opinion Loc Vo knew the name of the shooter and was not giving all of the information he knew (see hereinabove at pp. 24-25), that the subject of gangs first came up in earnest. According to the detective in his interview with Loc Vo, he (the detective) was trying to get Loc Vo to identify the shooter and was being in unsuccessful in that endeavor when at one point Loc Vo said, "If a guy comes in once in a while, how can I know what name he goes by," and "I know they are members of some gang, but I'm too busy in my business to think of that." (RT 452-453, 456-457.) Defense counsel's objections to this testimony were overruled by the trial court on the grounds that in the trial court's mind Loc Vo was not forthright in his answers, both in court and in his statements to the police, and that the gang evidence in question could be brought out by the prosecution so that the jury could give the appropriate weight, if any, with respect to Loc Vo's testimony. (RT 453-454.)

Thereafter, when the cross-examination of Loc Vo resumed, there was no mention of gangs in that portion of the cross-examination of Loc Vo. (RT 574-577.) Then, on the prosecution's redirect examination of Loc Vo, the prosecutor started going into the subject of gangs with Loc Vo, when the prosecutor proceeded to ask Loc Vo whether some "really rough guys" hung out at his restaurant. (RT 584.)

Defense counsel immediately objected, and at that time there was a side bar discussion between the trial court and both of the attorneys. (RT 584-859.) During that side bar discussion, defense counsel stated that the phrase "rough guys" was just another term for "gang" and that the prosecutor was violating the trial court's earlier in limine ruling about excluding evidence of gangs. (RT 584-585.) The trial court then indicated, albeit erroneously that it (the trial court) remembered as "clear as day" that Loc Vo had used the word "gang" in response to one of defense counsel's questions. (RT 585.) Also,

during this side bar discussion, the trial court said, with reference to gang evidence, "this is slowly being opened up" (RT 585) and that "it's wide open now anyway" (RT 587).

Additionally, during this side bar discussion, defense counsel made a motion for mistrial due to the prejudicial nature of the gang evidence that had been heard by the jury up to this point of time in the trial. The motion for mistrial was denied. (RT 587.) Also, defense counsel's objections to the line of questioning that was then being pursued by the prosecutor, in connection with the subject of gangs, was overruled by the trial court on the grounds that, in the words of the trial court, it was allowable ". . . for the issue of showing why the witness is testifying in the way he is." (RT 588-589.)

The prosecutor then asked Loc Vo if it were true that some "really rough guys" hung out at his restaurant who he found to be a little scary or intimidating. (RT 589.) Loc Vo replied, "Well, not many of them – well, it's like just a few. Not many of them, and it's like they would come to a table once or twice a week and they – it's not like anything, but they tattooed. They have tattoos all over they bodies, so I feel nervous. They haven't done any -- they didn't do anything." (RT 590.) The prosecutor then followed up that answer with the question, "Guys with tattoos make you nervous; is that true?" Loc Vo responded, "Yes." (RT 590.) Parenthetically, defendant has extensive tattoos on his body consisting of a dragon that started at his upper right chest area that continued across his right shoulder and down his right arm to almost his right elbow, another tatoo of a dragon where the face of the dragon was on his upper left chest area that continued down to the fold of his left elbow, the word "Dang" on his back which was in script writing that extended from one shoulder to the other covering an area of about 10 inches across his back, the word "Viet" on the back on his left triceps, and the word "pride" on the corresponding portion of his right triceps. (RT 506-507.)

Preliminarily, before turning to the real problem with the gang evidence

6(20)

in question, along with other degrading evidence that the prosecution was presenting, or attempting to present, through the witness Loc Vo, the trial court's belief that the subject of gang evidence was "slowly being opened up" (RT 584) and "it's wide open now anyway" (RT 587) was wrong for two critical reasons. First, the so-called "open the door" or "open the gates" argument is a popular fallacy. (People v. Matlock (1970) 11 Cal.App.3d 453, 461; People v. Gambos (1970) 5 Cal.App.3d 187, 192.) Second, as detailed hereinabove, nothing defense counsel did or said during the cross-examination of Loc Vo in any way brought up the subject of gang or gangs. It was the prosecutor, and always the prosecutor, who was bringing up that subject. The trial court's "clear as day" memory that the subject of gangs was brought up through defense counsel's cross-examination of Loc Vo was faulty recollection on the part of the trial court. To the extent that the trial court's faulty recollection in this regard was a product of its ruling allowing for the admission of gang evidence, the ruling was erroneous. (See People v. Matlock, supra, 11 Cal.App.3d 453, 460.)

In any event, the real problem in issue is that the trial court allowed the prosecution, over defendant's objections, to present, or attempt to present, a considerable amount of degrading evidence prejudicial to defendant under the guise of challenging, or putting into prospective, the credibility of Loc Vo as a witness in this case. These incredibly damaging matters, over and above the detective's opinion that Loc Vo knew the name of the shooter and was not giving all of the information he knew (a sub-issue already discussed hereinabove), consisted of (1) the suggested, but never proved, allegation that Loc Vo was paying protection money, in particular to defendant; (2) the suggested, but never proved, allegation that someone, inferentially defendant, was trying to take over Loc Vo's restaurant; (3) the gang evidence just discussed hereinabove which came into evidence by way of the detective's testimony and the prosecutor's examination of Loc Vo; and (4) Loc Vo's

awareness of the incident at his restaurant on October 21, 1998, a month before the shooting in this case, where the police came to his restaurant to investigate an attack defendant and others committed on a customer (a matter which the trial court also allowed to come before the jury as impeachment of defendant's statements to the detectives about never being San Jose, which has been shown to be an erroneous ruling as discussed in issue number 1 hereinabove). Again, all of the matters in question, over defendant's objection, were allowed to be presented to the jury on the theory that they went to issues of credibility and bias with regard to the witness Loc Vo. (RT 90-91, 299, 314, 316-317, 453-456, 484-489, 494.) As will be developed hereinbelow, this theory of admissibility was clearly wrong.

To put the issue in question in prospective, a few background facts are necessary. Loc Vo, an owner at the restaurant, always admitted that defendant was in the restaurant at the time of the shooting, but never admitted, either at trial or in his police interview, that defendant was the shooter. (RT 286, 295, 328, 345, 463-465, 467- 468, 472, 481, 582.) Also, Loc Vo was far from the most critical witness in the case. In fact, he was almost superfluous. Both Tina Ha and Ky Nguyen positively identified defendant as the shooter. (RT 168-170, 623-625.) Linda Tran provided testimony of an incriminating conversation wherein defendant admitted to her that he had shot someone in the head in San Jose. (RT 874-877.) Additionally, Tina Ha also provided testimony of incriminating admissions made to her by defendant that he did the shooting. (RT 636-637.) Furthermore, some of defendant's fingerprints were found on a glass on the table where defendant and Tina Ha had been seated in the restaurant, and were found on the inside of the front door of the restaurant at a location that was above and to the left of the handle to that door. (RT 522-523, 527-528, 532, 537-538, 931, 935-936; Exhibits 23, 25, 34, 38 and 42.)

Broken down to the least common denominator, the stated purpose of the prosecution for the presentation, and the attempted presentation, of the

above-described evidence, as to witness Loc Vo, and the one accepted by the trial court, was to show that Loc Vo had a fear of making a statement incriminating anyone of the shooting in this case and thus was not willing, either in his interview with the police or his testimony at trial, to identify defendant as the shooter. (RT 299, 313-315, 453, 588-589.)  In fact, that conclusion was drawn by the detective who interviewed Loc Vo; specifically, the detective testified that based upon statements made by Loc Vo during his (the detective's) interview with Loc Vo, the detective concluded that Loc Vo's statements suggested that Loc Vo knew the shooter's identity, but perhaps Loc Vo was afraid to provide the name to the authorities. (RT 457.)

However, for evidence to admissible on the issue of a particular witness' fear of testifying in order to show "a bias, interest or other motive" for the witness not to tell the truth (Evid. Code, § 780, subd. (f)) and to reflect on the witness' "attitude toward the action in which he [or she] testifies or toward the giving of testimony" (Evid. Code, § 780, subd. (j)), the prosecution must first establish the relevance of the witness' state of mind by demonstrating that the witness' testimony is inconsistent or suspect, and that the impeaching evidence was truly needed to resolve or understand the cause of the witness' suspect trial court testimony. (People v. Yates (1984) 150 Cal.App.3d 183, 986-987; People v. Brooks (1979) 89 Cal.App.3d 180, 187.)

Furthermore, the use of the impeaching evidence, if it contains material that would be prejudicial to the defendant should not be allowed when the circumstances indicate that the impeaching material is not critically essential to the prosecution's case, and the circumstances suggest that the impeachment is being done primarily to call the jury's attention to the prejudicial evidence. (See People v. Brooks, supra, 89 Cal.App.3d 180, 187; see also Evid. Code, § 352.)

All of the above-discussed criteria for excluding the impeachment evidence in question exist in this case.  This matter is not a case where the

witness told the authorities prior to trial that the defendant was the perpetrator of the crime and then gave inconsistent testimony at trial that seriously damaged the prosecution's case. In this case, from the beginning, Loc Vo did not identify the shooter.

As explained hereinabove, Loc Vo's testimony was not extremely critical to the prosecution's case since other witnesses identified defendant as the shooter and testified about incriminating statements made by defendant to them. Also, there was circumstantial fingerprint evidence connecting defendant to the shooting.

It appears that the prosecutor put Loc Vo on the witness stand knowing that Loc Vo would not identify defendant as the shooter, and then claimed "suspect testimony" as a ploy to get before the jury, or to attempt to get before the jury, (a) extremely prejudicial evidence that Loc Vo purportedly was paying protection money to defendant and that someone was trying to take over the restaurant, (b) extremely prejudicial evidence of a gang connection to this case, and (c) extremely prejudicial evidence of an incident investigated at the restaurant a month before the shooting in this case where defendant and some others attacked a customer. None of this was really and truly relevant to the credibility of Loc Vo's testimony particularly where, as here, Loc Vo never changed his critical statement disclaiming any knowledge of the identity of the shooter and Loc Vo was not really a critical witness for the prosecution's case. Under these circumstances, to the extent that the improper evidence in question had any marginal relevance as to the credibility of Loc Vo, its probative value was far outweighed by the danger of undue prejudice to defendant. Thus, even under section 352 of the Evidence Code, it was inadmissible.

On page 8 of the opinion of the Court of Appeal, that court states that the above-discussed issues concerning the admissibility or inadmissibility of the evidence relating to the attacks and attempted attacks on the credibility of

witness Loc Vo are to be judged only by an abuse of discretion standard. This is not correct.

Preliminarily, on pages 7 and 8 of the Court of Appeal opinion, that court attempted to reword defendant's arguments concerning the attacks and attempted attacks on the credibility of witness Loc Vo as being principally grounded upon section 352 of the Evidence Code. This is incorrect. Most of the issues pertaining to the inadmissibility of the evidence attacking the credibility of Loc Vo do not involve section 352 of the Evidence Code, and thus to say that they must be analyzed pursuant to an abuse of discretion standard is not correct.

The issues concerning Loc Vo's denials of paying protection money, and Loc Vo's denials of anybody trying to take control of the restaurant, have nothing to do with any type of section 352 analysis or any type of an abuse discretion standard. Those lines of questioning were legally improper since they suggested facts harmful to defendant which the prosecution may no effort to prove once there were denials by Loc Vo. (See People v. Perez, supra, 58 Cal.2d 229, 240-241; People v. Blackington, supra,167 Cal.App.3d 1216, 1220-1223; People v. Lo Cigno, supra, 193 Cal.App.2d 360, 387-388.)

The testimony of the detective that in his opinion Loc Vo knew the name of the shooter and was not giving all the information he (Loc Vo) knew, also has nothing to do with an abuse of discretion or an analysis under section 352 of the Evidence Code. It is well settled that such opinion testimony on the veracity, or lack of veracity, of a particular statement by another is inadmissible on that issue. (People v. Melton, surpa,44 Cal.3d 713, 744; People v. Smith, supra, 214 Cal.App.3d 904, 913; see also People v. Sergill, supra,138 Cal.App.3d 34, 38-40.)

Next, as noted hereinabove, the gang evidence in issue only came into evidence because of a faulty recollection by the trial court that defense counsel had asked Loc Vo a question on cross-examination where Loc Vo had used the

6(25)

word "gang" as a result of which the subject of gangs was "wide open now anyway." (RT 585-586.) This type of error is one obviously not grounded upon an abuse of discretion or a section 352 analysis.

Lastly, the overall thrust of the prosecution's attempt to present the evidence attacking and attempting to attack the credibility of Loc Vo was for the purported purpose to show a bias, interest or other motive not to tell the truth and to reflect on Loc Vo's attitude toward the action in which he was testifying. (Evid. Code, § 780, subds. (f) and (j).) However, as discussed hereinabove, in order for the prosecution to do so, the prosecution must first establish the relevance of the witness' state of mind by demonstrating that the witness' testimony is inconsistent or suspect, and that the impeaching evidence was truly needed to resolve or understand the cause of the witness' suspect trial court testimony. (People v. Yates, surpa,150 Cal.App.3d 983, 986-987; People v. Brooks, supra, 89 Cal.App.3d 180, 187.) Additionally, as already explained hereinabove, this is not a case where the prosecution was ever able to establish in the first instance that Loc Vo's testimony was inconsistent or suspect. For example, this is not a case where the witness told the authorities prior to trial that the defendant was the perpetrator of the crime and then gave inconsistent testimony at trial that seriously damaged the prosecution's case. In this case, from the beginning, Loc Vo did not identify the shooter. (RT 286, 295, 328, 345, 463-465, 467-468, 472, 481, 582.) Also, Loc Vo's testimony was not extremely critical to the prosecution's case since other witnesses identified defendant as the shooter and testified about incriminating statements made by defendant to them. (RT 168-170, 623-625, 636-637, 874-877.) None of this analysis turns upon an abuse of discretion standard or a section 352 balancing process.

The issues in question turn upon whether the prosecution established the necessary preliminary fact demonstrating that the witness' testimony is inconsistent or suspect, and the impeaching evidence was truly needed to

resolve or understand the cause of the witness' suspect trial court testimony. While some other aspects of the admissibility of this type of impeaching evidence can involve a section 352 analysis (see People v. Brooks, supra, 89 Cal.App.3d 180, 187), practically all of the arguments being raised by defendant as to the inadmissibility of the impeachment evidence against Loc Vo do not depend upon such an analysis. Thus, it clearly was improper for the Court of Appeal to treat defendant's arguments concerning the attacks and attempted attacks on the credibility of Loc Vo as something that only is to be analyzed pursuant to an abuse of discretion standard.

