1    3. Did you have any of the following?

2        Arraignment:                          Yes  X      No _____

3        Preliminary Hearing:                  Yes  X      No _____

4        Motion to Suppress:                   Yes _____   No  X

5    4. How did you plead?

6        Guilty _____   Not Guilty  X    Nolo Contendere _____

7        Any other plea (specify) _____No_____

8    5. If you went to trial, what kind of trial did you have?

9        Jury  X     Judge alone_____  Judge alone on a transcript _____

10   6. Did you testify at your trial?                Yes _____   No  X

11   7. Did you have an attorney at the following proceedings:

12       (a)   Arraignment                    Yes  X      No _____

13       (b)   Preliminary hearing            Yes  X      No _____

14       (c)   Time of plea                   Yes  x      No _____

15       (d)   Trial                          Yes  x      No _____

16       (e)   Sentencing                     Yes  x      No _____

17       (f)   Appeal                         Yes  X      No _____

18       (g)   Other post-conviction proceeding  Yes _____   No  X

19   8. Did you appeal your conviction?          Yes  X      No _____

20       (a)   If you did, to what court(s) did you appeal?

21             Court of Appeal               Yes  X      No _____

22             Year: 2000-2002    Result: Affirmed_____

23             Supreme Court of California    Yes  X      No _____

24             Year: 2002-2003*   Result: Review denied_____

25             Any other court                Yes _____   No  X

26             Year: _____   Result:_____

27

28       (b)   If you appealed, were the grounds the same as those that you are raising in this

* See the Declaration of Petitioner, and the Declaration of
Attorney Arthur Dudley, attached to this petition.
PET. FOR WRIT OF HAB. CORPUS          - 3 -

| | | | | |
|---|---|---|---|---|
| 1 | | | petition? | Yes __X__  No_____ |
| 2 | | (c) | Was there an opinion? | Yes __X__  No_____ |
| 3 | | (d) | Did you seek permission to file a late appeal under Rule 31(a)? | |
| 4 | | | | Yes _____  No __X__ |

5      If you did, give the name of the court and the result:

6      Not applicable

7      _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?          Yes _____  No __X__

10      [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16      (a)    If you sought relief in any proceeding other than an appeal, answer the following

17            questions for each proceeding. Attach extra paper if you need more space.

18            I.    Name of Court: _____

19                  Type of Proceeding: _____

20                  Grounds raised (Be brief but specific):

21                  a._____

22                  b._____

23                  c._____

24                  d._____

25                  Result: _____ Date of Result:_____

26            II.   Name of Court: _____

27                  Type of Proceeding: _____

28                  Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1                    a._____

2                    b._____

3                    c._____

4                    d._____

5                    Result: _____ Date of Result:_____

6           III.    Name of Court: _____

7                    Type of Proceeding: _____

8                    Grounds raised (Be brief but specific):

9                    a._____

10                  b._____

11                  c._____

12                  d._____

13                  Result: _____ Date of Result:_____

14          IV.    Name of Court: _____

15                    Type of Proceeding: _____

16                    Grounds raised (Be brief but specific):

17                    a._____

18                  b._____

19                  c._____

20                  d._____

21                  Result: _____ Date of Result:_____

22     (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                    Yes _____    No _X__

24                   Name and location of court: _____

25   **B. GROUNDS FOR RELIEF**

26       State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1   need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One: Improper use of bad character evidence to impeach portions
     of petitioner's out-of-court statements to the police violated due process
6   of law under the 14th amendment of the U.S. Constitution

7      Supporting Facts: SEE ATTACHMENT NO. 1

8

9

10

11      Claim Two: Improper attacks and attempted attacks on the credibility of
     a witness violated due process of law under the 14th amendment of the
12   U.S. Constitution

13      Supporting Facts: SEE ATTACHMENT NO. 2

14

15

16

17      Claim Three: Improper instructions to the jury that uncharged crimes only
     needed to be proved by a preponderence of the evidence violated the right
18   to a jury trial under the 6th amendment of the U.S. Constitution and
     violated due process of law under the 14th amendment of the U.S.
Constitution
19   Supporting Facts:

20                   SEE ATTACHMENT NO. 3

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25               Not applicable

26

27

28

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One: Improper use of prejudical, inadmissible evidence violated
                Four

6       due process of law under the 14th amendment of the U.S. Constitution

7       Supporting Facts: SEE ATTACHMENT NO. 4

8

9

10
            Five
11      Claim Two: Inadmissible evidence of another crime, even though ordered
        stricken, was so prejudicial that it violated due process of law under
12      the 14th amendment of the U.S. Constitution

13      Supporting Facts: SEE ATTACHMENT NO. 5

14

15

16
            Six
17      Claim Three: Trial counsel's failure to object to several items of
        inadmissible evidence constituted ineffective assistance of counsel in
18      violation of the 6th amendment and the 14th amendment of the U.S.
        Constitution
19      Supporting Facts: SEE ATTACHMENT NO. 6

20

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25              Not applicable

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 6A -

## DECLARATION OF PETITIONER

I, Tai Quoc Dang, declare as follows:

I am the petitioner in the above proceeding.

At no time on or before March 11, 2004 (which is one year and ninety days from December 11, 2002, which was the date the California Supreme Court denied the petition for review filed in my state court appellate proceedings), was I aware of any type of time limitations for filing a petition for a writ of habeas corpus in a federal district court.

I did not receive the letter of February 2, 2003, mentioned by my state court appellate attorney in his declaration accompanying this petition, nor, at any time within one year and ninety days of December 11, 2002, did I have any knowledge of the contents of that letter.

Also, I did not receive the November 23, 2004, finished petition for a writ of habeas corpus mentioned by my state court appellate attorney in his declaration accompanying this petition.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on _____ at California State Prison – Solano, in Vacaville, Solano County, California.

_____
TAI QUOC DANG

## DECLARATION OF ATTORNEY ARTHUR DUDLEY

I, Arthur Dudley, declare as follows:

I was the appointed, state court appellate attorney for petitioner herein with regard to the state court appellate proceedings involved in the accompanying petition for a writ of habeas corpus.

As appointed counsel for petitioner in the state court appellate proceedings, I represented petitioner in his appeal in California Court of Appeal, Sixth Appellate District, Case Number H021681. I also represented petitioner in preparing and filing a petition for review in the California Supreme Court after the Court of Appeal, Sixth Appellate District, affirmed petitioner's judgment of conviction in the state trial court proceedings. On December 11, 2002, the California Supreme Court, in Case Number S111093, denied the petition for review that I prepared and filed in that court on behalf of petitioner.

On February 2, 2003, I prepared and mailed to petitioner herein a letter explaining to petitioner his future avenues of review in federal district court by way of a petition for a writ of habeas corpus, and the necessity that such a petition would have to be filed in the United States District Court for the Northern District of California by no later than one year and ninety days from December 11, 2002, which was the date that the California Supreme Court denied the petition for review in his matter. Although I indicated to petitioner in that letter that I would not be representing him in any federal district court proceeding, I volunteered to assist petitioner in preparing a petition for a writ of habeas corpus to be filed by him in federal district court, if he wanted that assistance. In that letter I also included therein a standard blank form of a federal court petition for a writ of habeas corpus that petitioner could use on his own if he so decided. I also included in that letter a blank in forma pauperis form for petitioner's use.

After mailing the above-described letter, and blank forms, to petitioner on February 2, 2003, I do not remember receiving any type of response or reply from petitioner until after more than one year and ninety days had elapsed from the date the California Supreme Court denied the petition for review in Case Number S111093.

On November 23, 2004, I finished a petition for a writ habeas corpus identical in content to the petition accompanying this declaration for petitioner to file in propria persona in the appropriate federal district court. Within three days thereafter, I mailed the original of that petition to petitioner at what I believed was his then current place of confinement at Calipatria State Prison in Calipatria, California. I did not receive that original petition back in the mail as would be customary if it were undeliverable or otherwise was not received by the person to whom it was sent.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on January 17, 2007, in the City of Santa Cruz, Santa Cruz County, California.

ARTHUR DUDLEY

Tina Ha was still seated alone at table 14. Petitioner walked over to table 11 where Khanh Nguyen was seated. Petitioner, while standing up, pointed a pistol at the front of Khanh Nguyen's face and fired the pistol at Khanh Nguyen when the muzzle of the pistol was only one to two feet away from the front of Khanh Nguyen's face. The bullet entered to the left of Khanh Nguyen's nose. Khanh Nguyen, who was still seated at the table, fell forward and then onto the floor and died. (RT 158-159, 167-173, 185-186, 325, 623-628, 1121-1130.)

At the time of the shooting there were about 10 to 20 people in the restaurant, including customers and employees. When Ky Nguyen saw the shooting he froze momentarily in a place that was about seven to eight feet away from the location of the shooting. After the shooting petitioner walked out of the restaurant and got away. Also, all of the customers in the restaurant, including Tina Ha and Ky Nguyen, left the restaurant and took off. (RT 171, 173-174, 183, 218-221, 328-329, 332-333, 625.) The first police officer arrived at the restaurant at 9:26 P.M., in response to a 911 call placed by Loc Vo. (RT 182-183, 341-342, 426.)

After Tina Ha left the restaurant, she was picked up in the parking lot of the restaurant by the friend or friends she earlier had called. This occurred before the police arrived at the restaurant. They then went to San Francisco to dance. They had a good time at San Francisco, after which Tina Ha came back to San Jose. (RT 634, 714, 744-745.)

On the next day, November 22, 1998, petitioner placed a telephone call to Tina Ha. Petitioner said he wanted to talk to her. Tina Ha agreed. When petitioner came and picked up Tina Ha, they drove to Sacramento to the apartment of Linda Tran on Skypark Way in Sacramento. (RT 635-636, 863, 867.) On the way to Sacramento, Tina Ha asked petitioner about the shooting. Petitioner related that the victim had said a lot of bad things about petitioner's mother and that he (petitioner) had gotten angry. When Tina Ha tried to ask more about the shooting, petitioner would avoid the subject and just change the subject of the conversation. (RT 636.)

Petitioner stayed in Sacramento at the apartment of Linda Tran. Linda Tran's boyfriend, Tuan Ngo, was a good friend of petitioner. Linda Tran knew petitioner lived in San Jose and had met petitioner in San Jose in 1993. Linda Tran had three children by Tuan Ngo all of whom lived with Linda Tran. At that time Tuan Ngo was still Linda Tran's boyfriend, and he would spend the weekends at Linda Tran's apartment in Sacramento. During the week, Tuan Ngo worked in San Francisco. (RT 637-638, 863-872.)

In the months that followed, petitioner continued to stay at Linda Tran's apartment in Sacramento. During that time, Tina Ha still lived and worked in San Jose, but would regularly go to Sacramento to be with petitioner with whom she was strongly in love. Tina Ha, while in San Jose, also would frequently talk with petitioner on the telephone. (RT 638-641, 870-837.) During this time, when Tina Ha would bring up the subject of the San Jose

2

shooting, petitioner would say nothing more than the fact that he got angry over what the victim had said about petitioner's mother, after which petitioner would change the subject. (RT 636-637.)

Linda Tran started to become uncomfortable about the fact that petitioner was regularly staying at her apartment in Sacramento. Once when Linda Tran asked her boyfriend about what was going on, her boyfriend indicated that petitioner had no place to stay. Petitioner also explained that he had shot someone in the head in San Jose and that he had had a dispute with that person over "control" of the cafes. (RT 871-872, 874-876.)

Eventually, on April 22, 1999, petitioner was arrested in Sacramento at a location away from Linda Tran's apartment. This occurred after petitioner indicated that he was going out to visit friends. (RT 639, 641, 882-883.)