The only remaining issue is whether the inadmissible evidence in question (i.e., the detective's opinion that Loc Vo knew the identity of the shooter and was not giving all of the information he knew; the gang evidence; and the investigation of the attack at the restaurant by defendant and others a month before the shooting in this case), and the attempt to present the inadmissible evidence of Loc Vo's payment of protection money and that someone was trying to take control of the restaurant, were prejudicial.

The prejudicial impact of these matters in question was tremendous. It tied, or attempted to tie, defendant into other uncharged criminal conduct including the payment of protection money, the existence of gangs, and involvement in an earlier attack at the restaurant just a month before the shooting in this case. It also created a vehicle for a detective to express his opinion about the believability of a prosecution witness on the issue of defendant's involvement in this case.

Furthermore, in closing argument to the jury, the prosecution mentioned the subject of the prior incident at the restaurant where defendant and others were investigated for attacking a customer; also in closing argument the prosecutor mentioned Loc Vo's fear of defendant and the payment of protection money by Loc Vo. (RT 1181-1182, 1193.)

Similar to the inadmissible evidence discussed in issue number 1

hereinabove, the inadmissible evidence and improper matters discussed in this issue, paraded before the jury a significant amount of uncharged criminal conduct on the part of defendant that really was not relevant and was totally a gratuitous appeal to the passions and prejudices of the jury to view defendant in the worst possible way. The net effect of this inadmissible evidence, similar to the net effect of the inadmissible evidence discussed in issue number 1 hereinabove, was to paint a picture for the jury that defendant was an unrepented criminal. Under such circumstances, under any standard of harmless error, the admission, and the attempted admission, of the improper evidence in question was prejudicial.

Furthermore, since the matters in question involve the presentation, and the attempted presentation, of inadmissible uncharged crimes, there is a violation of principles of federal process of law as articulated in the case of McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385. Furthermore, when these federal principles are applied, the inadmissible and improper matters in question are not harmless beyond a reasonable doubt under the federal harmless error standard articulated in Chapman v. California, supra, 386 U.S. 18, 23-24 [17 L.Ed.2d 705].

CLAIM:3.    Improperly Instructing the Jury that the Uncharged Crimes in this Case Only Needed to be Proved by a Preponderance of the Evidence:

Due to the introduction of the significant amount of evidence of other crimes, and other bad conduct, allegedly committed by defendant, as discussed hereinabove in issue numbers 1 and 2, defendant requested, and the trial court granted, a cautionary instruction with regard to that evidence, which was read to the jury as part of the final instructions after the close of evidence. (RT 1097-1099.)

The cautionary instruction in question, which was adapted from some of the language contained in CALJIC No. 2.50, was read to the jury as follows: "Evidence has been introduced for the purpose of showing that the defendant

committed a crime other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining, if it does tend to show, a motive for the commission of the crime charged, the attitude of the witness Loc Vo towards [sic] the defendant, and that the defendant may have been in the Hoan My Restaurant. For the limited purpose for which you may consider this evidence, you may weigh it in the same manner as you do in this case. You are not to consider this evidence for any other purpose." (RT 1145-1146.)

The actual written instruction on the point in question, which was given to the jury as part of the full and complete packet of the written instructions that were read to the jury (RT 1268), was somewhat different from the instruction as read to the jury. In the written instruction after the phrase "a motive for the commission of the crime charged" appeared the writing "e.g. control café". (CT 528.) Also, the next to last sentence in the above, quoted instruction as read to the jury, appeared in the written instruction as follows: "For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in this case." (CT 528.) The underlying words "all other evidence" apparently were inadvertently omitted in the trial court's reading of the instruction to the jury.

In any event, immediately following the above-quoted cautionary instruction, the trial court further instructed the jury that within the meaning of preceding instruction, the prosecution had the burden of proving by a preponderance of the evidence that the defendant committed a crime other than those for which he was on trial. (RT 1146; CT 529.) The trial court then went on to define "preponderance of the evidence" to mean ". . . evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue

preponderates, your findings on that issue must be against the party who had the burden of proving it. You should consider all the evidence bearing upon every issue, regardless of who produced it." (RT 1146; CT 530.)

It is defendant's contention that, under the facts and circumstances of this case, it was error for the trial court to instruct that the other, uncharged crimes need only be proved by a preponderance of the evidence. As will be developed hereinbelow, the proper standard of proof is proof beyond a reasonable doubt, and the error in question is reversible per se.

There are a number of ways evidence of other uncharged crimes or bad acts (i.e., evidence of a defendant's conduct, falling short of a crime, which constitutes either a civil wrong or some other act that is designed to degrade and prejudice the defendant (see Evid. Code, § 1101, subd. (b); People v. Glass (1910) 158 Cal. 650, 655)) can get introduced into a trial on a current charge.

One way is where there are sufficient or significant similarities between the charged crime and the uncharged acts so that the uncharged acts are relevant circumstantial evidence on an issue such as identity or intent. (See People v. Ewoldt (1994) 7 Cal.4th 380, 402-403; People v. Thompson, supra, 27 Cal.3d 303, 319, including fn. 23; People v. Guerrero (1976) 16 Cal.3d 719, 728-729.)

Another way in which evidence of uncharged acts can be admitted into evidence in a current case is on a theory of motive, even though the charged act and the uncharged act have no similarities, since the events surrounding the uncharged act are the motive for the commission of the charged act (i.e., it is the fact of the commission of the uncharged acts – not their similarity to the charged offense – which gives rise to the reasonable inference that the defendant had a motive to commit the charged crime). (See People v. Thompson, supra, 27 Cal.3d 303, 319, fn. 23; People v. Durham (1969) 70 Cal.2d 171, 186-189.) For example, this can occur when a defendant kills a police officer who has stopped the defendant, and the motive for the killing is

that at the time of the stop the defendant has committed several prior dissimilar crimes and is trying to avoid apprehension by the police. (People v. Thompson, supra, 27 Cal.3d 303, 319, fn. 23; People v. Robillard (1960) 55 Cal.2d 88, 100.)

Also, as was done in this case, some times evidence of other uncharged crimes or bad acts might be used, albeit erroneously, to impeach a defendant's earlier statement to the police (see issue number 1 hereinabove) or to explain the bias of a particular witness (see People v. Yates, supra, 150 Cal.App.3d 983, 986-987).

In the first situation discussed hereinabove, where the prior uncharged crimes or bad acts are being used to prove an issue of identity or intent due to sufficient or significant similarities between the charged offense and the prior uncharged acts, the law is now settled that the existence of the uncharged acts need only be proven by a preponderance of the evidence. (People v. Carpenter (1997) 15 Cal.4th 312, 380-382.)

However, in the other situations just set forth hereinabove, where evidence of uncharged acts are being used for some reason other than their similarities to the charged crime, that circumstantial use of the uncharged acts is just ordinary circumstantial evidence that needs to be governed by the general rules of circumstantial evidence. One of those general rules of circumstantial evidence is that each fact which is essential to a complete set of circumstances necessary to establish a defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which the inference necessarily rests must be proved beyond a reasonable doubt. (CALJIC No. 2.01; see People v. Watson (1956) 46 Cal.2d 818, 830-831; People v. Yokum (1956) 145 Cal.App.2d 245, 254; see also 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation At Trial, § 142, p. 203.)

In this case, the evidence of the uncharged bad acts were not being used for their similarities with the charged crime in order to prove an issue such as identity or intent. In fact, the prosecutor conceded that was not a reason for the use of the uncharged bad act evidence in this case. (RT 1097-1098.)

The evidence of the uncharged acts in this matter were being used for the following reasons: (1) an apparent motive for the commission of the charged crime (i.e., control of the cafes); (2) to show that defendant had been in the restaurant and in San Jose previously, thus contradicting his statement to the detectives that he had never been to San Jose or to Santa Clara County in his life, which in turn was proof of a consciousness of guilt; and (3) an explanation of the attitude of witness Loc Vo in this case as to a bias or attitude toward the action in which he was testifying or toward the giving of testimony. All of these matters are general circumstantial evidence matters which the law requires to be proved under the traditional standard of proof beyond a reasonable doubt.

However, the trial court in this matter merely told the jury that proof of the uncharged crimes need only be proved by a preponderance of the evidence. This was clearly erroneous and seriously diluted the standard of proof to be applied to all of the applicable factual findings in this case.

It is fundamental that the due process clause of the Fourteenth Amendment to the United States Constitution protects a defendant against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. (Cage v. Louisiana (1990) 498 U.S. 39, 40 [112 L.Ed.2d 339]; Jackson v. Virginia (1979) 443 U.S. 307, 315 [61 L.Ed.2d 560]; In re Winship (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368].)

Where, as here, the concept of proof beyond a reasonable doubt was diluted significantly – in this case down to a mere preponderance of the evidence – as to matters to which it legitimately applied and which were relied

upon by the prosecutor in closing argument to the jury (i.e., prior incident at restaurant (RT 1181); Loc Vo's fear of defendant (RT 1182); payment of protection money (RT 1182); killing someone for control of the cafes (RT 1188); and having been in San Jose and in the restaurant previously (RT 1191-1193)), there has been a denial of both defendant's constitutional right to a jury trial under the Sixth Amendment of the United States Constitution and defendant's constitutional right to due process of law under the Fourteenth Amendment of the United States Constitution. (Sullivan v. Louisiana (1993) 508 U.S. 275, 277-278 [124 L.Ed.2d 182].) Additionally, this is a true "structural defect" with the legitimate trial process; thus, that the error defies standard harmless error analysis, and reversal is mandatory per se. (Sullivan v. Louisiana, supra, 508 U.S. 275, 278-282 [124 L.Ed.2d 182].)

With regard to the above-discussed issue of instructing that the other crimes evidence need only be proven by a preponderance of the evidence, the Court of Appeal accepted the Attorney General's argument that there was invited error in this regard. In doing so, the Court of Appeal cited to the case of People v. Medina (1995) 11 Cal.4th 694, 763.

However, in Medina, that case merely dealt with the situation where the evidence of the uncharged crimes was admitted under section 1101 of the Evidence Code which pertains to the admission of evidence to prove issues such as intent, identity or motive based upon a similarity between the commission of the charged offense, or offenses, and the commission of the uncharged offense, or offenses. In this case, the evidence of the uncharged offenses was not admitted for those purposes, but primarily was admitted for purposes relating to the credibility of defendant's statement to the detectives and the credibility of witness Loc Vo.

Furthermore, if defendant is correct in his argument that the appropriate standard of proof with regard to the evidence of the other crimes, under the circumstances of this case, was proof beyond a reasonable doubt, then there

cannot be any tactical basis whatsoever for a defense attorney acceding to a preponderance of the evidence standard. Stated in another manner, even if defendant had requested the instruction on preponderance of evidence, any error in that regard cannot be deemed invited since there is nothing in the record to show that defendant's trial counsel made a conscious, deliberate and tactical choice to have the instruction on preponderance of the evidence as being the appropriate standard of proof with regard to the uncharged crime evidence in issue. (See People v. Cooper (1991) 53 Cal.3d 771, 831.) This would be particularly true, where, as here, the appropriate standard is proof beyond a reasonable doubt.

## CLAIM:4. Miscellaneous Claims of Inadmissible Evidence Admitted Over Defense Counsel's Objections:

Over and above what has already been discussed hereinabove in issue numbers 1 and 2, the prosecutor in this case continually engaged in an effort to get as much inadmissible, prejudicial material before the jury as possible which the trial court permitted over defense counsel's objections. What follows is a catalog of those matters.

First, over an objection by defense counsel that the evidence was irrelevant, one of the detectives who worked on the investigation of the shooting at the Hoan My Restaurant was allowed to testify that the investigation was a "difficult case" since witnesses had fled from the scene of the shooting. (RT 442-443.) An officer's opinion that a particular case was difficult, is on the same level as an individual's opinion that someone was involved in a crime, because it expresses the belief or impressions that one has about a case. Since the latter is inadmissible (see People v. Page (1991) 2 Cal.App.4th 161, 189; People v. Brown (1981) 116 Cal.App.3d 820, 828-829, the former is too.

Second, over defense counsel's objections of no foundation and vagueness, the same detective just mentioned hereinabove was allowed to testify that one of the waitresses at the Hoan My Restaurant initially said she

1   need more space.  Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim Four: Improper use of prejudicial, inadmissible evidence violated due process
    of law under the 14th amendment of the U.S. Constitution

6

7       Supporting Facts: Please refer to previous page—Page 6(34), then following

8        pages—Pages 6(A)(1)–6(A)(2)

9

10

11      Claim Five: Inadmissible evidence of another crime, even though ordered stricken, was
    so prejudicial that it violated due process of law under the 14th amendment of the U.S.
12  Constitution

13      Supporting Facts:  Please refer to the following pages—Pages 6(A)(2)–6(A)(4)

14

15

16

17      Claim Six: Trial counsel's failure to object to several items of inadmissible evidence
    constituted ineffective assistance of counsel in violation of the 6th amendment and the 14th
18  amendment of the U.S. Constitution

19      Supporting Facts:  Please refer to the following pages— Pages 6(A)(5)–6(A)(24)

20

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25                      Not applicable

26

27

28

PET. FOR WRIT OF HAB. CORPUS          -6-
                                     6(A)

only had been a customer, and that this was an example of the level of dishonesty he (the detective) encountered in the investigation of this matter. The prosecutor claimed that this testimony was needed to explain the officer's conduct. (RT 446-447.) As to the latter claim by the prosecutor, information attempting to explain the propriety of an officer's conduct is not admissible at a trial on the issue of guilt or innocense. (People v. Aguilar, supra, 16 Cal.App.3d 1001, 1006.) Furthermore, with regard to the testimony of the "level of dishonesty" involved in this matter, opinion testimony about the veracity, lack of veracity, of particular information provided by another person is inadmissible. (People v. Melton, supra, 44 Cal.3d 713, 744; People v. Smith, supra, 214 Cal.App.3d 904, 915; see also People v. Sergill, supra, 138 Cal.App.3d 34, 38-40.)

Third, over an objection by defense counsel that the evidence was irrelevant, another detective involved in this matter was allowed to testify that he (the detective) had obtained a warrant for defendant's arrest from Judge Ball on November 24, 1998. (RT 983-985.) Pursuant to the principle that an individual's opinion, belief or impression that someone is involved in a crime as inadmissible (see People v. Page, supra, 2 Cal.App.4th 161, 189; People v. Brown, supra, 116 Cal.App.3d 820, 828-829), the fact that Judge Ball issued an arrest warrant for defendant's arrest, and thus implicitly had the opinion, belief or impression that defendant was involved in the charged crime, was clearly inadmissible.