Detectives from the San Jose City Police Department then quickly went to Sacramento County where petitioner was in custody. They commenced a three and one-half hour interrogation of petitioner at the Sacramento Police Department starting at approximately 12:40 A.M., on April 23, 1999. (RT 985-989, 1036; Augmented CT 11.) Throughout this interrogation petitioner not only denied any involvement in the shooting at the Hoan My Restaurant, petitioner repeatedly stated that he was not Tai Quoc Dang, that he had never been to the Hoan My Restaurant, that he had never been to San Jose, that he had never been to Santa Clara County and that he continuously had lived in Sacramento for the preceding two and one-half years. Petitioner said that he his name was Viet Le with a date of birth of November 2, 1971, and with an address of 2321 Connie Drive in Sacramento. (RT 995-1000, 1007-1009, 1011-1013, 1016-1017, 1021, 1029-1030, 1046-1048.) The detectives even showed petitioner a picture of himself under the name of Tai Quoc Dang, and petitioner denied that was a photograph of himself. (RT 1000-1002, 1030; Exhibit 22.) During the early stages of the interrogation, petitioner indicated that his girlfriend was a Cindy Pham from Los Angeles and that he barely knew her; however, near the end of the interrogation, petitioner said his girlfriend's name was Cindy Nguyen. (RT 1017, 1024.)

At one point in the interrogation when the detectives were discussing with petitioner the tatoos petitioner had on his body, petitioner initially indicated that he had gotten the tatoos at a store on Boulevard Street in Sacramento. Then, petitioner at one point changed that story and said that his tatoos were homemade. Later, during the interrogation, petitioner began to say that he had gotten the tatoos in downtown San Jose, but he caught himself when he began to say the words San Jose. At that point one of the detectives began to laugh at petitioner and repeatedly told petitioner that he had said San Jose. (RT 1022-1023.)

Later, on April 23, 1998, after the detectives completed their interrogation of petitioner, a series of telephone calls were made by petitioner from the Sacramento County Jail to Tina Ha who was at that time at Linda Tran's apartment in Sacramento. These

3

telephone conversations were tape recorded. (RT 641-643; Exhibit 61.) During the course of these telephone conversations, petitioner indicated "I lost" and told Tina Ha that she was Cindy Nguyen, that she barely met him and that she lived in L.A. (RT 646-647, 651.) Petitioner also indicated not to mention his name or use the words San Jose. (RT 662-664.) Petitioner also said that the police had a picture that they claimed was a photograph of himself. (RT 670.) At one point, Tina Ha said in one of the telephone calls "the thing about the murd –." Petitioner said, "Ah." (RT 672.)

At another point in one of the telephone conversations, petitioner indicated to Tina Ha that the police had told him that people had pointed him out. Tina Ha replied that they were all drunk. Petitioner said, "Don't say anything, we'll work it out later." (RT 677.) Petitioner said that he had told police that he was not there. (RT 678.) Later, in one of the telephone calls, Tina Ha brought up the word "restaurant" when she indicated that the people in the restaurant were drunk; petitioner responded by saying, "Don't say anything." (RT 679.)

### Claim

In this case the prosecution in its case in chief presented to the jury almost the entire statement petitioner gave to the detectives from the San Jose City Police Department shortly after petitioner's arrest in Sacramento. In that statement, petitioner, among other things, denied that he was Tai Quoc Dang, denied that he had ever been in the Hoan My Restaurant at any time, denied that he ever had been to San Jose and denied that he had ever been to Santa Clara County.

In attempting to show a consciousness of guilt on the part of petitioner, the prosecution proceeded to impeach the credibility of the denials in question in a number of ways. For example, this impeachment consisted of the following: (1) a document reflecting a police contact with petitioner dated July 12, 1991, in which petitioner's address was designated as 1350 Foxdale Loop, San Jose, California (Exhibit 28, RT 525); (2) a document reflecting a police contact with petitioner dated October 28, 1994, in which petitioner's address was designated as 1302 Sippola Way, San Jose, California (Exhibit 29; RT 526); (3) a document reflecting a police contact with petitioner dated October 6, 1997, in which petitioner's address was designated as 3675 Waterbury Court, No. 3, San Jose, California (Exhibit 30; RT 526); (4) a document reflecting a police contact with petitioner dated January 21, 1998, in which petitioner's address was designated as 3675 Waterbury Court, No. 3, San Jose, California (Exhibit 31; RT 526); (5) a document reflecting a police contact with petitioner dated July 26, 1998, in which petitioner's address was designated as 3154 Heritage Spring Court, San Jose, California (Exhibit 32; RT 527); (6) a document reflecting a police contact with petitioner dated October 12, 1998, in which petitioner's address was designated as 3154 Heritage Spring Court, San Jose, California (Exhibit 33; RT 527); (7) testimony from an individual who was a probation officer who interviewed petitioner for a presentence report

4

in December 1994, during which petitioner indicated that his address was 1302 Sippola Way, San Jose, California, and further stated that he had lived full time in Santa Clara County for the previous six years (RT 1037-1043); (8) evidence that on October 21, 1998, just a month before the shooting incident in this case, the police were called to the Hoan My Restaurant to investigate an attack petitioner and others committed on a customer (RT 303-304); and (9) testimony from one of the detectives, who interrogated petitioner in Sacramento right after petitioner's arrest, who explained that during that interrogation petitioner was confronted with the fact of the prior police contacts in San Jose, and also was confronted with the fact of the police investigation at the Hoan My Restaurant on October 21, 1998, during which petitioner was detained at the restaurant, and petitioner still continued to deny that he ever had been in San Jose (RT 998-999, 1019-1020).

It is petitioner's position, contrary to the trial court's rulings (RT 75-80, 560-564), and contrary to the opinion of the Court of Appeal, that the impeachment evidence just summarized hereinabove was in fact inadmissible and so prejudicial as to violate federal due process of law.

Any superficial reading of what was euphemistically referred to as "police contact" documents (Exhibits 28, 29, 30, 31, 32 and 33; RT 525-527), even though they were redacted in some form, clearly indicated that they were police arrest records. Each of the forms contained petitioner's inked fingerprints and contained a certification that they were correct copies of documents on file with the Sheriff of Santa Clara County. It would not take a rocket scientist to conclude that these records were arrest records pertaining to petitioner on six different occasions beginning as early as July 21, 1991 (Exhibit 28), up to and including October 12, 1998 (Exhibit 33). In fact, in the tape recording of petitioner's interrogation, which tapes were admitted into evidence at petitioner's trial (Exhibits 54A, 54B, 54C and 54D; RT 991-992), the documents in question were unabashedly referred to as "booking sheet[s]," which is what they really were. (Ex. 53; Augmented CT 84.)

Next, the testimony of the probation officer that he had done a presentence report where he interviewed petitioner reeked of evidence of prior criminal conduct. Moreover, the testimony of the investigation of the incident at the Hoan My Restaurant on October 21, 1998, involving an attack committed by petitioner and others on a customer, is obviously evidence of other significant criminal conduct on the part of petitioner.[1]

---

1. In footnote 1, on page 3 of the opinion of the Court of Appeal, it is stated that petitioner had refused to stipulate that he was the person in the arrest records and also had agreed to the redaction of those records and the use of the euphemism "police contacts." This is an over-simplification of what actually appears in the record on appeal, and this over-simplification was pointed out to the Court of Appeal in petitioner's petition for rehearing. As the pertinent portion of the record reflects, the refusal to stipulate merely dealt with the issue of whether petitioner was the person that "deposited" the fingerprints on some, but not

Clearly, the above evidence of prior arrests and prior criminal conduct on the part of petitioner painted petitioner in a bad light to the jury. Also, the only reason really advanced by the prosecution for the admissibility of this evidence was to show that petitioner was not being truthful to the detectives who interrogated him in Sacramento County when petitioner said that he had never been to San Jose, and thus, it tended to indicate a consciousness of guilt on the part of petitioner in connection with the charged murder in this case.

What is particularly troublesome in this case is the prosecution was permitted to present all of the impeachment evidence in question without any showing that it was necessary to include anything about petitioner's prior arrests and crimes. Additionally, the prosecution was permitted to present all of the impeachment evidence in question without any showing that the existence of petitioner's earlier addresses could not have been proven by some other type of evidence that did not include the facts of petitioner's prior arrests and crimes.

Common sense dictates that there are many ways to prove one's current and previous addresses without the necessity of demonstrating one's prior arrests and crimes. For example, a person's current and previous addresses can be proved by records from the Department of Motor Vehicles with regard to driver's licenses and vehicle registrations, records from a telephone company, rental agreements with landlords, observations of

---

all, of the booking records. (RT 561.) In fact, based upon what was said on the record, it appears that petitioner was willing to acknowledge that he was the person who had been arrested on these prior occasions, but the underlying problem dealt with whether some of the actual fingerprint cards were those that were generated at the time of some of his previous arrests. (RT 561.) Additionally, it is important to note that the prosecutor also was a part of the stipulation refusal process. Early on in the case, petitioner was willing to stipulate that he had been in the Hohn My Restaurant a month earlier on October 21, 1998, when the alleged, earlier assault had taken place. However, the prosecutor was unwilling to accept that stipulation. (RT 77-79.)

Furthermore, as petitioner pointed out in his petition for rehearing filed in the Court of Appeal, it also was an incorrect reading of the record to suggest that defense counsel had openly agreed to the redactions of the arrest records and to the use of the euphemism "police contacts." At one point during the trial, defense counsel explained that he agreed to the redactions, not as a concession that the underlying documents were admissible, but as a basis to reduce the amount of prejudice to be caused by those records by what defense counsel believed was the trial court's erroneous ruling to admit all of the documents concerning the arrest records. (RT 562-563.) These type of defensive acts in order to take the "sting" out of otherwise prejudicial evidence, which defense counsel believes is otherwise inadmissible, is no basis whatsoever to detract from the ability to raise the underlying substantive issue on appeal. (See People v. Turner (1990) 50 Cal.3d 668, 704, fn. 18.)

6

neighbors, tax forms such as employee withholding information, bank records with regard to checking and savings accounts, and post office records.

All of the arguments just discussed hereinabove are equally applicable to the evidence of petitioner's involvement in the attack that occurred in the Hoan My Restaurant on October 21, 1998, where, for impeachment purposes, the only relevance of the evidence was to show that petitioner really had been in San Jose contrary to the statements he gave to the detectives after his arrest in Sacramento.

Due to the fact that the inadmissible evidence in question involved evidence of so many incidents of other bad acts (i.e., six prior arrests, an interview with the probation officer and an uncharged attack at the restaurant a month before the charged murder), the admission of this evidence for whatever purpose violated principles of federal due process of law as articulated in the case of McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378, 1380-1385.

The only remaining issue is whether the improper admission of the above-described evidence was prejudicial. In this regard, petitioner will admit that at trial both Ky Nguyen and Tina Ha identified petitioner as the individual who shot Khanh Nguyen. (RT 168-169, 175, 225, 624-625, 627.) Additionally, Linda Tran testified that on one occasion while petitioner was staying at her apartment, petitioner admitted to her that he had shot someone in the head in San Jose with whom he was having a dispute over control of the cafes. (RT 874-875.) Also, some of petitioner's fingerprints were found on a glass on the table where petitioner and Tina Ha had been seated in the Hoan My restaurant and on the inside of the front door of the Hoan My restaurant at a location that was above and to the left of the handle to that door. (RT 522-523, 527-528, 532, 537-538, 931, 935-936; Exhibits 23, 25, 34, 38 and 42.)