Fourth, when the prosecutor was examining Tina Ha, the prosecutor asked her if during the whole time she (Tina Ha) knew defendant whether she ever was aware of defendant having a job. (RT 805-806.) Defense counsel objected to this questioning on the grounds of a lack of foundation, a lack of personal knowledge and being irrelevant. All these objections were overruled by the trial court. (RT 806.) Tina Ha then answered the question in the negative; in a follow-up question asked by the prosecutor as to whether

defendant always seemed to have money for whatever he wanted, Tina Ha said, "[h]e had some money but not a lot of money." (RT 806.) Also, over similar objections raised by defense counsel, Linda Tran was allowed to testify that she never knew defendant to have a job. (RT 881.) Evidence of lack of a job is on par with evidence of poverty. Evidence of poverty, without more, is inadmissible particularly to establish motive because it is unfair to make poverty alone a ground of suspicion and the probative value of the evidence is deemed to be outweighed by the risk of prejudice. (People v. Wilson (1992) 3 Cal.4th 926, 939; People v. Edelbacher (1989) 47 Cal.3d 983, 1024; People v. Hogan (1982) 31 Cal.3d 815, 854.)

While each of the individual items of inadmissible evidence just discussed hereinabove may not by itself be enough to constitute prejudicial error for a reversal of defendant's convictions in this case, when considered collectively, and along with the inadmissible evidence discussed in issue numbers 1 and 2 hereinabove, the totality of the errors is prejudicial and cannot be overcome any harmless error analysis.

Furthermore, in totality the evidentiary errors in question, including the evidentiary errors discussed in issue numbers 1 and 2 hereinabove, constitute a violation of defendant's right to federal due process of law as articulated in the case of McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385, and it is not harmless error under the federal harmless error standard articulated in Chapman v. California, supra, 386 U.S. 18, 23-24 [17 L.Ed.2d 705].

CLAIM: 5.    The Inadmissible Testimony of Tina Ha that was so Prejudicial that Even Though it was Ordered Stricken it Requires a Reversal of Defendant's Convictions:

During the in limine motions in this case conducted before the commencement of the presentation of evidence, there was a ruling that no mention would be made of a San Francisco homicide in which defendant was a suspect. (RT 73.)

Later, at one point during the prosecutor's direct examination of Tina

Ha, the prosecutor was asking Tina Ha about a segment of one of the series of telephone conversations she had with defendant shortly after defendant's arrest where defendant and Tina Ha were talking about whether or not defendant had outstanding warrants. After establishing the existence of the fact that such a subject had come up in a portion of a conversation between defendant and Tina Ha, the prosecutor then specifically asked Tina Ha, "Had Mr. Dang committed other crimes that he had not been arrested for, as far as you know? Is that what you were referring to?" (RT 672.) Defense counsel's objection to that question on the grounds of a lack of foundation was overruled. (RT 673.) Tina Ha then gave a peculiar but innocuous response which went as follows: "I was just trying to ask what that means because I wasn't sure, and I thought it was a good sign." (RT 673.)

Then later, when defense counsel was cross-examining Tina Ha on how she first told the authorities that she did not see who did the shooting, defense counsel was attempting to establish that the authorities had used some coercive tactics to get Tina Ha to say that she did in fact see defendant do the shooting. (RT 711-712, 759-761.) At one point, apparently to try to establish how coercive the authorities had been to Tina Ha, defense counsel asked Tina Ha if she had indicated to the authorities during her interview that she would kill herself. (RT 761.) Tina Ha responded, ". . . I can explain that. The reason I said that word . . . was because the police asked me if I know anything else about Tai doing any other murder." (RT 762.)

As a result of a discussion that occurred at side-bar between the court and both counsel (RT 763-766), defense counsel's motion to strike the answer as nonresponsive was granted, and the trial court admonished the jury to disregard the witness' answer, not to speculate on its meaning and to treat it as though it had never been said. (RT 767.)

It is defendant's position that the witness' volunteered answer in question, in light of the prosecutor's earlier question concerning the

commission of other crimes that defendant had committed for which he had not been arrested, was so prejudicial that the cautionary instruction given by the trial court was ineffective and defendant's conviction in this matter must be reversed.

As explained in In re Rosoto (1974) 10 Cal.3d 939, 949, "[t]he testimony of a witness is ordinarily elicited either by general questions seeking a narration of events or a series of specific questions calling for specific answers as to each fact. [Citations.] When counsel uses the latter method the witness should respond to the question. [The witness] should not evade or volunteer matters not specifically asked for; the nonresponsive answer may be stricken on motion of the questioner who is entitled to elicit testimony in [the questioner's] own way and to define the scope of the examination as [the questioner] sees fit. [Citation.]" This is true even when the nonresponsive reply occurs in connection with defense counsel's cross-examination of a prosecution witness. (See People v. Curtis (1965) 232 Cal.App.2d 859, 867-868.)

In this case the nonresponsive answer brought out a highly prejudicial and inadmissible fact of defendant's purported involvement in another murder. In fact, the subject matter was so sensitive to the overall fairness of defendant's case, that the subject of the suspected homicide in San Francisco had been considered in the in limine motions and ruled to be inadmissible. (RT 73.) It cannot be doubted that the subject of another murder in which defendant was involved is so prejudicial that any type of admonition to the jury, including the one given by the trial court in this matter, could not remove the harmful effect of the impermissible fact of the other murder being drawn to the jury's attention. Accordingly, the occurrence of the nonresponsive answer in issue requires a reversal of defendant's conviction in this case. (See People v. Roof (1963) 216 Cal.App.2d 222, 225-227; People v. Ozuna (1963) 213 Cal.App.2d 338, 341-342.)

Furthermore, the nonresponsive answer in question bringing up the subject of the other murder violates defendant's federal constitutional right to due process of law (see McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385), and it is not harmless beyond a reasonable doubt (Chapman v. California, supra, 386 U.S. 18, 23-24 [17 L.Ed.2d 705]).

CLAIM: 6.    Ineffective Assistance of Trial Counsel:

In this matter there are four excellent examples of ineffective assistance of trial counsel as demonstrated by the record on appeal. They are as follows:

First, trial counsel failed to raise a timely objection as to the inadmissibility of some testimony by Tina Ha that she believed that defendant was making money by illegal activities. In this regard, at the trial in this matter, on defense counsel's cross-examination of Tina Ha, it was established that when defendant was arrested defendant owned three gold bars which were worth about $300.00 a piece, and after defendant's arrest those gold bars came into the possession of Tina Ha. (RT 718-720.) On redirect examination of Tina Ha, the prosecutor at one point asked Tina Ha if she believed that defendant got the gold bars through illegal activity. (RT 807.) When defense counsel objected to that question on the grounds of speculation, the prosecutor momentarily dropped that line of questioning and proceeded to establish that just a couple of months before the commencement of the jury trial in this case Tina Ha gave the gold bars in question to defendant's mother who sold them for about $900.00. (RT 807-808.)

Then, the prosecutor proceeded to ask Tina Ha the question, ". . . Do you suspect or do you believe he [defendant] got those gold bars through illegal activity?" (RT 808.) At that point defense counsel imposed no objection, and Tina Ha responded by saying, "I believe so." (RT 808.) The prosecutor then followed up with the question, ". . . Do you believe that during the time that you were dating Tai Dang, from November 21st until . . . April 22nd, do you believe that Tai Dang was involved in illegal activities to support

himself?" (RT 808.) At that point defense counsel interposed objections of "vague, also 352." (RT 808.)

A discussion at side bar then ensued between the court and both counsel where defense counsel's objections were discussed and where defense counsel moved to strike the answer to the proceeding question where Tina Ha said that she believed that defendant got the gold bars through illegal activity. The trial court sustained defense counsel's "352 " objection to the current question which was asking Tina Ha if she believed that while she was dating defendant that defendant was involved in illegal activities to support himself. However, the trial court denied the motion to strike the answer to the preceding question since there had been no specific objection made to that question when it actually was asked. (RT 809-813.)

Clearly, if defense counsel had raised timely and proper objections concerning the question propounded to Tina Ha as to whether she believed defendant got the gold bars through illegal activity, that question would never have been allowed to have been answered on the grounds that it called for speculation (see 1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 27.54 and 27.55, p. 456), called for the production of prejudicial evidence of other bad acts (Evid. Code, § 1101, subds. (a) and (b)), and called for evidence the probative value of which was substantially outweighed by its prejudicial effect (Evid. Code, § 352).

Second, without proper preparation, defense counsel went into an area of inquiry on cross-examination of Tina Ha on the subject that a detective who interviewed her accused her of being a prostitute all of which caused Tina Ha to have a disastrous emotional breakdown in front of the jury. Specifically, as part of defense counsel's attempt to establish that the detective interviewing Tina Ha used coercive tactics to have her change her early statements in the interview that she did not know who did the shooting to a statement that identified defendant as the shooter, defense counsel asked Tina Ha whether the

detective who interviewed her accused her of being a prostitute. (RT 769.) At that point, the prosecutor asked to approach the bench with defense counsel. (RT 769.)

During the ensuing side bar discussion that occurred between the trial court and both counsel, defense counsel explained his purpose for going into the accusation of Tina Ha being a prostitute as a means of showing that the detective interviewing Tina Ha was being heavy handed with her. (RT 773, 782.) In substance, the prosecutor explained that if defense counsel proceeded with this line of questioning, the prosecution was prepared to show that defendant really was a pimp and thus the detective interviewing Tina Ha was merely asking a legitimate investigative question and was not trying to be intimidating or coercive by asking the question to Tina Ha if she were a prostitute. (RT 769-772.)

The prosecutor represented to the court that the prosecution had actual women who could testify that defendant was a pimp.  The prosecutor explained that the prosecution had substantial evidence from Sacramento that the way defendant was getting his money while in Sacramento was the fact that he was acting as a pimp. The prosecutor further explained that there were two prostitutes from Sacramento who were interviewed and who come to court to testify to the fact that defendant was a pimp. (RT 772, 775-776.) The prosecutor emphasized that the prosecution could prove that defendant was in fact a pimp. (RT 783.)

Defense counsel then said, "I'd ask for the discovery immediately," "I'd need the telephone numbers," and "[a]ll I need is the rest of discovery." (RT 783.) The prosecutor replied, ". . . counsel probably doesn't realize it, but he has the tapes of these witnesses.  He has their tapes and their statements. They're the women who were interviewed that put money on your client's books.  You have their statements."  (RT 784.)  Defense counsel then responded by saying, "I haven't listened to them." (RT 784.)

Shortly thereafter, defense counsel indicated that he was withdrawing his line of questioning in reference to the subject of Tina Ha being asked whether she was a prostitute by the detective who was interviewing her. (RT 785.) In the meantime, as the prosecutor noted on the record, Tina Ha, who was sitting on the witness stand as the side bar discussion in question was occurring, was "sobbing on the witness stand" (RT 781) and was "in tears now on the witness stand, and she has been for some minutes." (RT 786.)

Clearly, if defense counsel had prepared for this case properly by listening to all of the tape recorded statements, including the taped interviews of the two prostitutes from Sacramento, defense counsel would have had a basis for knowing why the detective asked Tina Ha about being a prostitute and would not have gone into that subject matter on his cross-examination of Tina Ha in front of the jury. The record is clear on this point since once defense counsel was advised of the full ramifications of the prosecution's evidence as to why the detective asked Tina Ha as to whether she was a prostitute, (i.e., primarily the taped interviews of the two prostitutes that defense counsel admitted he had not listened to), defense counsel withdrew the line of questioning about the detective accusing Tina Ha of being a prostitute. Due to this lack of preparation by defense counsel, Tina Ha had a significant breakdown on the witness stand in front of the jury as the result of defense counsel's ill timed and ill prepared cross-examination.

Third, defense counsel raised no objection to the testimony of the individual who was the probation officer who interviewed defendant for a presentence probation report in December 1994, during which defendant indicated that his address was 1302 Sippola Way, San Jose, California, and further stated that he had lived full time in Santa Clara County for the previous six years. (RT 1037-1043.) This testimony would have been totally inadmissible under the rationale of the case of People v. Pacchioli (1992) 9 Cal.App.4th 1331, 1338-1342, which held that statements made to a probation

officer during an interview for a presentence probation report could not be used in the prosecution's case in chief, but would be admissible for impeachment purposes if the defendant chose to testify at trial and the defendant's trial testimony conflicted with the earlier statements. In the instant case, it is obvious that this rule would be applicable since defendant did not testify at trial. Accordingly, with a proper objection, all of the testimony of the probation officer concerning what defendant said during the earlier interview in connection with the preparation of the presentence probation report would have been inadmissible.

Fourth, defense counsel raised no objection to the prosecutor's statement in closing argument to the jury that in connection with the incident that happened at the Hoan My Restaurant in October 1998, "We heard that a month earlier the defendant – the defendant had been involved in a violent attack on another customer in the restaurant one month earlier. You heard that the defendant and his two buddies dragged or took some guy into the bathroom, and there in the bathroom they struck this man over the head with a beer bottle, and the man was bleeding and so forth." (RT 1181.) There was absolutely no evidence in the record to support this factual assertion. The only time the subject came up as to what occurred specifically, in detail, at the earlier incident in the restaurant in October 1998, was when the detectives were conducting their tape recorded interrogation of defendant in Sacramento, and the detectives were making factual assertions about that earlier incident all of which defendant denied. (Exhibit 53; Augmented CT 83-84.) Obviously, these assertions by the detectives, which were denied by defendant and which were never otherwise proven by competent evidence at trial, are not evidence of the alleged asserted fact. Thus, with regard to the prosecutor's statement in closing argument concerning what happened at the earlier incident at the Hoan My Restaurant, there is no factual basis for that argument in the record. It is error for a prosecutor to argue facts not in evidence. (People v. Osband (1996)

13 Cal.4th 622, 698; People v. Benson (1990) 52 Cal.3d 754, 794-795.)  Had a proper objection been timely made with regard to the prosecutor's argument in question, it would have clearly been sustained.

Ineffective Assistance Claim continues on next page at line 8.

////                              ////

1

2

3

4

5

6

7

8    Fifth, defense counsel knew that during petitioner's post-arrest interrogation,

9    which was admitted into evidence (See Exhibit F. at Pp.991-993.), Sgt, Trejo asked

10   petitioner about "taking a bottle to a guy's head in ur in the bathroom of the

11   restaurant" (See Exhibit B, at P.83) and that Sgt. Trejo later confronted petitioner

12   stating, "I know... you've been arrested for hitting a guy with a, in the head with

13   a bottle at (unintelligible restaurant..." (Id.,at P.112.) At that interrogation,

14   petitioner denied any involvement in that assault. (Id.,at Pp.83,112.)