On the other hand, the prejudicial impact of the inadmissible evidence in issue was tremendous. It showed that petitioner had six prior arrests from July 12, 1991, to October 12, 1998; that petitioner was interviewed by a probation officer in connection with a presentence report after the conviction for a crime; and that petitioner was investigated in connection with an attack on a customer at the Hoan My restaurant just a month prior to the murder charge in this case. It is clear that evidence of other crimes or acts of violence alleged to have been committed by a petitioner, when such crimes are unrelated to the charged offense, can have a highly inflammatory and prejudicial effect on a jury.

Additionally, in closing argument to the jury, the prosecutor was more than willing to emphasize the prejudicial nature of the inadmissible evidence in question. The prosecutor referred to the prior "police contacts" (RT 1191) and talked about the attack at the Hoan My restaurant the month before the murder charge in this case. (RT 1181, 1193.) In fact, the prosecutor gave a very descriptive explanation of the earlier attack at the Hoan My restaurant, for which there was no foundational basis in the evidence presented to the jury,

7

which went as follows: "We heard that a month earlier the defendant - - the defendant had been involved in a violent attack on another customer in the restaurant one month earlier. You heard that the defendant and his two buddies dragged or took some guy into the bathroom, and there in the bathroom they struck this man over the head with a beer bottle, and the man was bleeding and so forth. You heard police were called. You heard that Tai Dang was temporarily detained and identified as one of the suspects at the scene." (RT 1181.)

Petitioner in this case was charged with murder. Instead of facing that charge, irrelevant and gratuitous evidence of petitioner's prior record and police investigations were paraded before the jury without any relevant purpose other than to prejudice the minds of the jurors against petitioner. Evidence showing that petitioner had been, and lived, in San Jose, contrary to his statement to the detectives, could have been presented to the jury by nonprejudicial evidence that did not reflect a record of prior arrests and police contacts in Santa Clara County, including an attack in the Hoan My restaurant just a month before the murder charge in this case. The net effect of the inadmissible evidence in question was to paint a picture for the jury that petitioner was an unrepentant criminal. Under such circumstances, under any standard of harmless error, the admission of the inadmissible evidence in question was prejudicial.

8

ATTACHMENT NO. 2

See Pertinent Facts in Attachment No. 1.

Loc Vo was one of the owners of the Hoan My restaurant, and he was present in the area of the cash register at the restaurant at the time of the shooting incident involved in this case. (RT 284, 286, 331-332.) Loc Vo knew petitioner and the victim Khanh Nguyen to be regular customers at the restaurant. (RT 287-288, 290-291.)

At trial, Loc Vo testified that petitioner was in the restaurant on the evening of the shooting, left the restaurant at around 8:00 p.m., and came back to the restaurant about 15 to 20 minutes before the shooting. (RT 286, 575-576.) Loc Vo also testified that although he heard the shot fired and saw the victim fall to the ground, he (Loc Vo) crouched down and did not see who did the shooting. (RT 334-335, 339, 341, 345.)

Also, evidence was produced at trial to show that when Loc Vo was interviewed by a detective just several hours after the shooting, Loc Vo said he did not look in the direction of the shot, hit the ground, hid upon hearing the shot, did not look at the shooter and did not know the shooter. (RT 447-448, 463-464, 466-467.) However, at one point in this interview, Loc Vo indicated that he had seen the shooter, but he did not then know the shooter's name; furthermore, Loc Vo explained that he once knew the shooter's name, but could not remember it. (RT 465-468.)

Over defense counsel's objections, the prosecution was permitted to attack, and attempt to attack, the credibility of Loc Vo by the following ways: (1) Loc Vo was aware of the police investigation that occurred on October 21, 1998, a month before the shooting in this case, where petitioner and others attacked a customer of the Hoan My restaurant (RT 304-305); (2) Loc Vo was aware that members of gangs patronized his restaurant (RT 457, 584-590); (3) Loc Vo was asked by the prosecution, but denied, that he paid protection money, in particular to petitioner, which purported fact was never otherwise proven by the prosecution (RT 299-300, 304-306, 312-315, 593); (4) Loc Vo was asked by the prosecution, but denied, that anybody was trying to take control of his restaurant, which purported fact also was never otherwise proven by the prosecution (RT 316-317); and (5) the detective who interviewed Loc Vo shortly after the shooting was of the opinion that Loc Vo knew the name of the shooter and was not giving all of the information he knew (RT 451, 453-457; 466-467, 514-515).

First, the detective, who testified that he believed that Loc Vo knew the shooter's name and was not giving all of the information he (Loc Vo) knew, was expressing nothing more than an opinion that he believed that Loc Vo was not being completely truthful in the area of the shooter's identity. The obvious purpose of this testimony was to suggest to the jury that Loc Vo was not believable when he said that he did not know the identity of the shooter. In fact, in closing argument to the jury, that is type of inference the prosecutor

1

wanted the jury to draw. (RT 1176-1183.)

To the extent that the prosecutor at trial tried to justify the admissibility of the detective's belief that Loc Vo knew the shooter's name and was not giving all the information he (Loc Vo) knew, on the grounds that it showed and explained the detective's conduct in the investigation (RT 451), that too is an improper basis to support the admissibility of the evidence in question. In a trial on the issue of guilt or innocense, testimony pertaining to information learned by an officer, in order to explain that officer's conduct, is irrelevant.

Next, several times during the prosecutor's examination of Loc Vo, both in direct examination and redirect examination, the prosecutor asked Loc Vo whether he was paying protection money to anyone, whether he otherwise was allowing individuals to eat and drink for free at the restaurant as a form of payment of protection money, whether in particular he specifically paid protection money to petitioner, and whether he had told anyone he was paying protection money in one form or another. On each occasion Loc Vo's answers were in the negative. (RT 299-300, 305, 593.) Defense counsel vehemently objected to the line of questioning in issue on the basis that the prosecutor could not prove any of the facts intimidated by the questions; in fact, defense counsel even moved for a mistrial on these grounds. (RT 299, 305-307, 312, 315-317, 593-594.)

The prosecutor represented to the court that the prosecution would be able to prove all of the suggested facts by competent witnesses including a witness by the name of Hong Troung. (RT 308-311.) Defense counsel's objections to the line of questioning in issue, and the motion for mistrial, were denied primarily upon the grounds that the prosecutor had represented that the suggested facts could be proved by competent evidence. (RT 299, 314-315, 594.) However, the prosecutor never called any witnesses, or presented any competent evidence, to prove the damaging facts suggested by the questions to Loc Vo which were denied by that witness.

Similarly, defense counsel's objections to the prosecutor's line of questioning concerning whether anybody was trying to take control of Loc Vo's restaurant, which was met with denials by the witness Loc Vo, were overruled by the trial court. (RT 316-317.) Again, the prosecutor never called any witnesses, or presented any competent evidence, to prove the damaging facts suggested by this line of questioning to Loc Vo which were denied by that witness.

With regard to the gang evidence concerning the fact that Loc Vo was aware that members of gangs patronized his restaurant, that evidence got before the jury in a very convoluted and circular route that was procedurally improper.

Preliminarily, during in limine motions prior to the commencement of trial, there was

2

a ruling by the trial court that there was to be no mention of gangs and no mention of petitioner's affiliation with any gang. (RT 74-75.) Thereafter, when Loc Vo was questioned on direct examination by the prosecutor, in accordance with the trial court's in limine rulings, there was no mention of gangs at all (RT 283-355), except at one innocuous spot when Loc Vo was explaining that on the night of the shooting, about an hour before the shooting occurred, the police were called in connection with a situation at the restaurant that Loc Vo described as follows: "I wouldn't call it loud – loud disturbance. All I would say – because I knew there were two group of people, two gang, two group of people, so that's the reason why the police was called." (RT 320.) Parenthetically, on cross-examination of Loc Vo, it was clarified that petitioner was not in the restaurant at the time of this earlier situation. (RT 419.)

Then, after the direct examination of Loc Vo was completed, defense counsel's cross-examination of Loc Vo was interrupted near its completion in order to allow for some witnesses to be taken out of order. During the first portion of Loc Vo's cross-examination there was no mention of gang or gangs. (RT 355-361, 417-437.)

One of the witnesses who was taken out of order was the detective who interviewed Loc Vo shortly after the shooting. The reason why this witness was being taken out of order at the time was due to the fact that the detective in question was going to be out of the country due to a serious family obligation. (RT 438-439.)

It was during the direct examination of the detective in question, who was the same one who also had testified that in his (the detective's) opinion Loc Vo knew the name of the shooter and was not giving all of the information he knew, that the subject of gangs first came up in earnest. According to the detective in his interview with Loc Vo, he (the detective) was trying to get Loc Vo to identify the shooter and was being unsuccessful in that endeavor when at one point Loc Vo said, "If a guy comes in once in awhile, how can I know what name he goes by," and "I know they are members of some gang, but I'm too busy in my business to think of that." (RT 452-453, 456-457.) Defense counsel's objections to this testimony were overruled by the trial court on the grounds that in the trial court's mind Loc Vo was not forthright in his answers, both in court and in his statements to the police, and that the gang evidence in question could be brought out by the prosecution so that the jury could give the appropriate weight, if any, with respect to Loc Vo's testimony. (RT 453-454.)

Thereafter, when the cross-examination of Loc Vo resumed, there was no mention of gangs in that portion of the cross-examination of Loc Vo. (RT 574-577.) Then, on the prosecution's redirect examination of Loc Vo, the prosecutor started going into the subject of gangs with Loc Vo, when the prosecutor proceeded to ask Loc Vo whether some "really rough guys" hung out at his restaurant. (RT 584.)

3

Defense counsel immediately objected, and at that time there was a sidebar discussion between the trial court and both of the attorneys. (RT 584-859.) During that sidebar discussion, defense counsel stated that the phrase "rough guys" was just another term for "gang" and that the prosecutor was violating the trial court's earlier in limine ruling about excluding evidence of gangs. (RT 584-585.) The trial court then indicated, albeit erroneously, that it (the trial court) remembered as "clear as day" that Loc Vo had used the word "gang" in response to one of defense counsel's questions. (RT 585.) Also, during this sidebar discussion, the trial court said, with reference to gang evidence, "this is slowly being opened up" (RT 585) and that "it's wide open now anyway" (RT 587).

Additionally, during this sidebar discussion, defense counsel made a motion for mistrial due to the prejudicial nature of the gang evidence that had been heard by the jury up to this point of time in the trial. The motion for mistrial was denied. (RT 587.) Also, defense counsel's objections to the line of questioning that was then being pursued by the prosecutor, in connection with the subject of gangs, was overruled by the trial court on the grounds that, in the words of the trial court, it was allowable ". . . for the issue of showing why the witness is testifying in the way he is." (RT 588-589.)

The prosecutor then asked Loc Vo if it were true that some "really rough guys" hung out at his restaurant who he found to be a little scary or intimidating. (RT 589.) Loc Vo replied, "Well, not many of them – well, it's like just a few. Not many of them, and it's like they would come to a table once or twice a week and they – it's not like anything, but they tattooed. They have tattoos all over they bodies, so I feel nervous. They haven't done any -- they didn't do anything." (RT 590.) The prosecutor then followed up that answer with the question, "Guys with tattoos make you nervous; is that true?" Loc Vo responded, "Yes." (RT 590.) Parenthetically, petitioner has extensive tattoos on his body consisting of a dragon that started at his upper right chest area that continued across his right shoulder and down his right arm to almost his right elbow, another tatoo of a dragon where the face of the dragon was on his upper left chest area that continued down to the fold of his left elbow, the word "Dang" on his back which was in script writing that extended from one shoulder to the other covering an area of about 10 inches across his back, the word "Viet" on the back on his left triceps, and the word "pride" on the corresponding portion of his right triceps. (RT 506-507.)