15

16   Moreover, during one of the client and counsel consultation sessions, petitioner

17   explained to trial counsel, Mr. Rios, that he was not arrested in connection with

18   an assault at the Hoan My Restaurant, to wit, "taking a bottle to a guy's head

19   in the bathroom of the restaurant." Petitioner further explained on the night in

20   question: October 21,1998, the San Jose Sheriffs had taken him and two other

21   men outside the restaurant and lined them one next to the other, facing the side

23   of a sheriff's patrol car. Then, the victim of the assault was allowed to identify

24   his assailant of assailants. After the field lineup was over, the sheriffs took one

25   man named Danh to a patrol car, but petitioner and the other man were uncuffed

26   and released, after the sheriff filled out white information cards.

27

28   Although the fifth component of petitioner's claim of ineffective assistance

1    of counsel shares the same factual subject as the fourth component: the assault

2    at Hoan My Restaurant on October 21,1998, it is distinguishable. Here, unlike the

3    appellate counsel, who focused on trial counsel's failure to object to the prosecutor's

4    statement in closing argument in regard to the assault, petitioner has focused on

5    trial counsel's failure to engage adequate pretrial investigation into the facts

6    surrounding the assault at Hoan My Reataurant on October 21,1998, allowing the

7    prosecutor to introduce a booking photo and a fingerprint card, both stemming

8    from petitioner's alleged  arrest in connection with an assault that took place

9    at the Hoan My Restaurant on October 21,1998- an arrest that never occurred,

10   as stated hereinabove.

11

12        More specifically, at the April 25, 2000, 402 hearing defense counsel requested

13   that there be no mention of an assault that happened at the Hoan My Restaurant

14   on October 21,1998, with the complaining witness name being Chinh Nguyen. (See

15   Exhibit C,at P.75,Ins.4-8.)

16

17        Then, the prosecutor objected stating that the assault was relevant for a

18   number of reasons. And therefore, the prosecutor wished to mention, during her

19   case in chief, that petitioner was arrested in connection with an incident that

20   took place at the Hoan My Restaurant on October 21, 1998, but would hold off

21   on the details of that arrest unless it either became relevant and the court

23   sustained admission of the acts under 1101 or if petitioner testified. (Id.,at

24   P.75,Ins.9-22.)

25

26        The prosecutor further stated:

27

28             Part of what happened when the defendant was arrested on October

1    21 st, the police took his fingerprints on that October 21 st. arrest.

2    (T)hat fingerprint card was the one that was used to find the

3    defendant's fingerprints on bottles and glasses on the table and the

4    doors and so forth the night of the murder, so the jury has to

5    understand that he was fingerprinted on October 21 st. in connection

6    with that incident, which the only way one gets fingerprinted, of

7    course, is if there's some arrest.

8    There was also a booking photo and I intend to introduce that

9    photo into evidence, so the jury can see how preposterous his claim

10   was that the photo didn't even look like him, and the photo is a

11   obvious booking photo. If the jury doesn't understand that he was

12   arrested, they won't understand that Photo was taken just one month

13   before the murder. (Id.,at P.18,Ins.13-28,P.79,Ins.2-11.)

14

15   Defense counsel made no objection (Id.at P.77 Ins.15), instead  he submitted.

16   (Id.,at P.79,In.13.) Then, the court ruled the evidence admitted. (Id.,at

17   P.79,Ins.26-29,P.80,Ins.1-28,P. 91, Ins.1-14.) However, Prior to the Court having

18   actually admitted the booking Photo and fingerprint card into evidence, petitioner

19   attempted to get the Court's attention, but the Court directed petitioner to speak

20   with defense counsel. (Id.,at 79,Ins.14-18.) During the discussion with his attorney,

21   Mr. Rios, Petitioner reiterated that he never was arrested in connection with an

22   assault at Hoan My Restaurant on October 21, 1998, after which defense counsel,

24   still, stated, "Submit it, your honor." (Id.,P.79,In24.)

25

26   Petitioner submits, had defense counsel pursued minimal investigation into

27   the subject of petitioner's alleged arrest such as sought to procure a computer

28   copy of petitioner's   arrest history, he could have proven that the prosecutor's

1 assertions as regards petitioner having been arrested in connection with an assault

2 at Hoan My Restaurant were factually untrue. To this end, petitioner has provided

3 a copy of his arrest and disposition history, wherein there is no entry for an

4 arrest on October 21, 1998, in San Jose of elsewhere. ( See Exhibit G, attached

5 hereto.)

6  In addition, had Defense Counsel Rios acted in the role as a diligent

7 conscientious advocate on petitioner's behalf, he would not have been oblivious

8 to the inconsistency within the prosecutors assertion that petitioner was actually

9 arrested in connection with an incident at Hoan My Restaurant, which resulted

10 in a booking photo and a fingerprint card (See exhibit ,C,at

11 P.78,Ins.13-28,P.79,Ins.2-11) and her statement in closing argument to the jury

12 that "we heard that a month earlier the defendant had been involved in a violent

13 attack on another customer in the restaurant.... You heard that Tai Dang was

14 temporarily detained and identified as one of the suspects at the scene." (See exhibit

15 F,at P.1181,Ins.19-21.25-27.) Without doubt, there is a legal distinction between

16 "temporarily detained" and "arrested."

18  Six, defense counsel had in his possession of all police reports, obtained from

19 people who were interviewed at, or around, Hoan My Restaurant on the night

20 of the murder. Among those police reports were, the statement of one named

21 Nhan Hguyen, who had reported that, on the night of the Hoan My Restaurant's

23 murder, he heard someone say, "mother fucker" and also heard someone say, "I

24 am going to shoot you" and then heard some one respond, "Go ahead and shoot."

25 And then Nhan stated that he saw petitioner shoot the victim. (Nhan"s police report

26 was unavailable; however, his statement was mentioned in the probation officer's

27 report, attached here to as exhibit "H" at P.2, paragraph 3.) Nhan, however,

28 recanted his statement and was never called as a witness for the prosecution.

1    It is axiomatic that a defense attorney interview everyone who has a

2  connection with the case or has information relevant to the events or persons

3  in question, even those who might be potential witnesses for the prosecution (See

4  penal code section 1054.1(a).) The defense counsel, even if a professional investigator

5  is employed should personally conduct interviews of the witnesses, so as to observe

6  the witness's demeanor and gauge his or her credibility and the potential value

7  of the witness's trial testimony.

8

9    A criminal defense attorney who fails adequately to investigate the facts

10  of the case may find that he or she is the subject of a claim of inadequacy of

11  counsel. Because among the defense attorney's basic duties is the requirement

12  that attorney diligently  and actively participate in the full and effective

13  preparation of the client's case, his or her thorough investigation of the  client's

14  case cannot be over emphasized. For this reason, the Ninth Circuit Court, in

15  the case United States v. Tucker, 716 F.2d 576,581, stated, "Pretrial investigation

16  and preparation are the keys to effective representation of counsel." (Quoting

17  Rummell v. Estelle, 590F.2d 103,104 (5th Cir, 1979.) The ninth  Circuit Court

18  further stated, "Courts have repeatedly stressed the importance of (among other

19  things), the interviewing of important witnesses and adequate investigation of

20  potential defenses. (Citing,e.g., Goodwin v. Balkcom 684 F.2d 794, 804 (11th

21  Cir.1982); United States v. Porterfield, 624 F.2d 122, 124 (10th Cir.); and Wood

22  v. Zahradnick, 578 F.2d 980, 982 (4th Cir. 1978).)

24   Petitioner submits, based on Nhan's statement, he was an eye witness to

25  the November 21, 1998's shooting, and a potential key witness, at trial, for the

26  prosecution. And even though ultimately Nhan, did not testify at petitioner's trial,

27  still defense counsel  Rios should have engaged in adequate pretrial investigation

28  of  Nhan, carefully interviewing Nhan, so as to prepare his crossexamination in

6(A)(15)

1  the event Nhan actually was called, at trial, as a witness for the prosecution.
2  In addition, adequate investigation and interview of Nhan was required because
3  his statement: he heard someone say, "mother fucker" and also heard someone
4  say, "I going to shoot you." and then heard someone say, I go ahead and shoot,"
5  effectively established that prior to the shooting, the shooter and the victim were
6  arguing, which might have developed itself into the basis of a viable sudden quarrel
7  defense, in an attempt to reduce the crime from murder to manslaughter. Like
8  wise, adequate investigation and interview of Nhan was necessitated because Nhan
9  might have possessed and provided leads valuable to the defense, especially in
10  light of his recantation. Defense counsel Rios opted to forgo investigation of
11  this important witness.

12

13  With this in mind, Defense Cousel's hereto above mentioned failure to
14  investigate and interview Nhan led to the loss of information which had the
15  potential to undermine both the propriety of the detective Pre- and Post-arrest
16  investigation of the murder case and the prosecution's case in chief.

17

18  For instance, after Petitioner was convicted and sentenced he received
19  a letter, written in Vietnamese, by Nhan, (See ExhibitI, letter and English
20  Translation, attached hereto.) In that letter, Nhan stated that on November 21,1998,
21  the night of the murder at Hoan My Reataurant, he and a friend named Tam
23  VN had gone to Nang's Coffeeshop, which was located around the corner from
24  Hoan My Restaurant. While at the coffee shop, something happened at Hoan
25  My Restaurant, but neither Nhan or Vn knew what had happen. Then, the Police
26  sealed the entire area off and interviewed everyone near the crime scene. Nhan
27  and Vn were detained until early the next morning but eventually released because
28  they didn't know anything. (Id.,at Translation,P1,Paragraph 2.)

6(A)(16)

1

2       Subsequently, on or around July 22, 1999, Nhan was arrested in connection

3    with a robbery. Then, Nhan wrote that, for some unexplained reason, the Police

4    began to question him about the murder at Hoan My Restaurant. (Id.,at

5    Translation,P.1,Paragraph 3.)

6

7       At this point, Nhan's letter becomes somewhat confusing. However, he wrote

8    that the police knew he was present at the Hoan My Restaurant. And Nhan

9    appeared to have written that the police, knowing he actually did not know anything

10   about the murder at Hoan My Restaurant, wanted him to testify as an eye witness

11   to the murder and gave him all the police reports of people who witnessed the

12   murder and people who said thing about petitioner. Nhan was told to familirize

13   himself with the reported facts of the murder. In fact, Nhan wrote specific

14   information that he attained from the reports. For example, Nhan wrote "you

15   (petitioner) know, the information read that you came to Hoan My, had an argument

16   with someone and shot them. Nhan Knew these facts; notwithstanding, he repeatedly

17   wrote that he never met petitioner and vis-a-vis. (Id,Trans.,at P.2,Paragraph 2.)

18   The Police offered some sort of deal, presumably assistance with the robbery case.

19   (Id.)

20

21      Nhan, however, refused the deal. And the police threaten to connect him

23   to the murder at Hoan My Restaurant. Thus, Nhan agreed to testify as a witness

24   for the prosecution. And Nhan's robbery charge was dropped.

25

26      Then, on or around August 18, 1999, Nhan was again arrested in connection

27   with a home invasion incident and was, eventually, convicted and sentenced to

28   13 years and eight months in prison. (Id.)

1

2    Lastly, Nhan wrote that while he was in prison, he was subpoenaed to testify

3 against petitioner and was instructed to identify petitioner in open court, but he

4 somehow avoided going to court. Then, Nhan was visited by the D.A. and detectives,

5 who again threaten him with some kind of adverse repercussion if he did not testify

6 against petitioner. Nhan explained that he actually hired an attorney to handle

7 this problem. (Id., at P.2, Paragraphs 3, P.3, Paragragh 1.)

8

9    Therefore had Defense Counsel Rios investigated and interviewed Nhan.

10 He would have come to know the information that Nhan conveyed in his letter.

11 And inspite of the fact that Nhan never testified for the prosecution, Nhan himself

12 was a powerful tool that the defense could have used to undermine the

13 trustworthiness of the prosecution's case in chief, because Nhan's testimony would

14 have communicated to the jurors a grave act of prosecutorial misconduct.

15

16       //

17

18

19

20

21

23

24

25

26

27

28

1  Prejuduicial effect of Counsel's Ineffective Assistance

2

3     First, defense counsel failed to object in a timely fashion

4  to clearly inadmissible testimony that Tina Ha believed that

5  petitioner got the gold bars through illegal activities. By the

6  time defense counsel realized the impropriety of this evidence,

7  which was one question too late, the damage had been done.

8

9     Second, by defense counsel's own admission he failed to listen

10 to taped statements of two witnesses; as a result of this failure

11 defense counsel went into an area of cross-examination with a

12 critical prosecution witness that resulted in the witness

13 emotionally breaking down on the stand as a result of the ill-

14 founded cross-examination which never would have occurred had

15 defense counsel listened to the taped statements in question,

16 This is clear from the fact that when defense counsel learned

17 of the content of the taped statements in question, defense counsel

18 withdrew the line of questioning that had resulted in the critical

19 prosecution witness emotionally breaking down on the witness stand.

20

21    Third, defense counsel failed to raise a critical and important

23 objection to the testimony of the probation officer, which if

24 timely raised would have precluded all of the testimony of the

25 probation officer which obviously reflected upon prior criminal

26 conduct by petitioner.

27

28    Fourth, defense counsel failed to raise a timely objection

1   to improper argument by the prosecutor wherein the prosecutor

2   was able, without a competent evidentiary basis in the record,

3   to paint a graphic picture of an attack that was perpetrated at

4   the Hoan My Restaurant purportedly by petitioner, and others.

5   just a month before the shooting in this case.

6

7     Fifth, defense counsel failed to adequately investigate the

8   facts of the assault which took place at Hoan My Restaurant, one

9   month before the shooting in this case. And defense counsel's

10  failure to investigate that assault resulted in a booking photo

11  and a fingerprint card, purportedly stemming from petitioner's

12  arrest in connection with that assault, to be admitted into

13  evidence. Petitioner however was not arrested in connection with

14  the assault.

15

16     Six, defense counsel failed to investigate and interview a

17  prosecution witness, who initially reported that he saw petitioner

18  shoot the victim but later recanted his statement. By defense

19  counsel's failure to investigate this witness critical and

20  important information which undermined the trustworthiness of the prosecution

21  case in chief, was loss.