Preliminarily, before turning to the real problem with the gang evidence in question, along with other degrading evidence that the prosecution was presenting, or attempting to present, through the witness Loc Vo, the trial court's belief that the subject of gang evidence was "slowly being opened up" (RT 584) and "it's wide open now anyway" (RT 587) was wrong. As detailed hereinabove, nothing defense counsel did or said during the cross-examination of Loc Vo in any way brought up the subject of gang or gangs. It was the prosecutor, and always the prosecutor, who was bringing up that subject. The trial court's "clear as day" memory that the subject of gangs was brought up through defense counsel's cross-examination of Loc Vo was faulty recollection on the part of the trial court.

4

In any event, the real problem in issue is that the trial court allowed the prosecution, over petitioner's objections, to present, or attempt to present, a considerable amount of degrading evidence prejudicial to petitioner under the guise of challenging, or putting into perspective, the credibility of Loc Vo as a witness in this case. These incredibly damaging matters, over and above the detective's opinion that Loc Vo knew the name of the shooter and was not giving all of the information he knew (a sub-issue already discussed hereinabove), consisted of (1) the suggested, but never proved, allegation that Loc Vo was paying protection money, in particular to petitioner; (2) the suggested, but never proved, allegation that someone, inferentially petitioner, was trying to take over Loc Vo's restaurant; (3) the gang evidence just discussed hereinabove which came into evidence by way of the detective's testimony and the prosecutor's examination of Loc Vo; and (4) Loc Vo's awareness of the incident at his restaurant on October 21, 1998, a month before the shooting in this case, where the police came to his restaurant to investigate an attack petitioner and others committed on a customer (a matter which the trial court also allowed to come before the jury as impeachment of petitioner's statements to the detectives about never being San Jose, which has been shown to be an erroneous ruling as discussed in claim number 1 hereinabove). Again, all of the matters in question, over petitioner's objection, were allowed to be presented to the jury on the theory that they went to issues of credibility and bias with regard to the witness Loc Vo. (RT 90-91, 299, 314, 316-317, 453-456, 484-489, 494.) As will be developed hereinbelow, this theory of admissibility was clearly wrong.

To put the issue in question in perspective, a few background facts are necessary. Loc Vo, an owner at the restaurant, always admitted that petitioner was in the restaurant at the time of the shooting, but never admitted, either at trial or in his police interview, that petitioner was the shooter. (RT 286, 295, 328, 345, 463-465, 467- 468, 472, 481, 582.) Also, Loc Vo was far from the most critical witness in the case. In fact, he was almost superfluous. Both Tina Ha and Ky Nguyen positively identified petitioner as the shooter. (RT 168-170, 623-625.) Linda Tran provided testimony of an incriminating conversation wherein petitioner admitted to her that he had shot someone in the head in San Jose. (RT 874-877.) Additionally, Tina Ha also provided testimony of incriminating admissions made to her by petitioner that he did the shooting. (RT 636-637.) Furthermore, some of petitioner's fingerprints were found on a glass on the table where petitioner and Tina Ha had been seated in the restaurant, and were found on the inside of the front door of the restaurant at a location that was above and to the left of the handle to that door. (RT 522-523, 527-528, 532, 537-538, 931, 935-936; Exhibits 23, 25, 34, 38 and 42.)

Broken down to the least common denominator, the stated purpose of the prosecution for the presentation, and the attempted presentation, of the above-described evidence, as to witness Loc Vo, and the one accepted by the trial court, was to show that Loc Vo had a fear of making a statement incriminating anyone of the shooting in this case and thus was not willing, either in his interview with the police or his testimony at trial, to identify petitioner as the shooter. (RT 299, 313-315, 453, 588-589.) In fact, that conclusion was drawn by the

5

detective who interviewed Loc Vo; specifically, the detective testified that based upon statements made by Loc Vo during his (the detective's) interview with Loc Vo, the detective concluded that Loc Vo's statements suggested that Loc Vo knew the shooter's identity, but perhaps Loc Vo was afraid to provide the name to the authorities. (RT 457.)

This matter is not a case where the witness told the authorities prior to trial that the petitioner was the perpetrator of the crime and then gave inconsistent testimony at trial that seriously damaged the prosecution's case. In this case, from the beginning, Loc Vo did not identify the shooter.

As explained hereinabove, Loc Vo's testimony was not extremely critical to the prosecution's case since other witnesses identified petitioner as the shooter and testified about incriminating statements made by petitioner to them. Also, there was circumstantial fingerprint evidence connecting petitioner to the shooting.

It appears that the prosecutor put Loc Vo on the witness stand knowing that Loc Vo would not identify petitioner as the shooter, and then claimed "suspect testimony" as a ploy to get before the jury, or to attempt to get before the jury, (a) extremely prejudicial evidence that Loc Vo purportedly was paying protection money to petitioner and that someone was trying to take over the restaurant, (b) extremely prejudicial evidence of a gang connection to this case, and (c) extremely prejudicial evidence of an incident investigated at the restaurant a month before the shooting in this case where petitioner and some others attacked a customer. None of this was really and truly relevant to the credibility of Loc Vo's testimony particularly where, as here, Loc Vo never changed his critical statement disclaiming any knowledge of the identity of the shooter and Loc Vo was not really a critical witness for the prosecution's case.

Since the matters in question involve the presentation, and the attempted presentation, of inadmissible uncharged crimes, there is a violation of principles of federal process of law as articulated in the case of McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385.

The only remaining issue is whether the inadmissible evidence in question (i.e., the detective's opinion that Loc Vo knew the identity of the shooter and was not giving all of the information he knew; the gang evidence; and the investigation of the attack at the restaurant by petitioner and others a month before the shooting in this case), and the attempt to present the inadmissible evidence of Loc Vo's payment of protection money and that someone was trying to take control of the restaurant, were prejudicial.

The prejudicial impact of these matters in question was tremendous. It tied, or attempted to tie, petitioner into other uncharged criminal conduct including the payment of protection money, the existence of gangs, and involvement in an earlier attack at the restaurant just a month before the shooting in this case. It also created a vehicle for a

6

detective to express his opinion about the believability of a prosecution witness on the issue of petitioner's involvement in this case.

Furthermore, in closing argument to the jury, the prosecution mentioned the subject of the prior incident at the restaurant where petitioner and others were investigated for attacking a customer; also in closing argument the prosecutor mentioned Loc Vo's fear of petitioner and the payment of protection money by Loc Vo. (RT 1181-1182, 1193.)

Similar to the inadmissible evidence discussed in claim number 1 hereinabove, the inadmissible evidence and improper matters discussed in this issue, paraded before the jury a significant amount of uncharged criminal conduct on the part of petitioner that really was not relevant and was totally a gratuitous appeal to the passions and prejudices of the jury to view petitioner in the worst possible way. The net effect of this inadmissible evidence, similar to the net effect of the inadmissible evidence discussed in claim number 1 hereinabove, was to paint a picture for the jury that petitioner was an unrepented criminal. Under such circumstances, under any standard of harmless error, the admission, and the attempted admission, of the improper evidence in question was prejudicial.

## ATTACHMENT NO. 3

See Pertinent Facts in Attachment No. 1.

Due to the introduction of the significant amount of evidence of other crimes, and other bad conduct, allegedly committed by petitioner, as discussed hereinabove in claim numbers 1 and 2, petitioner requested, and the trial court granted, a cautionary instruction with regard to that evidence, which was read to the jury as part of the final instructions after the close of evidence. (RT 1097-1099.)

The cautionary instruction in question, which was adapted from some of the language contained in CALJIC No. 2.50, was read to the jury as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than that for which he is on trial. This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining, if it does tend to show, a motive for the commission of the crime charged, the attitude of the witness Loc Vo towards [sic] the defendant, and that the defendant may have been in the Hoan My Restaurant. For the limited purpose for which you may consider this evidence, you may weigh it in the same manner as you do in this case. You are not to consider this evidence for any other purpose." (RT 1145-1146.)

The actual written instruction on the point in question, which was given to the jury as part of the full and complete packet of the written instructions that were read to the jury (RT 1268), was somewhat different from the instruction as read to the jury. In the written instruction after the phrase "a motive for the commission of the crime charged" appeared the writing "e.g. control café". (CT 528.) Also, the next to last sentence in the above, quoted instruction as read to the jury, appeared in the written instruction as follows: "For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in this case." (CT 528.) The underlying words "all other evidence" apparently were inadvertently omitted in the trial court's reading of the instruction to the jury.

In any event, immediately following the above-quoted cautionary instruction, the trial court further instructed the jury that within the meaning of preceding instruction, the prosecution had the burden of proving by a preponderance of the evidence that the defendant committed a crime other than those for which he was on trial. (RT 1146; CT 529.) The trial court then went on to define "preponderance of the evidence" to mean ". . . evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your findings on that issue must be against the party who had the burden of proving it. You should consider all the evidence bearing upon every issue, regardless of who produced it." (RT 1146; CT 530.)

1

It is petitioner's contention that, under the facts and circumstances of this case, it was error for the trial court to instruct that the other, uncharged crimes need only be proved by a preponderance of the evidence. As will be developed hereinbelow, the proper standard of proof is proof beyond a reasonable doubt.

There are a number of ways evidence of other uncharged crimes or bad acts (i.e., evidence of a defendant's conduct, falling short of a crime, which constitutes either a civil wrong or some other act that is designed to degrade and prejudice the defendant) can get introduced into a trial on a current charge.

One way is where there are sufficient or significant similarities between the charged crime and the uncharged acts so that the uncharged acts are relevant circumstantial evidence on an issue such as identity or intent.

Another way in which evidence of uncharged acts can be admitted into evidence in a current case is on a theory of motive, even though the charged act and the uncharged act have no similarities, since the events surrounding the uncharged act are the motive for the commission of the charged act (i.e., it is the fact of the commission of the uncharged acts – not their similarity to the charged offense – which gives rise to the reasonable inference that the defendant had a motive to commit the charged crime). For example, this can occur when a defendant kills a police officer who has stopped the defendant, and the motive for the killing is that at the time of the stop the defendant has committed several prior dissimilar crimes and is trying to avoid apprehension by the police.

Also, as was done in this case, albeit erroneously, some times evidence of other uncharged crimes or bad acts might be used to impeach a defendant's earlier statement to the police (see claim number 1 hereinabove) or to explain the bias of a particular witness.

In situations where evidence of uncharged acts are being used for some reason other than their similarities to the charged crime, that circumstantial use of the uncharged acts is just ordinary circumstantial evidence that needs to be governed by the general rules of circumstantial evidence. One of those general rules of circumstantial evidence is that each fact which is essential to a complete set of circumstances necessary to establish a defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which the inference necessarily rests must be proved beyond a reasonable doubt. (CALJIC No. 2.01.)

In this case, the evidence of the uncharged bad acts were not being used for their similarities with the charged crime in order to prove an issue such as identity or intent. In fact, the prosecutor conceded that was not a reason for the use of the uncharged bad act evidence in this case. (RT 1097-1098.)

2

The evidence of the uncharged acts in this matter were being used for the following reasons: (1) an apparent motive for the commission of the charged crime (i.e., control of the cafes); (2) to show that petitioner had been in the restaurant and in San Jose previously, thus contradicting his statement to the detectives that he had never been to San Jose or to Santa Clara County in his life, which in turn was proof of a consciousness of guilt; and (3) an explanation of the attitude of witness Loc Vo in this case as to a bias or attitude toward the action in which he was testifying or toward the giving of testimony. All of these matters are general circumstantial evidence matters which the law requires to be proved under the traditional standard of proof beyond a reasonable doubt.

However, the trial court in this matter merely told the jury that proof of the uncharged crimes need only be proved by a preponderance of the evidence. This was clearly erroneous and seriously diluted the standard of proof to be applied to all of the applicable factual findings in this case (i.e., proof beyond a reasonable doubt).