23

24     ////                             ////

25

26

27

28

1

2

3 **Petitioner Was Denied The Effective Assistance Of Counsel**

4

5 **The Relevant Law Pertaining To Incompetence Of Counsel**

6

7    The United States and California Constitutions both guarantee all criminal

8 defendants the right to be assisted by counsel. (U.S. Const., Amend.VI; California

9 Const., article I, section XIV.) The right to be assisted by counsel encompasses

10 not only access to counsel, but the benefit of counsel's effective assistance. (People

11 v. Lucas, (1995) 12 Cal. 4th 415,436; McMann v.Richardson, (1970) 397 U.S.

12 759,771,fn.14; Powell v. Alabama, (1932) 287 U.S.45 71.) Effective assistance requires

13 that counsel for an accused acts as a diligent conscientious advocate on behalf

14 of his client. (Anders v. California, supra,386 U.S.at P.744; People V. Pope, (1979)

15 23 Cal.3d 412,423.)

16

17    The proof that an attorney's assistance was so defective as to require reversal

18 of a conviction involves two components. First, petitioner must show his attorney's

19 performance was deficient. In re Marquez, (1992) 1 Cal.4th 584,602,citing, Strickland

20 v. Washington, (1984)466 U.S.668,687 and People v. Pope, supra,23 Cal.3d at P.425.)

21

23    "Deficient" means that "Counsel's representation fell below an objective

24 standard of reasonableness." (Strickland v. Washington, supra,466 U.S.at 688; People

25 v. Pope, supra,23 Cal.3d at Pp.423-425.)

26

27    Second, petitioner must show prejudice resulted from his counsel's deficiencies.

28 Under the federal standard of prejudice, petitioner must show there is a "reasonable

6(A)(21)

1   probability that but for counsel's unprofessional errors the result of the proceeding

2   would have been much different. A reasonable probability is a probability sufficient

3   to undermine confidence in the outcome. (**Strickland v. Washington**, supra,466 U.S.at

4   Pp.693-694; **In re Fields**, (1990) 51 Cal. 3d 1063,1070.) Under the California standard

5   of prejudice, petitioner must show that counsel's acts or omissions deprived

6   petitioner "of an adjudication of a crucial or potentially mentorious defense." (**People**

7   **v. Shaw**, (1984) 35 Cal.3d 535,541.) "A crucial defense is not necessarily one which,

8   if presented, would result inexorably in a defendant's acquittal. (Id.,at P.541, citing,

9   **People v. Pope**, supra,23 Cal.3d at P.425,fn.15.)

10

11   Therefore, countless authorities have stressed that factual investigation is

12   crucial to competent representation. "Counsel's first duty is to investigate the

13   facts of his client's case and to research the law applicable to these facts.

14   Generally, both the federal and State constitutions require counsel's diligence and

15   active participation in the full and effective preparation of his client's case,

16   investigating carefully all defenses of fact and of law that may be available to

17   the defendant. (**People v. Ledesma**, (1987) 43 Cal.3d 171,222.)

18

19   In addition, inadequate factual investigation by defense attorneys has led

20   to a number of reversals of criminal convictions or modification of sentences.

21   (See e.g. **People v. Ledesma**, supra,43 Cal.3d at Pp.207-208,227 (trial counsel failed

23   to make use of evidence and leads contained in material she obtained pretrial

24   from the defendant's prior counsel); **In re. Cordero**, (1988) 46 Cal.3d 161,173 (trial

25   counsel "failed egregiously to pursue leads and evidence made available to him");

26   **In re Hall**, (1981)30 Cal.3d 408,417-421 (trial counsel failed to persue numerous

27   substantial leads which would have led to valuable witnesses for the defense); **In**

28   **re Marquez**, supra,1 Cal.4th at Pp.599-609 (Counsel failed to inteview possible

1  alibi witnesses); **In re Jones**, (1996) 13 Cal. 4th 552,566-567,583,584 (trial counsel

2  made no attempt to locate a witness whom, according to a police report furnished

3  to counsel, had made statements tending to exculpate the defendant); **People v.**

4  **Williams**,22 Cal.App.3d 34 (failure to object to prejudicial hearsay).)

5

6  **Habeas Coupus Is A proper Vehicle For The Presentation of Petitioner's Claim**

7

8          The claim asserted in this ground for relief is that the petitioner was deprived

9  of his constitutional right to the effective assistance of counsel. In addition, the

10  first four showings of ineffective assistance of counsel were presented to the

11  California Court of Appeal on direct appeal. However, as to those four allegations

12  of ineffective assistance of counsel, the factual bases rest in part on evidence

13  in addition to that contained in the record on appeal. Therefore, those claims could

14  not have been presented as strongly on appeal as they have been herein. (See **In**

15  **re Hochberg**, (1970) 2 Cal.3d 870,875.) Although habeas corpus cannot serve as

16  a second appeal, denial of the right of counsel is a claim cognizable on habeas

17  corpus whether or not it was raised on appeal. (Id.)

18

19          Furthermore, as stated in **People v. Pope**, supra,23 Cal.3d at p.426:

20

21          Where the record does not illuminate the basis for the challenged

23  acts or omissions, a claim of ineffective assistance is more appropriately made

24  in a petition for habeas corpus. In habeas corpus proceedings, there is an opportunity

25  in an evidentiary hearing to have trial counsel fully describe his or her reasons

26  for acting or failing to act in the manner complained of.... For example, counsel

27  may explain why certain defenses were or were not presented. Having afforded

28  the trial attorney an opportunity to explain courts are in a position to intelligently

1   evaluate whether counsel's acts or omissions were within the range of reasonable
2   competence.

4        ////                                        ////

1  need more space. Answer the same questions for each claim.

2  [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim Seven: Petitioner was denied the affective assistance of

6  appellate attorney

7  Supporting Facts: Please refer to the following pages-Pages 6(B)(1)-
   6(B)(5)

8

9

10

11  Claim Eight: Trial court abused its discretion when it denied

12  petitioner's request to proceed Pro Se

13  Supporting Facts: Please refer to the following pages-Pages 6(B)(6)-

14  6(B)(12)

15

16

17  Claim Nine: Trial Court abused it desecration when it found Petitioner

18  was properly Mirandized, understood questions, and waived Miranda
    rights

19  Supporting Facts: Please refer to the following pages-Pages 6(B)(13)-

20  6(B)(25)

21

22

23  If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  N/A

26

27

28

PET. FOR WRIT OF HAB. CORPUS        6 (B)

1          **Memorandum of Points and Authorities**

2

3    **Ground One**

4

5          **Petitioner Was Denied the Effective Assistance of**

6    **Appellate Attorney**

7

8    **The Relevant Law Pertaining To Ineffective Assistance Of Appellate**

9    **Attorney**

10

11         The United States Supreme Court held that the

12   constitutional requirement of substantial quality and fair process

13   can only be attained where court appointed appellate counsel for

14   a criminal defendant acts in the role of an active advocate in

15   behalf of his client, as opposed to that of amicus curiae.

16   **(Anders v. California**,(1967) 386 U.S.738,788, 87 S.Ct.1396,18

17   L.Ed.2d 493.) Appellate counsel "must not only perform as an

18   advocate,  but must perform competently as well. (**In re Bank**,

19   4 Cal.3d 337,342,93 Cal.Rptr.591,594.)

20

21         In prosecuting an appeal, the United States Supreme

23   Court observed that a criminal appellant must face an adversary

24   proceeding that "like a trial is governed by intricate rules that

25   would be hopelessly forbidding to a lay person." An unrepresented

26   appellant is unable to protect the vital interests at stake, and

27   an appellant with nominal representation is in no better position

28   than one who has no counsel at all.(**Evitts v. Lucey)**,  (1985)469

1  U.S.387.)

2

3        In recent years, unsuccessful appellants have

4  increasingly challenged the effectiveness of appellate counsel.

5  Competence of appellate representation became a constitutional

6  issue in **In re Smith**, (1970) 3 Cal.3d 192,90 Cal.Rptr.1. In this

7  case the California Supreme Court said that "each of the counts

8  on which petitioner was convicted was potentially vulnerable

9  to legitimate and provocative appellate contentions that should

10  have been manifest to an alert and responsive attorney." (3 Cal.3d

11  at 198,90 Cal.Rptr.at 4.) The court has since held that the

12  inexcusable failure of appointed counsel to raise issues of

13  arguable merit on appeal deprives defendant of his or her

14  constitutional right to a "competent advocate." (**People v. Barton**,

15  (1978) 21 Cal.3d 513,146 Cal.Rptr.727.)

16

17        In **In re Greenfield**, (1970)11 Cal.App.3d 536,89

18  Cal.Rptr.847, counsel neglected to cite a recent line of cases

19  that would have resulted in reduction of the charge against

20  appellant. The court concluded that appellant had been denied

21  adequate representation at both the trial and appellate level.

23  In **People v. Lang** (1974) 11 Cal.3d 134,139,113 Cal.Rptr.

24  Cal.Rptr.9,12, Counsel's appellate brief stated that he disagreed

25  with defendant's assertion that the trial court evidence was

26  insufficient to sustain the conviction. The court held that the

27  inadequacy of counsel's presentation deprived appellant of his

28  constitutional right of effective counsel. The court also noted

1 several grounds of possible deficiency of trial counsel that

2 appellate counsel failed to pursue.

3

4 **Appellate Counsel's Ineffectiveness**

5

6          Petitioner submits that the record on appeal contained

7 several grounds of possible trial error and possible deficiency

8 of trial counsel that appellate counsel failed to pursue, for

9 Expmple:

10

11          1. Trial Court Abused Its Discretion When It Denied

12             Petitioner's Request for Leave to proceed Pro Se.

13

14          2. Miranda Violation.

15

16          3. Petitioner Was Denied the Effective Assistance of

17             Trial Attorney.

18             A) **Inadequate Pretrial Investigation**

19                1)Photograph

20                2) Fingerprints

21                3) Interrogation (no interpreter thereat)

23

24

25          Petitioner is aware that contentions which could have

26 been raised by a timely appeal but were not ordinarily cannot

27 be renewed (Or raised for a first) in a petition for habeas corpus.

28 (**In re Terry**, (1971) 4 Cal.3d 911,927,95 Cal.Rptr.31,43.) However,

1  deprivation of certain fundamental constitutional rights can be

2  raised on habeas corpus even though no appeal was taken, or the

3  issue was rejected previously on appeal. (**In re Foss,** (1974) 10

4  Cal.3d 910,930,112 Cal.Rptr.649,662; **In re Hochburg,** (1970) 2

5  Cal.3d 870,875,87 Cal.Rptr.681,684; **In re Wagner**, (1981) 119

6  Cal.App.3d 90,102,173 Cal.Rptr.766,770.) Moreover, a court always

7  has discretion to issue the writ if it believes an appeal is (or

8  was) not an adequate remedy. (**In re Duran**,(1974) 38 Cal.App.3d

9  632,635,113 Cal.Rptr.442,444, Cited with approval by the court

10  in **In re Jeanice,D.**,(1980) 28 Cal.3d 210,214,n.3,168 Cal.Rptr.455,

11  456,n.3.) Furthermore, the requirement that appellate or other

12  remedies be exhausted before habeas corpus will lie is a

13  discretionary policy, governing the exercise of the reviewing

14  courts jurisdiction to issue the writ. When special circumstances

15  exist, failure to have raised the issue first on appeal does not

16  preclude habeas corpus. (**in re Coughlin**, (1976) 16 Cal.3d 52,55,127

17  Cal.Rptr.337,339; **In re Crow,**(1971) 4 Cal.3d 613,622,Fn.9,94 Cal.

18  Rptr.254,261,fn.9.)

19

20        Petitioner, in this instant habeas corpus petition,

21  alleges that he was deprived of his constitutional right to the

23  effective assistance of counsel, on direct appeal. Appellate

24  counsel failed to raise certain assignments of error which, in

25  and of themselves, violated petitioner's fair trial rights, under

26  both the United States and California Constitutions.

27  (U.S.Const.,Amends.VI,XIV; Calif. Const.,Art.1,Section 15.)

28

Accordingly, Petitioner requests that the court

1   determines the adequacy of appellate counsel by the merit of the

2   forthcoming grounds for relief. In addition, petitioner requests

3   that the court to consider the merit of the forthcoming grounds

4   for relief for the purpose of issuing the petition for writ of

5   habeas corpus.

6

7

8                ////                                                    ////

9

10

11

12

13

14

15

16

17

18

19

20

21

23

24

25

26

27

28

PRINTED ON RECYCLED PAPER

6(B)(5)

1  **Ground Two**

2

3       **Trial Court Abused Its Discretion When It Denied Petitioner's Request to**

4       **Proceed Pro Se**

5

6  **The Relevant Law Governing Self-Representation**

7

8       A criminal defendant has an unconditional constitutional right of self-

9  representation if on timely motion the trial court determines that he voluntarily

10  and intelligently elects to do so. (**Faretta v. California,**(1975) 422 U.S.806,833-835,95

11  S.ct.2525,45 L.Ed.2d 562.) Erroneous deprivation of the timely asserted unconditional

12  right of self-representation in a criminal case is reversible error Per se. (**People**

13  **v. Joseph**, (1983)34 Cal.3d 936,945-948,196 Cal.Rptr.339,671 P.2d 843; **People v**

14  **Tyner,** (1977) 76 Cal.App.3d 352,356,143 Cal.Rptr.52.) If the conventional doctrine

15  of harmless error were applied, it would render the right of self-representation,

16  virtually unenforceable, since in most criminal prosecutions an attorney could offer

17  a better defense than could unskilled defendants. (**People  v.Freeman**, (1977) 76

18  Cal.App.3d 302,309-310,142 Cal.Rptr.806.)

19

20       To invoke the right of self-representation, the defendant must make an

21  unequivocal request to represent himself. (**Adams v. Carroll,**(9th Cir.1989) 875 F.2.d

23  1441,1444 (although "unequivocal requirement was only mentioned in passing in

24  **Faretta v. California**, supra, 422 U.S. 806,835,95 S.Ct.2525,45 L.Ed.2d 562, it was

25  a prequisite in the Ninth Circuit long before that decision and has remained so

26  ever since).) This requirement acts as a backstop for the defendant's right to

27  counsel, by ensuring that the defendant does not inadvertently waive that right

28  through occasional musing on the benefits of self

representation. It also prevents a defendant from taking advantage of the mutual exclusivity of the rights to counsel and self–representation by vacillating between representation by counsel and self–representation. Rather the defendant is forced to make an explicit choice, if he equivocates he is presumed to have requested the assistance of counsel. **(Adams v.Carroll,** supra,875 F.2d at 1444.)