Where, as here, the concept of proof beyond a reasonable doubt was diluted significantly – in this case down to a mere preponderance of the evidence – as to matters to which it legitimately applied and which were relied upon by the prosecutor in closing argument to the jury (i.e., prior incident at restaurant (RT 1181); Loc Vo's fear of petitioner (RT 1182); payment of protection money (RT 1182); killing someone for control of the cafes (RT 1188); and having been in San Jose and in the restaurant previously (RT 1191-1193)), there has been a denial of both petitioner's constitutional right to a jury trial under the Sixth Amendment of the United States Constitution and petitioner's constitutional right to due process of law under the Fourteenth Amendment of the United States Constitution.

3

## ATTACHMENT NO. 4

See Pertinent Facts in Attachment No. 1.

Over and above what has already been discussed hereinabove in claim numbers 1 and 2, the prosecutor in this case continually engaged in an effort to get as much inadmissible, prejudicial material before the jury as possible which the trial court permitted over defense counsel's objections. What follows is a catalog of those matters.

First, over an objection by defense counsel that the evidence was irrelevant, one of the detectives who worked on the investigation of the shooting at the Hoan My Restaurant was allowed to testify that the investigation was a "difficult case" since witnesses had fled from the scene of the shooting. (RT 442-443.) An officer's opinion that a particular case was difficult, is on the same level as an individual's opinion that someone was involved in a crime, because it expresses the belief or impressions that one has about a case. Since the latter is inadmissible (see People v. Page (1991) 2 Cal.App.4th 161, 189; People v. Brown (1981) 116 Cal.App.3d 820, 828-829, the former is too.

Second, over defense counsel's objections of no foundation and vagueness, the same detective just mentioned hereinabove was allowed to testify that one of the waitresses at the Hoan My Restaurant initially said she only had been a customer, and that this was an example of the level of dishonesty he (the detective) encountered in the investigation of this matter. The prosecutor claimed that this testimony was needed to explain the officer's conduct. (RT 446-447.) As to the latter claim by the prosecutor, information attempting to explain the propriety of an officer's conduct is not admissible at a trial on the issue of guilt or innocense. Furthermore, with regard to the testimony of the "level of dishonesty" involved in this matter, opinion testimony about the veracity, lack of veracity, of particular information provided by another person is inadmissible.

Third, over an objection by defense counsel that the evidence was irrelevant, another detective involved in this matter was allowed to testify that he (the detective) had obtained a warrant for petitioner's arrest from Judge Ball on November 24, 1998. (RT 983-985.) Pursuant to the principle that an individual's opinion, belief or impression that someone is involved in a crime is inadmissible, the fact that Judge Ball issued an arrest warrant for petitioner's arrest, and thus implicitly had the opinion, belief or impression that petitioner was involved in the charged crime, was clearly inadmissible.

Fourth, when the prosecutor was examining Tina Ha, the prosecutor asked her if during the whole time she (Tina Ha) knew petitioner whether she ever was aware of petitioner having a job. (RT 805-806.) Defense counsel objected to this questioning on the grounds of a lack of foundation, a lack of personal knowledge and being irrelevant. All these objections were overruled by the trial court. (RT 806.) Tina Ha then answered the question in the negative; in a follow-up question asked by the prosecutor as to whether petitioner

1

always seemed to have money for whatever he wanted, Tina Ha said, "[h]e had some money but not a lot of money." (RT 806.) Also, over similar objections raised by defense counsel, Linda Tran was allowed to testify that she never knew petitioner to have a job. (RT 881.) Evidence of lack of a job is on par with evidence of poverty. Evidence of poverty, without more, is inadmissible particularly to establish motive because it is unfair to make poverty alone a ground of suspicion, and the probative value of the evidence is deemed to be outweighed by the risk of prejudice.

　　　　While each of the individual items of inadmissible evidence just discussed hereinabove may not by itself be enough to constitute prejudicial error, in totality the evidentiary errors in question, including the evidentiary errors discussed in claim numbers 1 and 2 hereinabove, constitute a violation of petitioner's right to federal due process of law as articulated in the case of McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385.

2

## ATTACHMENT NO. 5

See Pertinent Facts in Attachment No. 1.

During the in limine motions in this case conducted before the commencement of the presentation of evidence, there was a ruling that no mention would be made of a San Francisco homicide in which petitioner was a suspect. (RT 73.)

Later, at one point during the prosecutor's direct examination of Tina Ha, the prosecutor was asking Tina Ha about a segment of one of the series of telephone conversations she had with petitioner shortly after petitioner's arrest where petitioner and Tina Ha were talking about whether or not petitioner had outstanding warrants. After establishing the existence of the fact that such a subject had come up in a portion of a conversation between petitioner and Tina Ha, the prosecutor then specifically asked Tina Ha, "Had Mr. Dang committed other crimes that he had not been arrested for, as far as you know? Is that what you were referring to?" (RT 672.) Defense counsel's objection to that question on the grounds of a lack of foundation was overruled. (RT 673.) Tina Ha then gave a peculiar but innocuous response which went as follows: "I was just trying to ask what that means because I wasn't sure, and I thought it was a good sign." (RT 673.)

Then later, when defense counsel was cross-examining Tina Ha on how she first told the authorities that she did not see who did the shooting, defense counsel was attempting to establish that the authorities had used some coercive tactics to get Tina Ha to say that she did in fact see petitioner do the shooting. (RT 711-712, 759-761.) At one point, apparently to try to establish how coercive the authorities had been to Tina Ha, defense counsel asked Tina Ha if she had indicated to the authorities during her interview that she would kill herself. (RT 761.) Tina Ha responded, ". . . I can explain that. The reason I said that word . . . was because the police asked me if I know anything else about Tai doing any other murder." (RT 762.)

As a result of a discussion that occurred at sidebar between the court and both counsel (RT 763-766), defense counsel's motion to strike the answer as nonresponsive was granted, and the trial court admonished the jury to disregard the witness' answer, not to speculate on its meaning and to treat it as though it had never been said. (RT 767.)

It is petitioner's position that the witness' volunteered answer in question, in light of the prosecutor's earlier question concerning the commission of other crimes that petitioner had committed for which he had not been arrested, was so prejudicial that the cautionary instruction given by the trial court was ineffective. In this case the nonresponsive answer brought out a highly prejudicial and inadmissible fact of petitioner's purported involvement in another murder. In fact, the subject matter was so sensitive to the overall fairness of petitioner's case, that the subject of the suspected homicide in San Francisco had been considered in the in limine motions and ruled to be inadmissible. (RT 73.) It cannot be

1

doubted that the subject of another murder in which petitioner was involved is so prejudicial that any type of admonition to the jury, including the one given by the trial court in this matter, could not remove the harmful effect of the impermissible fact of the other murder being drawn to the jury's attention.    Thus, the nonresponsive answer in question bringing up the subject of the other murder violates petitioner's federal constitutional right to due process of law.    (See McKinney v. Rees, supra, 993 F.2d 1378, 1380-1385.)

## ATTACHMENT NO. 6

See Pertinent Facts in Attachment No. 1.

In this matter there are four excellent examples of ineffective assistance of trial counsel as demonstrated by the record on appeal. They are as follows:

First, trial counsel failed to raise a timely objection as to the inadmissibility of some testimony by Tina Ha that she believed that petitioner was making money by illegal activities. In this regard, at the trial in this matter, on defense counsel's cross-examination of Tina Ha, it was established that when petitioner was arrested petitioner owned three gold bars which were worth about $300.00 a piece, and after petitioner's arrest those gold bars came into the possession of Tina Ha. (RT 718-720.) On redirect examination of Tina Ha, the prosecutor at one point asked Tina Ha if she believed that petitioner got the gold bars through illegal activity. (RT 807.) When defense counsel objected to that question on the grounds of speculation, the prosecutor momentarily dropped that line of questioning and proceeded to establish that just a couple of months before the commencement of the jury trial in this case Tina Ha gave the gold bars in question to petitioner's mother who sold them for about $900.00. (RT 807-808.)

Then, the prosecutor proceeded to ask Tina Ha the question, ". . . Do you suspect or do you believe he [petitioner] got those gold bars through illegal activity?" (RT 808.) At that point defense counsel imposed no objection, and Tina Ha responded by saying, "I believe so." (RT 808.) The prosecutor then followed up with the question, ". . . Do you believe that during the time that you were dating Tai Dang, from November 21st until . . . April 22nd, do you believe that Tai Dang was involved in illegal activities to support himself?" (RT 808.) At that point defense counsel interposed objections of "vague, also 352." (RT 808.)

A discussion at sidebar then ensued between the court and both counsel where defense counsel's objections were discussed and where defense counsel moved to strike the answer to the preceding question where Tina Ha said that she believed that petitioner got the gold bars through illegal activity. The trial court sustained defense counsel's "352 " objection to the current question which was asking Tina Ha if she believed that while she was dating petitioner that petitioner was involved in illegal activities to support himself. However, the trial court denied the motion to strike the answer to the preceding question since there had been no specific objection made to that question when it actually was asked. (RT 809-813.)

Clearly, if defense counsel had raised timely and proper objections concerning the question propounded to Tina Ha as to whether she believed petitioner got the gold bars through illegal activity, that question would never have been allowed to have been answered on the grounds that it called for speculation, called for the production of prejudicial evidence

of other bad acts, and called for evidence the probative value of which was substantially outweighed by its prejudicial effect.

Second, without proper preparation, defense counsel went into an area of inquiry on cross-examination of Tina Ha on the subject that a detective who interviewed her accused her of being a prostitute all of which caused Tina Ha to have a disastrous emotional breakdown in front of the jury. Specifically, as part of defense counsel's attempt to establish that the detective interviewing Tina Ha used coercive tactics to have her change her early statements in the interview that she did not know who did the shooting to a statement that identified petitioner as the shooter, defense counsel asked Tina Ha whether the detective who interviewed her accused her of being a prostitute. (RT 769.) At that point, the prosecutor asked to approach the bench with defense counsel. (RT 769.)

During the ensuing sidebar discussion that occurred between the trial court and both counsel, defense counsel explained his purpose for going into the accusation of Tina Ha being a prostitute as a means of showing that the detective interviewing Tina Ha was being heavy handed with her. (RT 773, 782.) In substance, the prosecutor explained that if defense counsel proceeded with this line of questioning, the prosecution was prepared to show that petitioner really was a pimp and thus the detective interviewing Tina Ha was merely asking a legitimate investigative question and was not trying to be intimidating or coercive by asking the question to Tina Ha if she were a prostitute. (RT 769-772.)

The prosecutor represented to the court that the prosecution had actual women who could testify that petitioner was a pimp. The prosecutor explained that the prosecution had substantial evidence from Sacramento that the way petitioner was getting his money while in Sacramento was the fact that he was acting as a pimp. The prosecutor further explained that there were two prostitutes from Sacramento who were interviewed and who come to court to testify to the fact that petitioner was a pimp. (RT 772, 775-776.) The prosecutor emphasized that the prosecution could prove that petitioner was in fact a pimp. (RT 783.)

Defense counsel then said, "I'd ask for the discovery immediately," "I'd need the telephone numbers," and "[a]ll I need is the rest of discovery." (RT 783.) The prosecutor replied, ". . . counsel probably doesn't realize it, but he has the tapes of these witnesses. He has their tapes and their statements. They're the women who were interviewed that put money on your client's books. You have their statements." (RT 784.) Defense counsel then responded by saying, "I haven't listened to them." (RT 784.)