In addition, to invoke the right of self–representation, a defendant in a criminal trial should make an unequivocal assertion of the right within a reasonable time before the commencement of the trial. (**People v. Windham,** 1977) 19 Cal.3d 121,127–128,137 Cal.Rptr. 8,560 P.2d 1187; See also, **People v. Hawkins,** (1899) 127 Cal.372,374,59 P.697(criminal trial is deemed to have commenced when jury is empaneled or when empanelment of jury has begun).) If the motion is timely made, and the defendant makes a knowing and intelligent waiver of counsel, the court "must" permit the defendant to represent himself. (**People v. Wilks,** (1978) 21 Cal.3d 460,468,146 Cal.Rptr.364,578 P.2d 1369 (motion made after trial is continued is timely so long as motion precedes actual commencement of trial).) On the other hand, if the motion is made after a reasonable time before trial has passed, the court is no longer required to grant the motion and instead has the discretion to grant or deny it. Among the factors that the court may consider are whether or not the defendant is prepared to begin trial at the appointed time, without a continuance to prepare for his defense and whether or not the defendant has brought the untimely motion for purposes of delay and whether or not the defendant can show reasonable cause for the lateness of his request. (**People v. Moore,** (1988) 47 Cal.3d,63,79,252 Cal.Rptr.494,762 P.2d 1218.)

A request for self–representation requires the trial judge to determine whether the defendant's election to waive counsel is made voluntarily and intelligently.

1   The sole issue to be determined is whether the defendant has the mental capacity

2   to waive the right to counsel, with a realization of the probable risks and

3   consequences of that action. (**Faretta v. California,**supra,422 U.S.at 835.) The purpose

4   of the knowing and voluntary inquiry is to determine whether the defendant actually

5   does understand the significance and consequences of a particular decision and

6   whether the decision is coerced. The trial court may not conduct a perfunctory

7   hearing on the issue, and the record must show that the defendant made a knowing

8   and intelligent election. (**Godinez v. Moran**, (1993) 509 U.S._____,113 S.Ct.2680,

9   125 L.Ed.2d 321,333,fn.12; **Curry v. Superior Court**, (1977) 75 Cal.App.3d 221,225,141

10  Cal.Rptr.884.)

11

12       Finally, if the court has doubt regarding a defendant's competence to exercise

13  the right of self-representation, it should conduct an inquiry or order a psychiatric

14  evaluation. If such doubt exist, the trial court must determine whether the defendant

15  has a rational understanding of the proceeding. This determination is the same

16  as that for determining competence to stand trial, in fact, if the defendant has

17  already been found competent to stand trial under penal code section  1368, the

18  trial court need not make a second independent determination of the issue. The

19  focus of the question is whether the defendant has the competence to waive the

20  right to counsel, and not whether the defendant has the competence to represent

21  himself or the legal skills with which to do so. (**People v. Burnett,** (1987)188

23  Cal.App.3d 1314,1319,234 Cal.Rptr.67; **Faretta v. California**, supra, 422 U.S. 835,95

24  S.Ct.2525,45 L,Ed.2d 562.)

25

26       In the instant matter, on December 8,1999, four months and twenty-two days

27  before trial commenced, petitioner appeared for a Marsden motion before Honorable

28  Paul R. Teilh, in Department No.35 of the Superior Court for the County of Santa

*PRINTED ON RECYCLED PAPER*

6(B)(8)

1    Clara. At that Marsden motion hearing, petitioner explained to the Court his reasons

2    for not wanting attorney Rios as his trial counsel. (See Exhibit A, Marsden motion,

3    at Pp.42-48, P.49 Ins.1-10.)

4

5        The Marsden motion was denied when the Court concluded, "It appears to

6    me that Mr.Rios has acted properly under the circumstances, and the motion is

7    denied. "The Court then stated, "You will remain in the case, Mr.Rios." (Exhibit

8    A, at P.49,Ins.7-9.)

9

10       The petitioner declared, "Your Honor, I'm going represent myself. Your Honor,

11   I don't need him (Attorney Rios) to represent me. If you don't help me, I'll

12   represent me." (Id.,at P.49,Ins.11-13) and "He (Attorney Rios) work with the D.

13   A. , so I cannot trust him, your Honor. If you let him work for me, your Honor,

14   I'm- honorably and respectfully, I represent myself. (Id.,at 49,Ins.20-22.)

15

16       Petitioner submits he clearly invoked his right of self presentation under

17   **Faretta v. California**, supra,422 U.S.806,95 S.Ct.2525,45 L.Ed.2d 565, wherein the

18   United States Supreme Court held that a criminal defendant who is competent

19   has a constitutionally protected right, under the Sixth and Fourteenth Amendments,

20   to waive the right to counsel and represent himself.

21

23       Before a motion for self-representation is granted, however, "the defendant

24   should be made aware of the dangers and disadvantages of self-representation,

25   so that the record will establish that he knows what he is doing, and his choice

26   is made with open eyes. (Citations). (**People v. Jones**, (1991) 53 Cal.3d 1115,1141,282

27   Cal.Rptr.465,811 P.2d 757; internal quotations omitted.) "The right to

28   self-representation, although constitutionally based, 'must be initiated by a timely

1    and unequivocal assertion by the defendant....' (Citation.)" (**People v. Clark**, (1992)

2    3 Cal.4th 41,98,10 Cal.Rptr.2d 554,833 P.2d 561.) Once such an assertion is made,

3    the court must determine whether the accused has the mental capacity to make

4    a voluntary and intelligent waiver of his right to counsel. (**People v. Joseph** (1983)

5    34 Cal. 3d 936,943,196 Cal.Rptr.339,671 P.2d 843.)

6

7    Here, as stated heretoabove, petitioner made three unequivocal assertions

8    as regards to self-representation: (1) "Your Honor,  I'm going to represent

9    myself...." (Exhibit A, at P.49,Ins.11-12),(2)"..., I'll represent me" (Id.,at P.49, In.13),

10   and (3) "Your Honor, I'm honorably and respectfully (requesting that) I represent

11   myself." (Id.at P.49 Ins.21-22.)

12

13   In addition, petitioner's assertions were timely made, as are substantiated

14   by three statements made by the Judge: (1) "This matter still has not reached

15   preliminary examination" (Exhibit A, at P.46,Ins.26-27),(2) "Well, you (Attorney

16   Rios) are far from trial on this case" (Id,.at P.46,Ins.23-24), and (3) "We're not

17   anywhere close to a trial." (Id,.at P.49 Ins.3-4.)

18

19   Notwithstanding Petitioner's timely and unequivocal assertions, the judge

20   exhibited a total disregards for his duties, once petitioner made such assertions,

21   to ascertain whether petitioner had the mental capacity to waive his constitutional

23   right to counsel, with a realization of the probable risks and consequences of his

24   action and to ascertain whether petitioner election to waive counsel was made

25   voluntarily and intelligently, opting instead to ignore petitioner's invocations for

26   self-representation.

27

28   Moreover, the Judge showed a total disregard for the legal tenet that if

1   the motion for self-representation is timely made and the defendant has made

2   a knowing and intelligent waiver of counsel, the court must permit the defendant

3   to represent himself. (See **People v. Wilks**, supra, 21 Cal.3d at P. 468; **People v.**

4   **Windham**, supra, 19 Cal.3d at PP.127-128; **People v. Hawkins,** supra, 127 Cal.

5   at P.374.)

6

7      Petitioner submits, the instant matter is not similar to other cases where

8   the defendant made an equivocal request for Pro Se status and where the defendant

9   expressed a dissatisfaction with counsel which was not accompanied by a direct

10   request for self-representation (See,e.g., **People v. Clark**, supra,3 Cal.4th 41,98,10

11   Cal. Rptr.2d 554,833 P.2d 561; **People v. Wright**, (1990) 52 Cal.3d 367,409-410,276

12   Cal.Rptr. 731,802 P.2d 221), or where the record showed that the request for Pro

13   se status was made in conjunction with an attempt to manipulate the court into

14   relieving one attorney and appointing another. (See e.g. **People v. Williams**, (1990)

15   220 Cal.App.3d 1165,1170,269 Cal.Rptr.705.)

16

17      Here, in addition to complaining about the quality of appointed counsel,

18   Petitioner clearly stated he did not need an attorney "to represent" him. (See

19   Exhibit A at P.49 Ins.11-12.) And, here, there is no evidence of gamesmanship

20   or manipulation. The facts of the record are more akin to those in **People v. Joseph**,

21   supra, where the Supreme Court held that the defendant's request for

23   self-representation was not equivocal, even though it was preceded by a Marsden

24   motion during which the defendant expressed his lack of confidence in appointed

25   counsel. (34 Cal.3d at PP. 940-941,944,fn.3,196 Cal.Rptr.339,671 P.2d 843.)

26

27      Also, this Court should not construe petitioner's acquiescence in the Judge's

28   decision to ignore his invocations to self-representation as an act of equivocation.

1    Any failure on petitioner's part to argue more vociferously must be attributed

2    to the apparent futility of any further challenge to the court's disposition.

3

4        For the foregoing reasons, petitioner asserts that his right of self-

5    representation was improperly denied (or refused) and since an error in denying

6    an accused the right to pled his own cause is reversible Per se (**People v. Joseph**,

7    supra, 34 Cal.3d 936,946-948,196 Cal.Rptr.339,671 P.2d 843; accord, **People v. Ortiz**,

8    (1990) 51 Cal.3d 975,988-989,275 Cal.Rptr.191 800 P.2d 547), there is no requirement

9    to show prejudice arising therefrom. Therefore, this court should reverse the

10   judgment of conviction.

11        ////                                                    ////

12

13

14

15

16

17

18

19

20

21

23

24

25

26

27

28

6(B)(12)

1  Ground Three

2

3          Trial Court Abused Its Discretion When It Found

4          Petitioner Was Properly Mirandized, Understood

5          Each Of The questions, And Waived Each Of The

6          Miranda Rights

7

8          On April 23, 1999, at 2:40 a.m. petitioner, Tai Quoc Dang, was interrogated

9   by Sgt. Santiago Trejo and Sgt. Ramirez of the San Jose Police Department.

10  Sgt.Santiago initiated the interrogation when he asked, "Listen there's some confusion

11  as to who, who are you? And the forthcoming colloquy ensued:

12

13          Tai Q Dang:    (unintelligible) Lee.

14          Sgt. Ramirez: Okay Mr. Ling....

15          Tai Q Dang:    Yes.

16          Sgt. Ramirez: or Lee?

17          Tai Q. Dang:  Lee.

18          Sgt. Ramirez: or Lee?

19          Tai Q. Dang:  Yes.

20          Sgt. Ramirez: Like I said there's some confusion. We have an arrest

21                          warrant for a person by the name of Tai Dang, and

23                          I know you've talked to the other investigators and

24                          told'em that your name, that your real name is Lee?

25          Tai Q. Dang:  Yes.

26          Sgt. Ramirez: And that you are not Tai Dang, right?

27          Tai Q. Dang:  No.

28          Sgt. Ramirez: Is that correct?

*PRINTED ON RECYCLED PAPER*

1        Tai Q. Dang:   Yes

2        Sgt. Ramirez: Okay, ur we have an arrest warrant obviously for for

3                    Mr. Tai Dang, Okay, on something that happened down

4                    in San Jose if you're not him than we'll go ahead and

5                    proceed- we'll talk to you and then we'll try to get

6                    this straightened out and get you on your

7                    way as soon as possible....

8        Tai Q. Dang:   Yes.

9   (See Exhibit B, at P.11,Ins.1-28,P.12 Ins.1-3.)

10

11     Then, Sgt. Ramirez spoke of a couple of procedures that had to be done;

12  he introduced Sgt. Trejo and himself. (Id.,at P.12,Ins.4-15.) In the same way, Sgt.

13  Ramirez had one other thing he had to do, and he had to read something. (Id.,at

14  P.12,Tns.16-18.) The pertinent colloquy followed:

15

16        Sgt. Ramirez: Before we do, before I do this do you understand English?

17        Tai Q. Dang:   Not very well.

18        Sgt. Ramirez: Not very well.

19        Tai Q. Dang:   Yes.

20        Sgt. Ramirez: Okay.

21        Tai Q. Dang:   I understand a little bit.

23        Sgt. Ramirez: Okay if there's anything I tell you that you don't

24                    understand let me know if there's any questions I ask

25                    that you don't understand let me know okey....

26        Tai Q. Dang:   Yeah.

27        Sgt. Ramirez: And I'll either try to re-word it or clarify it or do

28                    what ever I can to make you understand it okay.

1              Tai Q. Dang:  Yeah.

2              Sgt. Ramirez: Let me read this. You have the right to remain silent

3                                  do you understand?

4              Tai Q. Dang:  Yes.

5              Sgt. Ramirez: Let me read this. You have the right to remain silent

6                                  do you understand?

7              Tai Q. Dang:  Yes.

8              Sgt. Ramirez: Anything you say may be used against you in court,

9                                  do you understand that?

10             Tai Q. Dang:  (No audible response.)

11             Sgt. Ramirez: Yes?

12             Tai Q. Dang:  Yes.

13             Sgt. Ramirez: Okay, you have the right to the presence of an attorney

14                                  before and   during any questioning, do you understand

15                                  that?

16             Tai Q. Dang:  No.

17             Sgt. Ramirez: Okay you don't?

18             Tai Q. Dang:  Not very well some I understand some I don't.

19             Sgt. Ramirez: Okay, do you understand that you have the right to

20                                  the presence of an attorney before and during any

21                                  questioning do you understand....

23             Tai Q. Dang:  No not really (Unintelligible)

24             Sgt. Ramirez: It means that you have, that's that's a right that you

25                                  have.

26             Tai Q. Dang: Yes.

27             Sgt. Ramirez: Do you understand that?

28             Tai Q. Dang:  Yes.

1              Sgt. Ramirez: Okay, If you cannot afford to ...If you cannot afford

2                      an attorney one will be appointed for you free of charge

3                      before any questioning if you want do you understand

4                      that?

5           Tai Q. Dang:   Yes.

6    (Id.,at p,12,Ins.19–28,P.13,Ins.1–28.)

7

8        At that point, Sgt. Ramirez proceeded to interrogate petitioner. (Id.,at P.14.)

9

10      Thereafter, on April 25, 2000, a 402 hearing occurred before Honorable James

11   H, Chang, regarding the voluntariness of petitioner's statements made during the

12   interrogation and some Miranda issues (See Exhibit C, at P.54,Ins. 17–26.) For this

13   Court's consideration, the entire 402–hearing transcript has been attached as exhibit

14   C.

15

16      At the 402 hearing, the prosecution called Sgt. Santiago Trejo, presumably

17   to establish that petitioner was properly Mirandized and that he voluntarily waived

18   Miranda rights. Sgt. Trejo testified that Miranda admonitions were discussed with

19   petitioner (Exhibit C, at P.59,Ins. 16–19.) and that he (Sgt. Trejo) determined

20   petitioner did speak English (Id.,at P.60,Ins. 2–10); Sgt. Trejo observed that when

21   he or his partner asked the questions, petitioner would answer appropriately–he

23   would answer consistently to what the questions were. (Id., at P.71, Ins.1–15.)