Shortly thereafter, defense counsel indicated that he was withdrawing his line of questioning in reference to the subject of Tina Ha being asked whether she was a prostitute by the detective who was interviewing her. (RT 785.) In the meantime, as the prosecutor noted on the record, Tina Ha, who was sitting on the witness stand as the sidebar discussion in question was occurring, was "sobbing on the witness stand" (RT 781) and was "in tears

now on the witness stand, and she has been for some minutes." (RT 786.)

Clearly, if defense counsel had prepared for this case properly by listening to all of the tape recorded statements, including the taped interviews of the two prostitutes from Sacramento, defense counsel would have had a basis for knowing why the detective asked Tina Ha about being a prostitute and would have not gone into that subject matter on his cross-examination of Tina Ha in front of the jury. The record is clear on this point since once defense counsel was advised of the full ramifications of the prosecution's evidence as to why the detective asked Tina Ha as to whether she was a prostitute, (i.e., primarily the taped interviews of the two prostitutes that defense counsel admitted he had not listened to), defense counsel withdrew the line of questioning about the detective accusing Tina Ha of being a prostitute. Due to this lack of preparation by defense counsel, Tina Ha had a significant breakdown on the witness stand in front of the jury as the result of defense counsel's ill timed and ill prepared cross-examination.

Third, defense counsel raised no objection to the testimony of the individual who was the probation officer who interviewed petitioner for a presentence probation report in December 1994, during which petitioner indicated that his address was 1302 Sippola Way, San Jose, California, and further stated that he had lived full time in Santa Clara County for the previous six years. (RT 1037-1043.) This testimony would have been totally inadmissible under the rationale of the case of People v. Pacchioli (1992) 9 Cal.App.4th 1331, 1338-1342, which held that statements made to a probation officer during an interview for a presentence probation report could not be used in the prosecution's case in chief, but would be admissible for impeachment purposes if the defendant chose to testify at trial and the defendant's trial testimony conflicted with the earlier statements. In the instant case, it is obvious that this rule would be applicable since petitioner did not testify at trial. Accordingly, with a proper objection, all of the testimony of the probation officer concerning what petitioner said during the earlier interview in connection with the preparation of the presentence probation report would have been inadmissible.

Fourth, defense counsel raised no objection to the prosecutor's statement in closing argument to the jury that in connection with the incident that happened at the Hoan My Restaurant in October 1998, "We heard that a month earlier the defendant – the defendant had been involved in a violent attack on another customer in the restaurant one month earlier. You heard that the defendant and his two buddies dragged or took some guy into the bathroom, and there in the bathroom they struck this man over the head with a beer bottle, and the man was bleeding and so forth." (RT 1181.) There was absolutely no evidence in the record to support this factual assertion. The only time the subject came up as to what occurred specifically, in detail, at the earlier incident in the restaurant in October 1998, was when the detectives were conducting their tape recorded interrogation of petitioner in Sacramento, and the detectives were making factual assertions about that earlier incident all of which petitioner denied. (Exhibit 53; Augmented CT 83-84.) Obviously, these assertions

3

by the detectives, which were denied by petitioner and which were never otherwise proven by competent evidence at trial, are not evidence of the alleged asserted fact. Thus, with regard to the prosecutor's statement in closing argument concerning what happened at the earlier incident at the Hoan My Restaurant, there is no factual basis for that argument in the record. It is error for a prosecutor to argue facts not in evidence. (People v. Osband (1996) 13 Cal.4th 622, 698; People v. Benson (1990) 52 Cal.3d 754, 794-795.) Had a proper objection been timely made with regard to the prosecutor's argument in question, it would have clearly been sustained.

In summary, first defense counsel failed to object in a timely fashion to clearly inadmissible testimony that Tina Ha believed that petitioner got the gold bars through illegal activities. By the time defense counsel realized the impropriety of this evidence, which was one question too late, the damage had been done.

Second, by defense counsel's own admission he failed to listen to taped statements of two witnesses; as a result of this failure, defense counsel went into an area of cross-examination with a critical prosecution witness that resulted that the witness emotionally breaking down on the stand as a result of the ill founded cross-examination which never would have occurred had defense counsel listened to the taped statements in question. This is clear from the fact that when defense counsel learned of the content of the taped statements in question, defense counsel withdrew the line of questioning that had resulted in the critical prosecution witness emotionally breaking down on the witness stand.

Third, defense counsel failed to raise a critical and important objection to the testimony of the probation officer, which if timely raised would have precluded all of the testimony of the probation officer which obviously reflected upon prior criminal conduct by petitioner.

Fourth, defense counsel failed to raise a timely objection to improper argument by the prosecutor wherein the prosecutor was able, without a competent evidentiary basis in the record, to paint a graphic picture of an attack that was perpetrated at the Hoan My Restaurant purportedly by petitioner, and others, just a month before the shooting in this case.

Although there was other evidence pointing to petitioner's guilt in this matter, all four of the deficiencies in question clearly point to a situation where counsel's deficient performance rendered the results of petitioner's trial unreliable or otherwise caused the proceedings to be fundamentally unfair.

4

## ATTACHMENT NO. 7

Claim No. One:     McKinney v. Rees, 993 F.2d 1378, 1380-1385 (9th Cir. 1993)

Claim No. Two:     McKinney v. Rees, 993 F.2d 1378, 1380-1385 (9th Cir. 1993)

Claim No. Three:   Sullivan v. Louisiana, 508 U.S. 275, 277-282 (1993)
                   Cage v. Louisiana, 498 U.S. 39, 40 (1990)
                   Jackson v. Virginia, 443 U.S. 307, 315 (1979)
                   In re Winship, 397 U.S. 358, 364  (1970)

Claim No. Four:    McKinney v. Rees, 993 F.2d 1378, 1380-1385 (9th Cir. 1993)

Claim No. Five:    McKinney v. Rees, 993 F.2d 1378, 1380-1385 (9th Cir. 1993)

Claim No. Six:     Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)
                   Strickland v. Washington, 466 U.S. 668, 687-688, 691-692, 694 (1984)

1

# EXHIBIT COVER PAGE:

Exhibit: ___ G ___

Description of this exhibit: THE STATE BAR'S LETTER OF APRIL 18, 2007,
AND IT'S STIPULATION AND ORDER

Number of pages of this exhibit: 12  pages

JURISDICTION:  (Check only one)

_____ Municipal Court

_xx_ Superior Court

_____ Appellate Court

_____ State Supreme Court

_____ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____



THE STATE BAR
OF CALIFORNIA

OFFICE OF THE CHIEF TRIAL COUNSEL
ENFORCEMENT

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA 94105-1639

TELEPHONE: (415) 538-2000
TDD: (415) 538-2231
FAX: (415) 538-2220

DIRECT DIAL: (415) 538-2037

April 18, 2007

**PRIVILEGED AND CONFIDENTIAL**

Mr. Tai Q. Dang P-83131
California State Prison- Solano
P.O. Box 4000
Vacaville, CA 95696

Re:    Respondent:      Arthur G. Dudley
       Case Number:     06-O-10112

Dear Mr. Dang:

The State Bar of California has been actively prosecuting Arthur G. Dudley in the captioned matter in which you are the complainant.

We are writing to advise you that on February 6, 2007, the State Bar entered into a Stipulation as to Facts and Disposition with respondent in order to resolve this matter. In the Stipulation, respondent stipulated to committing acts of professional misconduct in violation of rule 3-110(A) of the Rules of Professional Conduct and section 6068(m) of the Business and Professions Code.

On February 23, 2007, the State Bar Court issued its Order Regarding Stipulation. Enclosed are copies of the Stipulation and Order for your review. The State Bar Court ordered that respondent be publicly reproved for his misconduct that he must attend State Bar Ethics School and comply with the conditions attached to the public approval, including quarterly reporting requirements, for a period of one (1) year.

Thank you for your invaluable assistance throughout this matter.

Very truly yours,

Susan L. Kagan
Deputy Trial Counsel

Enclosures

SIK

(Do not write above this line.)

# State Bar Court of California
## Hearing Department
### San Francisco

| Counsel For The State Bar<br><br>Susan I. Kagan<br>**Deputy Trial Counsel**<br>**180 Howard Street**<br>**San Francisco, CA 94105**<br>**(415) 538-2037**<br><br><br>Bar # **214209** | Case Number (s)<br>**06-O-10112** | (for Court's use)<br>**PUBLIC MATTER**<br><br>**FILED** /s<br><br>FEB 2 3 2007 |
|---|---|---|
| In Pro Per Respondent<br><br>**Arthur G. Dudley**<br>**605 Center Street**<br>**Santa Cruz, CA 95060**<br>**(831) 429-9966** | | STATE BAR COURT CLERK'S OFFICE<br>SAN FRANCISCO |
| Bar # **56921**<br>In the Matter Of:<br>**Arthur G. Dudley** | Submitted to: **Settlement Judge** | |
| | STIPULATION RE FACTS, CONCLUSIONS OF LAW AND<br>DISPOSITION AND ORDER APPROVING | |
| Bar # **56921** | **PUBLIC REPROVAL** | |
| A Member of the State Bar of California<br>(Respondent) | ☐ PREVIOUS STIPULATION REJECTED | |

**Note: All information required by this form and any additional information which cannot be provided in the space provided, must be set forth in an attachment to this stipulation under specific headings, e.g., "Facts," "Dismissals," "Conclusions of Law," "Supporting Authority," etc.**

## A. Parties' Acknowledgments:

(1) Respondent is a member of the State Bar of California, admitted **December 19, 1973**.

(2) The parties agree to be bound by the factual stipulations contained herein even if conclusions of law or disposition are rejected or changed by the Supreme Court.

(3) All investigations or proceedings listed by case number in the caption of this stipulation are entirely resolved by this stipulation and are deemed consolidated. Dismissed charge(s)/count(s) are listed under "Dismissals." The stipulation consists of 9 pages, not including the order.

(4) A statement of acts or omissions acknowledged by Respondent as cause or causes for discipline is included under "Facts."

(5) Conclusions of law, drawn from and specifically referring to the facts are also included under "Conclusions of Law".

(6) The parties must include supporting authority for the recommended level of discipline under the heading "Supporting Authority."

(Do not write above this line.)

(7)   No more than 30 days prior to the filing of this stipulation, Respondent has been advised in writing of any
      pending investigation/proceeding not resolved by this stipulation, except for criminal investigations.

(8)   Payment of Disciplinary Costs—Respondent acknowledges the provisions of Bus. & Prof. Code §§6086.10 &
      6140.7. (Check one option only):

      ☒   costs added to membership fee for calendar year following effective date of discipline (public reproval)
      ☐   case ineligible for costs (private reproval)
      ☐   costs to be paid in equal amounts for the following membership years:
          (hardship, special circumstances or other good cause per rule 284, Rules of Procedure)
      ☐   costs waived in part as set forth in a separate attachment entitled "Partial Waiver of Costs"
      ☐   costs entirely waived

(9)   The parties understand that:

      (a)   ☐   A private reproval imposed on a respondent as a result of a stipulation approved by the Court prior to
                initiation of a State Bar Court proceeding is part of the respondent's officials State Bar membership
                records, but is not disclosed in response to public inquiries and is not reported on the State Bar's web
                page.  The record of the proceeding in which such a private reproval was imposed is not available to
                the public except as part of the record of any subsequent proceeding in which it is introduced as
                evidents of a prior record of discipline under the Rules of Procedure of the State Bar.

      (b)   ☐   A private reproval imposed on a respondent after initiation of a State Bar Court proceeding is part of
                the respondent's official State Bar membership records, is disclosed in response to public inquiries
                and is reported as a record of public discipline on the State Bar's web page.

      (c)   ☒   A public reproval imposed on a respondent is publicly available as part of the respondent's official
                State Bar membership records, is disclosed in response to public inquiries and is reported as a record
                of public discipline on the State Bar's web page.