24

25      After hearing Sgt. Trejo's testimony, the court found that petitioner was

26   properly Mirandized and that he understood each of the questions that were asked

27   to him and that he waived each of the Miranda rights that he was advised of.

28   (Id.,at P.71,Ins.27–28,P.72,Ins.1–2.)

1

2    Also, the court found that petitioner understood the questions that were put

3    to him. There's no indication that he misunderstood any of the questions because

4    of his ability to speak English. (Id.,at P.72, Ins.3-6.)

5

6    And finally, the Court found that petitioner's statements were made

7    voluntarily: he was not coerced in any way. And there was nothing improper by

8    way of threats, coercion, promises, inducements, or otherwise that would make

9    petitioner's replies or statements to the police involuntary. (Id.,at P.72,Ins.7-12.)

10

11    In **Miranda v. Arizona**, (1966) 384 U.S.436,86 S.Ct:1602,16 L.Ed 2d 694,the

12    Supreme Court devised a set of warnings that the police must give a suspect in

13    custody "before" they interrogate him in order to protect the suspect's privilege

14    against self-incrimination. For the purposes of Miranda "interrogation" includes

15    "any words or actions on the part of the police (other than those normally attendant

16    to arrest and custody) that the police should know are reasonably likely to elicit

17    an incriminating response from the suspect." (**Rhode Island v. Innis**, (1980) 448

18    U.S.291.)

19

20    At the trial, a heavy burden should have rested on the prosecution to

21    demonstrate that petitioner knowingly and intelligently waived his privilege against

23    self-incrimination and his right to retained or appointed counsel. (citations.)"

24    (**Miranda v. Arizona**, supra,384 U.S.at P.475,86 S.Ct.at P.1628.)

25

26    Here, however, as it more appropriately should have been had appellate counsel

27    presented the issue to tne court of appeal, on direct appeal, the question of the

28    voluntariness of petitioner's statements is based upon a review of the totality of

1     the circumstances surrounding the statements. (**Fare V. Michael C.,**(1979) 442

2     U.S.707,724-725,99 S.Ct.2560,2571-2572,61 L.Ed.2d 197,212: **People v.Sanchez,**(1969)

3     70 Cal.2d 562,576,75 Cal.Rptr. 642,451 P.2d 74,cert. dism. (1969) 394 U.S.1025,89

4     S.Ct.1646,23 L.Ed.2d 743; **In re Cameron** (1968) 68 Cal.2d 487,498,67

5     Cal.Rptr.529,439 P.2d 633.) The record must contain evidence from which the trial

6     judge could have found beyond a reasonable doubt that the statement at issue

7     was the product of a knowing and intelligent waiver of defendant's Miranda rights.

8     (**People v. Braeseke,** (1979) 25 Cal.3d 691.701,159 Cal.Rptr.684,602 P.2d 384,

9     judgment vacated cause remanded (1980) 446 U.S.932,100 S.Ct.2147,64L.Ed.2d

10    784,reiterated (1980) 28 Cal.3d 86,168 Cal.Rptr.603,618 P.2d 149, cert.den.(1981)

11    451 U.S.1021,101 S.Ct.3015,69 L.Ed.2d 395.) A reviewing Court must examine the

12    uncontradicted facts in the record to determine independently whether the trial

13    court's finding of intelligent waiver was properly made. As to conflicting testimony

14    the reviewing court must accept that version of events which is most favorable

15    to the People to the extent that it is supported by the record. (See,e.g., **People**

16    **v.Jimenez** (1978) 21 Cal.3d 595,609,147 Cal. Rptr.172,580 P.2d 672; **People v.**

17    **Prysock,** (1982) 127 Cal.App.3d 972,988-989,180 Cal.Rptr.15.)

18

19        Preliminarily, it should be noted that this court must independently assess

20    whether petitioner knowingly and intelligently waived his rights. This degree of

21    (habeas) scrutiny is required since the facts in the record are essentially

23    uncontradicted. (**People v. Jimenez**, supra,

24    21 Cal.3d 595,609,147 Cal.Rptr.172,580 P.2d 672.) Once such an assessment is made,

25    it will be apparent that the trial court erred in its findings.

26

27        As noted above the U.S. Supreme Court devised a set of warnings that the

28    police must give a suspect in custody "before" they interrtogate him in order to

1  protect the suspect's privilege against self-incrimination. Although the record is

2  silent as to whether, before the 402 hearing, the trial court had reviewed the

3  190 pages' worth of transcripts of petitioner's tape-recorded interrogation, those

4  transcripts were readily available to the court. Therefore, presumably, the totality

5  of the evidence presented before the trial court reveals that petitioner had been

6  interrogared  before he was Mirandized.

7

8  Contrary to Sgt. Trejo's testimony which conveyed first he and his partner,

9  Sgt. Ramirez, discussed Miranda Admonitions with petitioner. (See Exhibit C, at

10  P. 59,Ins,16-19), the transcript of petitioner's tape-recorded interrogation revealed

11  that first Sgt. Ramirez and Sgt. Trejo sought to question petitioner regarding his

12  identity. (Se Exhibit B, at P.11,Ins.1-28,P.12,Ins.1-3.)

13

14  Again, as noted above, for the purposes of Miranda ""Interrogation" includes

15  "any words or actions on the part of the police (other than those normally attendant

16  to arrest and custody) that the police should know are reasonably likely to elicit

17  an incriminating response from the suspect." (**Rhode v. Island**, supra,448 U.S.291)

18  It should be noted that Sgt. Ramirez and Sgt.Trejo knew the suspect (petitioner)

19  they  were interrogating was arrested, not merely detained. (See Exhibit C,at

20  P.58,Ins.25-28,P.59,Ins.1.)

21

23  With this in mind, Sgt. Ramirez and Sgt. Trejo had foreknowledge that the

24  suspect (petitioner) they were interrogating told Sacramento investigators that his

25  name was Lee. (Id.,at P.11,Ins.16-19.) Moreover Sgt. Ramirez and Sgt. Trejo knew,

26  before the interrogation began, the suspect they were interrogating was, in fact,

27  Tai Dang. (See Exhibit B, at P.70,Ins.3-20, P.174,Ins.8-9.)

28

1    It is a well known fact that a lie, especially in a criminological sense, is

2    construed as a conscious of guilt. The record, therefore, shows that Sgt. Ramirez

3    and Sgt. Trejo did not elicit a statement that directly related to petitioner guilt,

4    but rather they elicited, at the onset of their interrogation, an unmirandized

5    statement which directly related to petitioner's consciousness of guilt for which

6    the prosecution adversely used against petitioner at the trial. (See Exhibit D,

7    Appellant Opening Brief (AOB), at P.17, Paragraph 1.)

8

9    The record also shows that the trial court found, as had Sgt. Trejo

10   Testified (See Exhibit C, at P.60,Ins.2-10) that petitioner understood each of the

11   questions that were asked to him. Under careful analysis, however, the trial court's

12   finding is erroneous. And the record is replete with evidence which supports the

13   proposition that petitioner did not understand each of the questions that were

14   asked to him, at least not fully.

15

16   First, when Sgt. Ramirez asked petitioner, "(D)o you understand English?"

17   Petitioner answered, "Not very well" and "I understand a little bit." (Se Exhibit

18   B, at P.12,Ins.19-24) At that point, notwithstanding Sgt. Ramirez having told

19   petitioner that if there was anything he (petitioner) didn't understand that he would

20   try to clarify it (Exhibit C, at P.69 Ins.5-10), Sgt. Ramirez and Sgt. Trejo, to

21   protect petitioner privilege against self-incrimination and to preserve the propiety

23   of the interrogation, should have enlisted the services a Vietnamese interpreter.

24

25   Second, on July 28,1999, nine months and six days before trial commenced,

26   petitioner appeared for a Marsden motion before Honorable Ray E. Cunningham,

27   in Department No. 54 of the Superior Court for Santa Clara Judicial District.

28   And it should be noted that at this first Marsden motion there was a court

1 | interpreter (See Exhibit E, at P. 7, Ins. 13-15), as it was at the second Marsden

2 | motion. (See Exhibit A, at P. 41, Ins. 10-11.)

3

4 | At the July 28, 1999, Marsden motion, while explaining certain aspects of

5 | his visits with petitioner, trial counsel stated:

6 | I saw him this morning for a little over an hour and we discussed

7 | some of the supplemental reports I received on this case. And that

8 | was not with an interpreter. The time before that was last week and

9 | I met with Him all morning, and it was with an interpreter. And the

10 | interpreter translated to Mr. Dang pretty much a hundred and fifty

11 | pages of reports.... I did that because from what I could tell Mr.

12 | Dang's English was limited. So, I wanted to make sure that he

13 | understood what was in the police report. I am satisfied that every

14 | thing has been interpreted to him. (See Exhibit E, at P.8,Ins.15-26.)

15

16 | And again:

17

18 | I have visits when I don't need an interpreter, because I found that

19 | if I-We sort of talk and have the opportunity to repeat myself and

20 | explain things I can generally get by without an interpreter. However,

21 | when it comes to interpreting for the Court, we need an interpreter

23 | for then Mr. Dang's case is a challenging case from what I see so

24 | for. (Id.,at P.10,Ins.4-9.)

25

26 | In addition, when the hearing Court made its ruling on the Marsden motion,

27 | it stated:

28

PRINTED ON RECYCLED PAPER

6(B)(21)

1             And Mr. Rios (trial counsel) got an interpreter to come into the jail

2             and reread to you and translate the entire report, so you would, at

3             least be able to hear every word that was in the police report. (Id.,

4             at P.14,Ins.23.)

5

6   And again:

7

8             I think in the case you trust Mr. Rios. You appear very conscientious

9             talking with him, making sure you are understanding everything. And

10           he is not trying to demean you at the time. He is meeting certain

11           issues. He is comfortable as to certain issues and he is doing that

12           and the issues he is concerned about and wants to make a hundred

13           percent sure there is no miscommunication he wants to rely on the

14           interpreter to be safe. I think that is prudent and I think that is good.

15           (Id.,at P.16,Ins.6-13.)

16

17      Without doubt, the hereaboveto mentioned statements lead to primarily one

18   conclusion: for it to be safely determined that petitioner harbored no

19   miscommunication, he required an interpreter.

20

21      Indeed, Honorable Ray E. Cunningham's action of having provided a court

23   interpreter to assist petitioner at the Marsden motion hearing was antithesis of

24   the trial court's findings at the 402 hearing: that petitioner was properly Mirandized,

25   petitioner understood each of the questions that were asked to him, that petitioner

26   waived each of the Miranda rights that he was advised of him, and that there

27   was no indication that petitioner misunderstood any of the questions because of

28   his inability to speak English. (See Exhibit C,at P.71Ins.27-28,P.72,Ins.1-6.)

PRINTED ON RECYCLED PAPER

1

2       Third, relevant here is the law pertaining to court interpreters. In keeping

3   with the basic due process right of fairness California courts have held that a

4   defense interpreter is required where there is a showing of necessity. Therefore,

5   when a defendant cannot communicate in English with counsel or cannot understand

6   the English proceedings, and that fact is brought to the court's attention by the

7   defendant or his counsel and the court finds a need for a defense interpreter,

8   such an interpreter is required under the provisions of article I, section 14 of

9   California's constitution. (**People v. Carreon**, 151 Cal.App.3d 559,573,198 Cal. Rptr.

10  843,852.)

11

12      Article I, Section 14 of the California Constitution Provides: "(a) Person unable

13  to understand English, who is charged with a crime, has a right to an interpreter

14  throughout the proceedings." "California's constitution does not provide a half

15  measure of protection. Rather it requires that when an interpreter is appointed

16  for a criminal defendant, that interpreter must be provided to aid the accused

17  during the whole course of the proceedings." (P**eople v. Aguilar**, (1984)35 35Cal

18  785,790,200 Cal.Rptr.908,677 P.2d 1198.) "The defendant's right to understand the

19  instructions and rulings of the judge, the questions and objections of defense

20  counsel and the prosecution, as well as the testimony of witnesses is a continuous

21  one. At moment crucial to the defense... the non-English speaking defendant who

23  is denied the assistance of an interpreter is unable to communicate with the court

24  or with counsel and is unable to understand and participate in the proceedings

25  which hold the key to freedom. (Id.,35 Cal.3d at Pp. 790-791,200 Cal.Rptr.908,677

26  P.2d 1198.)

27

28      Finally, the above legal tenets regarding the appointment of an interpreter

6(B)(23)

1  guided the trial court's decision to appoint a court interpreter to assist petitioner
2  at trial proceedings. For prior to the presentation of evidence, at the April 25,
3  2000, 402 hearing, the trial court stated:

4

5              the record should also reflect that he's (petitioner is) being assisted
6              by the Vietnamese-speaking interpreter. And unless the record specifies
7              otherwise, he will be continued to be assisted by a Vietnamese-speaking
8              interpreter throught out the rest of this trial.

9  (Exhibit C, at P. 56,Ins.16-20.)

10

11  Ironically, even though the trial court found that petitioner, without an
12  interpreter at the interrogation, understood each of the questions that were asked
13  to him, and there was no indication that petitioner misunderstood any of the
14  questions because of his inability to speak English (Exhibit C, at
15  P.71,Ins.27-28,P.72Ins.1-6.), it also found that petitioner could not understand English
16  proceedings pursuant to article I, section 14 of the California Constitution and,
17  therefore, found the need for an interpreter to assist petitioner thought out the
18  trial.

19

20  Petitioner submits, it is an absurdity to suggest that he had complete
21  understanding of the English language on April 23, 1999, and then to suggest that
23  he lost the ability to understand English on April 25, 2000. That would be turning
24  the hands of implication backward, for example, rain means wet streets, but wet
25  streets do not mean rain. Therefore, the trial court's finding that petitioner was
26  properly Mirandized, because he understood each of the questions that were asked
27  to him and that there was no indication that petitioner misunderstood any of the
28  questions because of his inability to speak English was erroneous; it was not just,

1   but rather arbitrary and capricious.

2

3         ////                                                           ////

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

23

24

25

26

27

28

PRINTED ON RECYCLED PAPER

1 | need more space. Answer the same questions for each claim.