## B. Aggravating Circumstances [for definition, see Standards for Attorney Sanctions for Professional Misconduct, standard 1.2(b)]. Facts supporting aggravating circumstances are required.

(1)   ☐   **Prior record of discipline** [see standard 1.2(f)]

      (a)   ☐   State Bar Court case # of prior case

      (b)   ☐   Date prior discipline effective

      (c)   ☐   Rules of Professional Conduct/ State Bar Act violations:

      (d)   ☐   Degree of prior discipline

      (e)   ☐   If Respondent has two or more incidents of prior discipline, use space provided below or a separate
                attachment entitled "Prior Discipline.

(2)   ☐   **Dishonesty:**  Respondent's misconduct was surrounded by or followed by bad faith, dishonesty,
          concealment, overreaching or other violations of the State Bar Act or Rules of Professional Conduct.

(Do not write above this line.)

(3) ☐ **Trust Violation:** Trust funds or property were involved and Respondent refused or was unable to account to the client or person who was the object of the misconduct for improper conduct toward said funds or property.

(4) ☒ **Harm:** Respondent's misconduct harmed significantly a client, the public or the administration of justice.

(5) ☐ **Indifference:** Respondent demonstrated indifference toward rectification of or atonement for the consequences of his or her misconduct.

(6) ☐ **Lack of Cooperation:** Respondent displayed a lack of candor and cooperation to victims of his/her misconduct or to the State Bar during disciplinary investigation or proceedings.

(7) ☐ **Multiple/Pattern of Misconduct:** Respondent's current misconduct evidences multiple acts of wrongdoing or demonstrates a pattern of misconduct.

(8) ☐ **No aggravating circumstances** are involved.

**Additional aggravating circumstances:**

## C. Mitigating Circumstances [see standard 1.2(e)]. Facts supporting mitigating circumstances are required.

(1) ☒ **No Prior Discipline:** Respondent has no prior record of discipline over many years of practice coupled with present misconduct which is not deemed serious.

(2) ☐ **No Harm:** Respondent did not harm the client or person who was the object of the misconduct.

(3) ☒ **Candor/Cooperation:** Respondent displayed spontaneous candor and cooperation with the victims of his/her misconduct and to the State Bar during disciplinary investigation and proceedings.

(4) ☐ **Remorse:** Respondent promptly took objective steps spontaneously demonstrating remorse and recognition of the wrongdoing, which steps were designed to timely atone for any consequences of his/her misconduct.

(5) ☐ **Restitution:** Respondent paid $          on          in restitution to          without the threat or force of disciplinary, civil or criminal proceedings.

(6) ☐ **Delay:** These disciplinary proceedings were excessively delayed. The delay is not attributable to Respondent and the delay prejudiced him/her.

(7) ☐ **Good Faith:** Respondent acted in good faith.

(8) ☐ **Emotional/Physical Difficulties:** At the time of the stipulated act or acts of professional misconduct Respondent suffered extreme emotional difficulties or physical disabilities which expert testimony would establish was directly responsible for the misconduct. The difficulties or disabilities were not the product of any illegal conduct by the member, such as illegal drug or substance abuse, and Respondent no longer suffers from such difficulties or disabilities.

(9) ☐ **Severe Financial Stress:** At the time of the misconduct, Respondent suffered from severe financial stress which resulted from circumstances not reasonably foreseeable or which were beyond his/her control and which were directly responsible for the misconduct.

(Do not write above this line.)

(10) ☐ **Family Problems:** At the time of the misconduct, Respondent suffered extreme difficulties in his/her personal life which were other than emotional or physical in nature.

(11) ☐ **Good Character:** Respondent's good character is attested to by a wide range of references in the legal and general communities who are aware of the full extent of his/her misconduct.

(12) ☐ **Rehabilitation:** Considerable time has passed since the acts of professional misconduct occurred followed by convincing proof of subsequent rehabilitation.

(13) ☐ **No mitigating circumstances** are involved.

**Additional mitigating circumstances:**

## D. Discipline:

(1) ☐ **Private reproval (check applicable conditions, if any, below)**

    (a) ☐    Approved by the Court prior to initiation of the State Bar Court proceedings (no public disclosure).

    (b) ☐    Approved by the Court after initiation of the State Bar Court proceedings (public disclosure).

or

(2) ☒ **Public reproval (Check applicable conditions, if any, below)**

## E. Conditions Attached to Reproval:

(1) ☒ Respondent must comply with the conditions attached to the reproval for a period of **one (1) year**.

(2) ☒ During the condition period attached to the reproval, Respondent must comply with the provisions of the State Bar Act and Rules of Professional Conduct.

(3) ☒ Within ten (10) days of any change, Respondent must report to the Membership Records Office of the State Bar and to the Office of Probation of the State Bar of California ("Office of Probation"), all changes of information, including current office address and telephone number, or other address for State Bar purposes, as prescribed by section 6002.1 of the Business and Professions Code.

(4) ☒ Within thirty (30) days from the effective date of discipline, Respondent must contact the Office of Probation and schedule a meeting with Respondent's assigned probation deputy to discuss these terms and conditions of probation. Upon the direction of the Office of Probation, Respondent must meet with the probation deputy either in-person or by telephone. During the period of probation, Respondent must promptly meet with the probation deputy as directed and upon request.

(5) ☒ Respondent must submit written quarterly reports to the Office of Probation on each January 10, April 10, July 10, and October 10 of the condition period attached to the reproval. Under penalty of perjury, Respondent must state whether Respondent has complied with the State Bar Act, the Rules of Professional Conduct, and all conditions of the reproval during the preceding calendar quarter. Respondent must also state in each report whether there are any proceedings pending against him or her in the State Bar Court and if so, the case number and current status of that proceeding. If the first report would cover less than 30 (thirty) days, that report must be submitted on the next following quarter date, and cover the extended period.

In addition to all quarterly reports, a final report, containing the same information, is due no earlier than twenty (20) days before the last day of the condition period and no later than the last day of the condition period.

(Do not write above this line.)

(6) ☐ Respondent must be assigned a probation monitor. Respondent must promptly review the terms and conditions of probation with the probation monitor to establish a manner and schedule of compliance. During the period of probation, Respondent must furnish such reports as may be requested, in addition to the quarterly reports required to be submitted to the Office of Probation. Respondent must cooperate fully with the monitor.

(7) ☒ Subject to assertion of applicable privileges, Respondent must answer fully, promptly and truthfully any inquiries of the Office of Probation and any probation monitor assigned under these conditions which are directed to Respondent personally or in writing relating to whether Respondent is complying or has complied with the conditions attached to the reproval.

(8) ☒ Within one (1) year of the effective date of the discipline herein, Respondent must provide to the Office of Probation satisfactory proof of attendance at a session of the Ethics School, and passage of the test given at the end of that session.

   ☐ No Ethics School recommended. Reason:          .

(9) ☐ Respondent must comply with all conditions of probation imposed in the underlying criminal matter and must so declare under penalty of perjury in conjunction with any quarterly report to be filed with the Office of Probation.

(10) ☐ Respondent must provide proof of passage of the Multistate Professional Responsibility Examination ("MPRE"), administered by the National Conference of Bar Examiners, to the Office of Probation within one year of the effective date of the reproval.

   ☐ No MPRE recommended. Reason:          .

(11) ☐ The following conditions are attached hereto and incorporated:

   ☐ Substance Abuse Conditions          ☐ Law Office Management Conditions

   ☐ Medical Conditions          ☐ Financial Conditions

## F. Other Conditions Negotiated by the Parties:

(Do not write above this line.)

Attachment language (if any):

## FACTS AND CONCLUSIONS OF LAW

### Facts

1. On June 29, 2000, respondent was appointed by the Sixth District Appellate Program to represent Tai Quoc Dang in an appeal of his criminal conviction in *People v. Dang*, Santa Clara Superior Court Case number C9927769. At the time of his appointment, Dang was in prison for a murder conviction.

2. On May 11, 2001, respondent filed appellant's opening brief in the case *People v. Dang*, Court of Appeal, Sixth Appellate District, Case number H021681.

3. On September 12, 2002, the court heard oral argument and the case was submitted.

4. On September 24, 2002, the appellate court affirmed the conviction.

5. On November 1, 2002, respondent filed a petition for review with the California Supreme Court.

6. On December 11, 2002, the California Supreme Court entered an order denying Dang's petition for review. Respondent received the order denying Dang's petition for review soon after it was entered. However, it was not until February 2, 2003, that respondent sent a letter to Dang in which he provided a copy of the order and informed Dang of the process for seeking a petition of habeas corpus and the deadline for filing the petition. Dang never received respondent's letter.

7. In March 2004, having not received respondent's February 2, 2003 letter, Dang wrote to respondent to determine the status of his petition for review.

8. Respondent received Dang's March 2004 letter soon after it was sent, but did not respond to it.

9. On May 31, 2004, Dang wrote a letter to the clerk of the Sixth District Court of Appeal to determine the status of his petition for review.

10. Prior to June 16, 2004, Dang received a copy of the December 11, 2002 order from the clerk of the Sixth District Court of Appeal.

11. On June 16 and June 17, 2004, Dang wrote letters to respondent requesting that respondent inform him of his legal options.

12. Respondent received Dang's June 16 and June 17, 2004 letters soon after they were sent, but did not respond to them.

13. On August 18, 2004, Dang filed a complaint with the State Bar regarding respondent's failure to communicate and failure to perform.

14. Prior to September 21, 2004, the time in which to file a habeas corpus petition had expired.

15. On September 21, 2004, respondent offered to assist Dang with filing a late habeas corpus petition in response to a letter from a State Bar complaint analyst.

16. On September 28, 2004, based upon respondent's representation that he would prepare the paperwork for the habeas corpus petition, the State Bar closed Dang's complaint.

17. On November 7, 2004, respondent sent Dang a letter offering to prepare the paperwork for a late federal habeas corpus petition within two weeks of the date of his letter.

(Do not write above this line.)

18. Thereafter, respondent prepared and mailed a copy of the habeas corpus petition to Dang. However, Dang never received the petition.

19. On June 20, 2005, Dang wrote to respondent to inform him that Dang had not received any materials from respondent regarding the federal habeas corpus petition. He requested that respondent provide those materials to him.

20. Respondent did not respond to Dang's June 20, 2005 letter and did not provide Dang with another copy of the federal habeas corpus petition.

21. On September 14, 2005, Dang wrote to respondent to inform respondent once again that he had not received the federal habeas corpus petition and to request that respondent provide him with the documents contained in his client file.

22. Respondent received the September 14, 2005 letter soon after it was sent.

23. On October 13, 2005, respondent sent the client file to Dang. However, at that time, he did not provide another copy of the federal habeas corpus petition.

24. On August 16, 2006, Dang renewed his complaint with the State Bar because respondent had failed to communicate with Dang since the State Bar closed his previous complaint.

25. On January 17, 2006, in response to a letter from a State Bar complaint analyst, respondent wrote in a letter to the State Bar that he would initiate contact with Dang to assist him with his late federal habeas corpus petition. However, respondent took no action. However, it was not until January 17, 2007, one year later, that respondent provided Dang with another copy of the federal habeas corpus petition.

## Conclusions of Law

By failing to timely inform Dang that his petition for review was denied, which triggered the time in which Dang had to file a habeas corpus petition, failing to timely advise Dang about the deadlines regarding the federal habeas corpus petition and failing to timely assist Dang with filing a request to file a late federal habeas corpus petition, after agreeing to do so, respondent recklessly and repeatedly failed to perform with competence in violation of rule 3-110(A) of the Rules of Professional Conduct.