2 | [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3 | petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4 | 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5 | Claim Ten: The Prosecution introduced false evidence violating

6 | Petitioner's rights to a fair trial and due process

7 | Supporting Facts: Please refer to pages 6(C)(1)-6(C)(9)

8 |

9 |

10 |

11 | Claim

12 |

13 | Supporting Facts:

14 |

15 |

16 |

17 | Claim :

18 |

19 | Supporting Facts:

20 |

21 |

22 |

23 | If any of these grounds was not previously presented to any other court, state briefly which

24 | grounds were not presented and why:

25 |

26 |

27 |

28 |

PET. FOR WRIT OF HAB. CORPUS

6(C)

1  Ground Five

2

3      The Prosecution Introduced False Evidence

4      Violating Petitioners Rights To A Fair Trial And

5      Due Process

6

7      During petitioner's trial, he had certain trial rights that

8  arose from the United States Constitution, the California

9  Constitution, and California Statutes. Among those rights,

10  petitioner had the right to a fair trial.

11

12      The assurance of a fair trial is constitutionally founded

13  in due process. (U.S.Const.,Amend.IV;Cal.Const.,art.1,15;In re

14  Murchison, (1955)349 U.S.133,136,75 S.Ct.623,99 L.Ed.942; People

15  v.Sharp,(1972) 7 Cal.3d 448,459,103 Cal. Rptr.233.) and any

16  abridgement of the fair trial right is necessarily a due process

17  violation. Moreover, the right to a fair trial is a fundamental

18  right and applies to all criminal trials, regardless of the nature

19  of the charge. (Argersinger v. Hamlin, (1972) 407 U.S.25,40,92

20  S,Ct.2006,32L,Ed 2d 530.) A fair trial does not include the right

21  to proceedings that are planned or directed by the accused, but

23  rather proceeding that will accord the defendant the fullest

24  opportunity to perserve his or her rights and defense against the

25  charges. (people v. Whittington, (1977) 74 Cal.App.3d 806,820,141

26  Cal.Rptr 742.)

27

28                              //

PRINTED ON RECYCLED PAPER

6(C)(1)

1    Therefore, the prosecutor's role-restrained by the defendant's
2    right to prosecutorial fairness - at trial is to seek justice,
3    not convictions. (Berger v. United States,295 U.S.78,84,55
4    S.Ct.346,79 L.Ed.131; People v. Superior Court Greer, (1977)19
5    Cal.3d 255,266,137 Cal,Rptr.476.) For that reason, unseemly behavior,
6    on the part of the prosecutor, that has the effect of prejudicing
7    the defendant will be a violation of the defendant's fair trial
8    right. (See,e.g.,Evans v. Superior Court,(1974)11 Cal.3d 617,625,
9    114 Cal.Rptr.121.) or the distortion, or suppression, of material
10   evidence, whether or not done in good faith, violates the right
11   to a fair trial. (Giglio v. United States, (1972)405
12   U.S.150,153-154,92 S. Ct.849,31 L.Ed.2d 104; See also, People v.
13   Bolton, (1979) 23 Cal.3d 208,212-213,153 Cal.Rptr.141 (Misconduct
14   when prosecutor twice hinted that but for certain rules of evidence,
15   he could show that defendant had a record of prior convictions
16   when, in fact, defendant had no prior criminal record).)
17

18       In the instant matter, the prosecutor, no doubt, engaged in
19   unseemly behavior when she introduced false evidence that petitioner
20   was arrested, booked, and fingerprinted in connection with a brutal
21   assault upon another at the Hoan My Restaurant, on October 21,
23   1998, one month before the murder. And, there by, the prosecutor
24   prejudiced petitioner as well as violated his right to a fair trial
25   and to due process of law.
26

27       As hereinabove mentioned, the prosecutor, at the April 25,
28   2000, 402 hearing, sought to introduce, in her case in chief, the

PRINTED ON RECYCLED PAPER          6(C)(2)

1  facts that petitioner was arrested in connection with an incident
2  that took place at the Hoan My Restaurant. (See Exhibit C,at
3  P.75,Ins.9-22)

4

5      At the 402 Hearing, the prosecutor told the trial court that
6  petitioner was arrested on October 21st and that police took
7  petitioner fingerprints on that October 21st arrest. And that those
8  very fingerprints- fingerprint card was the one that was used to
9  find petitioners fingerprints on bottles and glasses on the table,
10  and the doors, and so forth the night of the murder. The prosecutor
11  further explained that there was a booking photo, from the October
12  21st arrest which she was going to introduce into evidence. The
13  prosecutor thought  it was imperative for the jury to understand
14  that petitioner was arrested on October 21,1998, so it would
15  understand that the booking photo and the fingerprint card, in
16  question, were  taken just one month before the murder, (See Exhibit
17  C,at P.78,Ins. 12-28,P.79,Ins.5-11.)

18

19      The records shows that the trial Court allowed the prosecutor
20  to present the facts that petitioner was arrested, booked, and
21  fingerprinted on October 21, 1998, in connection with an incident
23  that occurred at  the Hoan My Restaurant, to the jury. (See Exhibit
24  C, at P.79,Ins. 26-28,P.80,Ins.1-23.)

25

26      Petitioner submits, the only problem, however, was that the
27  aforementioned facts as regards petitioner's October 21,1998, arrest
28  were factually untrue.

6(C)(3)

1         In 1975, California penal code section 1473 was amended to
2    add the introduction of false evidence as a new ground for habeas
3    corpus relief. The writ is available when (a) false evidence that
4    is substantially material or probative on the issue of guilt or
5    punishment was introduced at any hearing of trial relating to the
6    petitioners incarceration, or (b) false physical evidence that
7    the petitioner believed to be factual, probative, or material on
8    the issue of guilt was a material factor  directly related to his
9    plea of guilty. (See penal code section 1473(b).) It is no longer
10   necessary for petitioner to establish that the prosecution knew,
11   or should have known, the evidence was false. (Penal Code section
12   1473(c).)

13

14        The presentation of the purported October 21,1998, arrest
15   (of petitioner) in connection with an assault that occurred at
16   the Hoan My Restaurant, one month before the murder night, standing
17   alone, appear to be harmless, especially since the jury also was
18   presented with petitioner's other prior convictions: (1) a document
19   from a prior conviction petitioner's had on July 12,1991 (People's
20   exhibit No.28); (2) a document from a prior conviction petitioner
21   had on October 28,1994  (People's exhibit No.29); (3) a document
23   reflecting a conviction on October 6,1997 (People's exhibit No.30);
24   (4) a document reflecting a conviction on July 21,1998 (People's
25   exhibit No.31); (5) a document which reflected a conviction on
26   July 26, 1998 (People's exhibit No.32); and (6) a document that
27   reflected a conviction on October 12,1998 (People's exhibit No.
28   33).(See exhibit F,at P.525,Ins.24-28,P.526,Ins.1-28,P.527,Ins.1-17.)

1    However, the prosecutor's false assertion that petitioner was

2    arrested, booked, and fingerprinted, one month before the murder,

3    in connection with a brutal assault on another customer, at the

4    Hoan My Restuarant, was everything but harmless. Indeed, when the

5    false assertion is considered with other evidence presented to

6    the jury and in light  of the overall theme that the totality of

7    the prosecution's evidence conveyed to the jury, it is apparent

8    that the prosecution's false assertion was highly prejudicial;

9    it violated petitioner's right to a fair trial; it violated

10   petitioner's right to due process.

11

12   For instance, first, in its case in chief, the prosecution

13   presented to the jury almost the entire transcript of petitioner's

14   pre-arrest tape-recorded interrogation. Within that transcript,

15   the jury had for its consideration certain statements of the

16   interrogating officers which are pertinent to petitioner's showing

17   of prejudice associated with the instant contention. For example

18   the jury read where the officer said, "Tai (petitioner) let me

19   tell you this.... You went to that restaurant several times for

20   whatever reason... you liked the beer there was gambling .

21   There was prostitution there was some kind of shit or dope dealing

23   going on." (See Exhibit B,at P.138,Ins.23-28.) Then the jury read

24   where the officer said, "Was he (the victim) stealing money from

25   you?" " Did he (the victim) take your dope" "Did (the victim) try to move

26   in to your territory. Was he (the victim) cutting into your prostitution stuff?"

27   And, finally, the jury read where the officer said, "you're (petitioner is)

28   a ganster" and "You're (petitioner is) a ganster, every body described you as

1  a gangster." (Id., at P.153, Ins.2-24.)

2

3      Second, in its case in chief, the prosecution presented, through

4  its direct examination of Mr. Loc Van Vo, the owner of the Hoan

5  My Restaurant (See Exhibit F, at P.284,Ins.20-21,P.285,Ins.8-11),

6  to the jury that one hour before the murder, the police were at

7  Mr. Vo's restaurant because there was a problem "with some adult

8  and some juveniles gambling, creating a disturbance." (Id.,at

9  P.303,Ins.1-6). One month before the murder Mr. Vo, or someone,

10 called the police who came to the restaurant to investigate an

11 attack that petitioner and others committed on a customer (Id.,at

12 P.303,Ins.7-28,P.304,Ins.1-15,P.320,Ins.27-28,P.321,Ins.1-2), and

13 one hour before "Khanh (the victim) lost his life." because "two

14 gang(s), two groups of people" might have caused some kind of

15 problem, the police were called to the restaurant. (Id.,at

16 P.320,Ins.1-16.)

17

18      Third, in its case in chief, the prosecution presented, through

19 its direct examination of Sgt. Trejo (See Exhibit F,at

20 P.438,Ins.1-10), to the jury that Sgt. Trejo interviewed Mr. Vo,

21 the owner of the Hoan My Restaurant. (Id.,at P.447,Ins.7-9.) And

23 during Mr. Vo's interview, he stated in regard to the shooter,

24 and apparently his other customer, "I know they are members of

25 some gang, but I'm too busy in my business to think of that." (Id.,at

26 457,Ins.6-9.) Then, Sgt. Trejo further testified that Mr. Vo's

27 answers suggested that Mr. Vo knew the identity of the shooter

28 but perhaps was afraid (of retaliation), because they  (the shooter

1   and other customers) were members of gangs to tell the identity
2   of the shooter. (Id.,at 456,Ins.25-28,P.457,Ins.1-14.)

3

4       Finally, in its closing argument, the prosecutor propounded:

5

6           Now why, if Loc Van Vo saw this murder, wouldn't
7           he tell us about it? Why? He's scared. He's scared.
8           You learned through the course of this case that
9           the Hoan My Restaurant is not exactly a family place.
10          You heard that it's kind of a rough restaurant.
11          Some rough things happen there.

12

13          You heard, for example, that gambling goes on in
14          that restaurant, that an hour before shooting the
15          police were out there because there had been some
16          previous disturbance where Loc Van Vo was very
17          worried. Two large groups came in. There was some
18          gambling; something was going on. They all left,
19          but he called the police.... A few juveniles and
20          one adult are identified outside of the restaurant...

21

23          We heard that a month earlier the defendant-the
24          defendant had been involved in a violent attack
25          on another customer in the restaurant, one month
26          earlier. You heard that the defendant and his two
27          buddies dragged or took some guy into the bathroom,
28          and there in the bathroom, they struck this man

PRINTED ON RECYCLED PAPER

6(C)(7)

1              over the head with a beer bottle, and the man was

2              bleeding and so forth. You heard police were called.

3              You heard that Tai Dang was temporarily detained

4              and identified as one of the suspects at the scene..

5

6              What's relevant is Loc Van Vo's own words about

7              how he feels, and he told us. He told us during

8              his testimony. In his tape to the police, he said,

9              "I don't like my restaurant anymore. They come in,

10             and they make noise when they sit and drink. I feel

11             nervous all the time and I am scared."

12    (See Exhibit F, at P.1181, Ins.3-27, P.1182, Ins.20-25.)

13

14      Petitioner submits, when the hereinabove mentioned constituents

15  of the prosecution's evidence are viewed as a whole, they conveyed.

16  to the jury, that petitioner was a gambler, a pimp, a drug dealer,

17  and a gangster; and that the Hoan My Restaurant was an establishment

18  frequented by gangsters, juvenile delinquents, and prostitutes;

19  and that oftentimes the owner of Hoan My Restaurant had to call

20  the police  because "two (rival) gang(s), two groups of people"

21  could have caused some sort of problem.

23

24      Then, when the prosecutor's false assertion that petitioner

25  was arrested, booked, and fingerprinted in connection with a brutal

26  assault on another customer at the Hoan My Restaurant, just one

27  month before Khanh, the victim, lost his life at the Hoan My

28  Restaurant, coupled with the question asked to petitioner by

1   interrogating officer: "Was he (Khanh) stealing money from you

2   (petitioner)?" "Did he (Khanh) take your (petitioner's) dope?"

3   "Did he (Khanh) try to move into your (petitioner's) territory?"

4   "Was he (Khanh) cutting into your (petitioner's) prostitution

5   stuff?" There is a reasonable probability that the jurors, based

6   on the aforementioned facts, concluded that petitioner and Khanh,

7   the victim, were two members of rival gangs and that these two

8   gangs were in an on going battle over control of the Hoan My

9   restaurant. Even worse, there is a reasonable probability that

10   the juror inferred a nexus between the assault of October 21,

11   1998, for which they were told petitioner was arrested and the

12   murder of November 21,1998, for which they were told petitioner

13   committed.

14

15      Accordingly, the prosecutor's introduction of false evidence

16   was prejudicial because it was substantially probative on the issue

17   of petitioner's guilt.

18

19       ////                                     ////

20

21

23

24

25

26

27

28

PRINTED ON RECYCLED PAPER

6(C)(9)

1     List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3   of these cases:

4   _____

5   _____

6   _____

7   Do you have an attorney for this petition?                              Yes_____     No_X_

8   If you do, give the name and address of your attorney:

9   _____

10     WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _____ JUNE /19 /2007_____

14              Date                                    Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

## DECLARATION AND PROOF OF SERVICE BY MAIL

I, __Tai Q. Dang_____, declare under the penalty of perjury that I am over the age of 18 years, ( ) and not a party, or ( X ) am a party to this action, and reside in Solano County, at P.O. Box 4000, (Cell #12-240____) Vacaville, California, 95696-4000.

That on ___19___, JUNE, 200__, I deposited in the United States Mail at California State Prison - Solano, Vacaville, California a copy of the attached hereof:
Federal Petition for a writ of habeas Corpus

in a sealed envelope with postage fully prepaid, and addressed to:

    Attorney General's Office
    455 Golden Gate Ave., Suite 11000
    San Francisco, Ca. 94102

I declare under the penalty of perjury that the foregoing is true and correct. This declaration was executed on this ___19___, JUNE, 2007_, at CSP-Solano, Vacaville, California, 95696-4000.



DECLARANT