By failing to timely inform Dang about the California Supreme Court's denial of his petition for review, respondent failed to inform Dang of a significant matter in which respondent had agreed to provide legal services in violation of Business and Professions Code section 6068(m). By failing to respond to Dang's letters of March 2004, June 16, 2004, June 17, 2004, June 20, 2005 and September 14, 2005, respondent failed to respond to reasonable status update requests in violation of Business and Professions Code section 6068(m).

## WAIVER OF VARIANCE BETWEEN NOTICE OF DISCIPLINARY CHARGES AND STIPULATED FACTS AND CULPABILITY

The parties waive any variance between the Notice of Disciplinary Charges filed on October 26, 2006, and the facts and/or conclusions of law contained in this stipulation. Additionally, the parties waive the issuance of an amended Notice of Disciplinary Charges. The parties further waive the right to the filing of a Notice of Disciplinary Charges and to a formal hearing on any charge not included in the pending Notice of Disciplinary Charges.

## PENDING PROCEEDINGS

The disclosure date referred to on page two, paragraph A (7) was January 25, 2007.

(Do not write above this line.)

## STATE BAR ETHICS SCHOOL

Because respondent has agreed to attend State Bar Ethics School as part of this stipulation, respondent may receive Minimum Continuing Legal Education credit upon the satisfactory completion of State Bar Ethics School.

## SUPPORTING AUTHORITY

Standard 2.4(b) suggests reproval or suspension for a respondent who has wilfully failed to perform services in which he was retained. Standard 2.6(a) suggests that a violation of Business and Professions Code section 6068 shall result in disbarment or suspension depending on the gravity of the offense or harm, if any, to the victim, with due regard to the purpose of imposing discipline set forth in standard 1.3.

Based on the mitigation in this matter, particularly respondent's 33 years' of discipline-free practice, which, in totality, outweighs the aggravating circumstance, a public reproval is the appropriate level of discipline.

## FACTS SUPPORTING AGGRAVATING AND MITIGATING CIRCUMSTANCES

### AGGRAVATING CIRCUMSTANCES

Standard 1.2(b)(iv). Although respondent provided Dang with another copy of the federal habeas corpus petition, his failure to timely perform services on behalf of Dang caused Dang to miss the deadline for timely filing a federal habeas corpus petition, significantly harming Dang.

### MITIGATING CIRCUMSTANCES

Standard 1.2(e)(i). Respondent has been in practice since 1973. He has no prior record of discipline.

Standard 1.2(e)(v). Respondent displayed spontaneous candor and cooperation to the State Bar during the disciplinary proceedings.

(Do not write above this line.)

| In the Matter of<br>**Arthur G. Dudley** | Case number(s):<br>**06-O-10112** |
|---|---|

## SIGNATURE OF THE PARTIES

By their signatures below, the parties and their counsel, as applicable, signify their agreement with each of the recitations and each of the terms and conditions of this Stipulation Re Fact, Conclusions of Law and Disposition.

2/5/07
Date

(Respondent's Signature

Arthur G. Dudley
Print Name

Date

Respondent's Counsel Signature

N/A
Print Name

2/6/07
Date

Deputy Trial Counsel's Signature

Susan I. Kagan
Print Name

(Stipulation form approved by SBC Executive Committee 10/16/00.  Revised 12/16/2004; 12/13/2006.)          Signature Page

TOTAL P.11

## CERTIFICATE OF SERVICE
### [Rule 62(b), Rules Proc.; Code Civ. Proc., § 1013a(4)]

I am a Case Administrator of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of San Francisco, on February 23, 2007, I deposited a true copy of the following document(s):

### STIPULATION RE FACTS, CONCLUSIONS OF LAW AND DISPOSITION AND ORDER APPROVING

in a sealed envelope for collection and mailing on that date as follows:

[X]    by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at San Francisco, California, addressed as follows:

> **ARTHUR GUILFORD DUDLEY**
> **PAGE SALISBURY & DUDLEY**
> **605 CENTER ST**
> **SANTA CRUZ, CA   95060**

[X]    by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

> **SUSAN KAGAN, Enforcement, San Francisco**

I hereby certify that the foregoing is true and correct. Executed in San Francisco, California, on **February 23, 2007.**

Laine Silber
Case Administrator
State Bar Court

# EXHIBIT COVER PAGE:

Exhibit: __H__

Description of this exhibit: USDC Order on initial review

Number of pages of this exhibit: __5__ pages

JURISDICTION: (Check only one)

_____ Municipal Court

_____ Superior Court

_____ Appellate Court

_____ State Supreme Court

__✓__ United States District Court

_____ United States Circuit Court

_____ United States Supreme Court

_____ California Department of Corrections, 602 Exhibit.

_____ Other: _____

Exh. H

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

9   TAI Q. DANG,                                No. C 07-3268 SI (pr)

10           Petitioner,                        **ORDER ON INITIAL REVIEW**

11       v.

12   D. K. SISTO, warden,

13           Respondent.

14   _____/

15

                              **INTRODUCTION**

16       Tai Q. Dang, a prisoner incarcerated at the California State Prison - Solano, has filed a

17   pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition is now

18   before the court for review pursuant to 28 U.S.C. § 2243 and Rule 4 of the Rules Governing

19   Section 2254 Cases. The court now also considers his motion for a stay and abeyance, as well

20   as his non-payment of the filing fee.

21

22                            **BACKGROUND**

23       Dang's petition and attachments disclose the following: Dang was convicted in the Santa

24   Clara County Superior Court of murder and being a felon in possession of a firearm. In June

25   2000, he was sentenced to 52 years to life in state prison. He appealed. His petition for review

26   was denied on December 11, 2002, although he contends that he did not receive notice of that

27   denial for many months thereafter. He apparently filed a petition for writ of habeas corpus in

28   the Santa Clara County Superior Court in May 2007.

United States District Court

For the Northern District of California

1    He then filed this action. His federal petition has a proof of service dated June 19, 2007,

2  and was stamped "filed" on June 21, 2007.

3    When Dang filed his petition, he also filed a "motion to stay and hold in abeyance petition

4  for writ of habeas corpus." He did not pay the filing fee or file an in forma pauperis application,

5  even though the court sent him notice of this deficiency.

6

7                                       **DISCUSSION**

8  A.    The Petition's Apparent Timeliness Problem

9    This court may entertain a petition for writ of habeas corpus "in behalf of a person in

10  custody pursuant to the judgment of a State court only on the ground that he is in custody in

11  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A

12  district court shall "award the writ or issue an order directing the respondent to show cause why

13  the writ should not be granted, unless it appears from the application that the applicant or person

14  detained is not entitled thereto." 28 U.S.C. § 2243. Under Rule 4 of the Rules Governing

15  Habeas Corpus Cases Under Section 2254, a district court may also order the respondent to file

16  another pleading where neither summary dismissal nor service is appropriate.

17    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became

18  law on April 24, 1996, imposed for the first time a statute of limitations on petitions for a writ

19  of habeas corpus filed by state prisoners. Petitions filed by prisoners challenging non-capital

20  state convictions or sentences must be filed within one year of the latest of the date on which:

21  (1) the judgment became final after the conclusion of direct review or the time passed for

22  seeking direct review; (2) an impediment to filing an application created by unconstitutional state

23  action was removed, if such action prevented petitioner from filing; (3) the constitutional right

24  asserted was recognized by the Supreme Court, if the right was newly recognized by the

25  Supreme Court and made retroactive to cases on collateral review; or (4) the factual predicate

26  of the claim could have been discovered through the exercise of due diligence. See 28 U.S.C.

27  § 2244(d)(1). Time during which a properly filed application for state post-conviction or other

28

United States District Court

For the Northern District of California

2

1 ‖ collateral review is pending is excluded from the one-year time limit. <u>See id.</u> § 2244(d)(2).

2 ‖      It appears that the petition may be untimely under the AEDPA's one-year limitation
3 ‖ period. This apparent procedural problem should be addressed before the court reaches the
4 ‖ merits of the claims raised in the petition. If the petition is time-barred, the litigants and court
5 ‖ need not expend resources addressing the claims in the petition. Accordingly, pursuant to Rule
6 ‖ 4 of the Rules Governing Habeas Corpus Cases Under Section 2254, respondent must either (1)
7 ‖ move to dismiss the petition on the ground that it is untimely, or (2) inform the court that
8 ‖ respondent is of the opinion that such a motion to dismiss is unwarranted in this case.

9 ‖

10 ‖ B.    <u>The Motion To Stay</u>

11 ‖      Petitioner filed a motion to stay and hold the petition in abeyance pending his exhaustion
12 ‖ of state court remedies. A stay and abeyance "is only appropriate when the district court
13 ‖ determines there was good cause for the petitioner's failure to exhaust his claims first in state
14 ‖ court," the claims are not plainly meritless, and there are no intentionally dilatory litigation
15 ‖ tactics by the petitioner. <u>Rhines v. Webber</u>, 544 U.S. 269, 277-78 (2005). The motion does not
16 ‖ satisfy the requirements of <u>Rhines</u>. Most notably, the motion does not explain why state court
17 ‖ remedies were not exhausted earlier for the claims that are being presented to the state court for
18 ‖ the first time in May 2007, in light of the fact that direct review apparently concluded in 2002
19 ‖ and petitioner reportedly learned of the denial of his petition for review no later than June 2004.
20 ‖ The motion is DENIED without prejudice to petitioner submitting a motion with the proper
21 ‖ showing as required by <u>Rhines</u>. (Docket # 2.)

22 ‖      Finally, it appears that the best course of action is to determine whether the petition is
23 ‖ untimely before considering whether to stay the action so that state court remedies may be
24 ‖ exhausted for additional claims. If the petition is already untimely – as discussed in the
25 ‖ preceding section – there is no reason to stay and hold the matter in abeyance for the exhaustion
26 ‖ of state court remedies as to additional claims because they too would be untimely.

27 ‖
28 ‖

United States District Court
For the Northern District of California

3

**CONCLUSION**

Good cause appearing therefor,

1.    The clerk shall serve by certified mail a copy of this order, the petition, and all attachments thereto upon respondent and respondent's attorney, the Attorney General of the State of California.  The clerk also shall send a copy of this order to petitioner.

2.    Respondent must file and serve, no later than **January 25, 2008**, a motion to dismiss the petition or a notice that respondent is of the opinion that a motion to dismiss is unwarranted.

3.    If petitioner wishes to oppose the motion to dismiss, he must do so by filing an opposition with the court and serving a copy upon respondent no later than **February 29, 2008**.

4.    Respondent must file and serve his reply, if any, no later than **March 14, 2008**.

5.    The motion will be deemed submitted as of the date the reply brief is due.  No hearing will be held on the motion.  If respondent notifies the court that a motion to dismiss is unwarranted or the motion to dismiss is decided against respondent, the court will then determine whether to require an answer to the petition.

6.    Petitioner's motion to stay and hold in abeyance is DENIED.  (Docket # 2.)

7.    Petitioner has not filed an in forma pauperis application or paid the $5.00 filing fee.  He must pay that fee or file a completed in forma pauperis application no later than **December 21, 2007**.  Failure to pay the fee or file an in forma pauperis application by that deadline will result in the dismissal of this action without further notice.

IT IS SO ORDERED.

DATED: November /3, 2007

SUSAN ILLSTON
United States District Judge

## UNITED STATES DISTRICT COURT

### FOR THE

### NORTHERN DISTRICT OF CALIFORNIA

TAI Q. DANG,

Plaintiff,

v.

D.K. SISTO et al,

Defendant.

Case Number: CV07-03268 SI

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 15, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Tai Q. Dang P-83131
California State Prison - Solano
P.O. Box 4000
Vacaville, CA 95696

Dated: November 15, 2007

Richard W. Wieking, Clerk
By: Tracy Sutton, Deputy Clerk